# EXHIBIT C

# OIG | OFFICE *of the* INSPECTOR GENERAL

*Roy W. Wesley*
*Inspector General*

*Bryan B. Beyer*
*Chief Deputy Inspector General*

*Independent Prison Oversight*

SENTINEL CASE

OIG Nº 20–04

AUGUST 19, 2020

## The Department Made an Egregious Error in Judgment and Relied on Poor Legal Advice When It Did Not Sustain Dishonesty Allegations and Dismiss Two Officers in a Use-of-Force Case

The Office of the Inspector General (OIG) is responsible for, among other things, monitoring the California Department of Corrections and Rehabilitation's (the department) internal investigations and employee disciplinary process. Pursuant to California Penal Code section 6133, the OIG reports semiannually on its monitoring of these cases. However, in some cases, where there are compelling reasons, the OIG may issue a separate public report regarding a case; we call these *Sentinel Cases*. The OIG may issue a Sentinel Case when it has determined that the department's handling of a case was unusually poor and involved serious errors, even after the department had a chance to repair the damage. This Sentinel Case, No. 20–04, involves an incident captured on video in which two officers used unreasonable force on an incarcerated and mentally ill person; afterward, department attorneys and executives made multiple unreasonable and contradictory decisions, not supported by the evidence, that ultimately resulted in the officers not receiving an appropriate penalty for their misconduct and in the incarcerated person receiving an unjust rules violation report. *We requested permission from the department to publish the video of the incident along with this Sentinel Case*. Without explanation, however, the department declined our request, preventing the public from seeing the disturbing video images of this particular use of force and, thereby, reducing the transparency of the department's actions.

Furthermore, as part of our normal, prerelease process of our public reports, we provided the department with a confidential draft as an advance copy of this Sentinel Case. We did this, in part, to afford the department an opportunity to not only read the draft, but also to allow the department the chance to provide us with comments and feedback. In this case, the department provided us with a response to our confidential draft asserting attorney-client privilege to several statements we made in the confidential draft report. It also requested that we not include its response in the public report because the response contained attorney-client privileged information that it wished to remain confidential. These assertions are within the department's right under the law. Although the legal issues surrounding the attorney-client privilege are somewhat blurred due to our legal authority to provide oversight, we are honoring the department's assertions as they relate to this case. As a result, however, our public report leaves out much of the context behind several of the key decisions made throughout the case.



On the morning of November 21, 2018, an incarcerated person, who had been receiving mental health services from the department, was occupying an individual exercise yard at a prison in northern California. As a officer walked past the person, the person spat on the officer's face, arm, and shoulder. A couple of hours later, a sergeant instructed two other officers (referred to in this report as *the first officer* and *the second officer*) to escort the incarcerated person from the yard and return him to his cell. A third officer ordered the person to put on a jumpsuit and a spit mask, the first officer put handcuffs on the person, and the third officer opened the individual exercise yard door. The first officer escorted the person by holding the person's left arm with his right hand. The second officer followed behind. From this point in the incident, the written descriptions provided by the officers diverged considerably from a video recording of the incident. The officers described the person in handcuffs as making a dramatic movement in an attempt to batter the first officer and escape, while the video showed the person walking straight forward when the officers took him to the ground.

10111 Old Placerville Road, Suite 110, Sacramento, California 95827 ❖ Telephone: (916) 255-1102 ❖ www.oig.ca.gov

Case 2:19-cr-00107-KJM   Document 702-3   Filed 01/22/21   Page 3 of 7

*Roy W. Wesley*
Inspector General

*Bryan B. Beyer*
Chief Deputy
Inspector General

*Independent
Prison Oversight*

OFFICE *of the*
INSPECTOR GENERAL

OIG N° 20–04

SENTINEL CASE

AUGUST 19, 2020

## An Overview of the Incident: Accounts Derived From Three Sources

### The First Officer's Version of Events

In his report, the first officer alleged that as the incarcerated person he was escorting and the officers exited the gate of the exercise yard area, the incarcerated person, who was in handcuffs, pulled away from him, so the officer put his arms around the person's body and used his body weight to force the person to the ground. The first officer alleged that when he and the incarcerated person landed on the ground, the officer's right hand was pinned underneath the person's body. The first officer alleged that he gave the incarcerated person an order to stop resisting and then punched the person's right temple. The first officer alleged that the person then bit a finger on the first officer's right hand, so the officer punched the person in the head with his left fist 10 to 12 times, assessing whether further force was needed before each subsequent strike, but the pain in his right hand forced him to continue striking the person. According to the first officer, the person eventually stopped resisting.

### The Second Officer's Version of Events

The second officer alleged in his written report that once the first officer and the incarcerated person reached the threshold of the exercise yard area gate, the person resisted and attempted, according to the officer, "to push and pull" his body away from the first officer. The second officer alleged that he quickly rushed through the gate threshold in an attempt to gain a position on the person's right side. However, before the second officer could do so, the person in custody rapidly turned toward the first officer and struck the first officer's body. The second officer was able to gain control of the person and, using his own body weight, forced him to the ground. The second officer alleged that, once on the ground, the person—who was still in handcuffs—resisted and thrashed his body from side to side while attempting to kick and "headbutt" both officers.

### The Video Recording

The video recording of the incident offered a different version of the events. The recording showed that the third officer opened the gate so the restrained incarcerated person and the two officers escorting him could exit the exercise yard area. As the first officer, the second officer, and the handcuffed incarcerated person approached the open gate, the first officer appeared to nod to the second officer, and the second officer immediately rushed forward from behind to put his hands on the handcuffed person's back. The person himself made no perceptible movements other than continuing to walk forward before the second officer moved toward him. As the three men passed through the gate, the officers pushed the person behind a tarp and took him to the ground. Although the tarp partially obstructed the camera's view, it is clear from the recording that once they were on the ground, the first officer struck the incarcerated person with his left fist at least 13 times in rapid succession. The first officer stopped striking the person, but approximately 16 seconds later, he appeared to strike a final blow with an elbow or forearm. The third officer then closed the gate, cutting off any further view of the area.

### The Department Found the Incarcerated Person Guilty of a Serious Rules Violation, but Also Conducted an Internal Investigation

Following the incident, and based on a report containing the first officer's version of events, a senior hearing officer at the prison (a lieutenant) found the incarcerated person guilty of battery on a peace officer due to his conduct during this use-of-force incident.[1] However, after reviewing the video and the officers' reports, the warden requested that the Office of Internal Affairs conduct an investigation. The Office of Internal Affairs subsequently investigated allegations that the first officer and the second officer had used unreasonable force on this person and that the third officer failed to report the unreasonable force he had witnessed.

In his report, the first officer alleged that he struck the incarcerated person with his fist and that "between each strike I assessed, however the pain in my right hand forced me to continue to utilize immediate force." During the Office of Internal Affairs' interview with the first

---

1. Based on the guilty finding, the incarcerated person received a term in the security housing unit, and lost phone and day room privileges. This guilty finding was separate and apart from the rules violation report he received for spitting on another officer earlier in the day.

Case 2:19-cr-00107-KJM   Document 702-3   Filed 01/22/21   Page 4 of 7

OIG | OFFICE of the INSPECTOR GENERAL

Roy W. Wesley
*Inspector General*

Bryan B. Beyer
*Chief Deputy Inspector General*

*Independent Prison Oversight*

OIG № 20–04                                       SENTINEL CASE                                       AUGUST 19, 2020



*Medical report prepared by the department's clinical staff diagramming the extent of the first officer's injuries.*

officer, the special agent pointed out that the occupational report of injury did not document any injury to his right hand, and that although someone took close-up photographs immediately after the incident of all injuries the officer sustained, there were no photographs taken specifically of the officer's right hand. Nonetheless, a close examination of the available photographs, zooming in on the officer's right hand wherever possible, revealed no noticeable injury to his hand or fingers; moreover, another departmental medical report of injury from this incident also made no mention of any noticeable injury to his right hand or fingers.

The officer did not provide a reasonable explanation about the lack of physical evidence that concerned having been bitten. Furthermore, the officer himself provided medical documentation that contradicted his claim of having been bitten.

The first officer also made a statement during his interview that was contradicted by a supervisor, a sergeant: the first officer denied being present when his statement was typed. That sergeant who had no perceivable reason to lie told the Office of Internal Affairs' special agent that he sat with the first officer as he typed the officer's report for him. The sergeant further stated that while typing up the officer's account, he had recited the officer's statements back to him. Yet the first officer denied being with the sergeant when the sergeant typed his report, asserting that he only provided the sergeant with a quick synopsis of the incident.

The second officer gave the Office of Internal Affairs the same version of events during his interview that he wrote in his report. However, when the Office of Internal Affairs' special agent showed the video to the second officer and asked him to identify the incarcerated person's movement that had caused the officer to rush forward, the second officer said he could not see it on the video. The Office of Internal Affairs' special agent then asked the second officer why he rushed forward; the second officer changed his story and said he "was just trying to get through the door." The second officer told the special agent that the video from that angle did not show the movement by the person under escort. This assertion contradicted the second officer's earlier statements that the person had become resistant before he rushed up and as they reached the threshold of the gate, which would have been captured on video. When the Office of Internal Affairs' special agent asked the second officer why he had to move forward quickly when he did, the second officer said that he could not recall.

### The Department Attorneys Provided Legal Advice Not Supportable by the Facts or the Law, and the Department Ultimately Made an Untenable Disciplinary Decision

After reviewing the Office of Internal Affairs' investigative report and all supporting materials, including the video, the warden decided to sustain the allegations that the first officer and the second officer used unreasonable force.[2]

---

2. The department did not sustain the sole allegation against the third officer. The OIG agreed with this finding.

Case 2:19-cr-00107-KJM   Document 702-3   Filed 01/22/21   Page 5 of 7

| | | Roy W. Wesley |
|---|---|---|
| | OIG OFFICE *of the* INSPECTOR GENERAL | *Inspector General* |
| | | Bryan B. Beyer |
| | | *Chief Deputy Inspector General* |
| | | *Independent Prison Oversight* |

OIG Nº 20–04                                   Sentinel Case                                   August 19, 2020

However, the assigned department attorney disagreed and immediately invoked executive review, a process by which a stakeholder can elevate a decision in an employee discipline case to a departmental executive.

The executive review process is authorized by departmental policy to resolve significant disagreements among stakeholders regarding investigative findings, impositions of penalty, or settlement agreements. This process is rarely used in disciplinary cases, and multiple invocations of the process in the same case are exceedingly rare. The OIG uses the executive review process sparingly and judiciously in order to maintain the integrity of the disciplinary process. For employee discipline cases we monitored and closed between January and June 2019, the OIG sought executive review in only four of 170 cases. For cases we monitored and closed between July and December 2019, we sought executive review in only one of the 158 cases.

During the executive review process, three department attorneys—an attorney, an assistant chief counsel, and a chief deputy general counsel—repeatedly made arguments that were not supported by either the facts or the law. We observed these department attorneys give legal advice to the hiring authority that was legally and factually wrong, and demonstrated a profound lack of understanding of a basic legal precept. They were unable to grasp that their advice, while not only wrong, would lead to absurd legal outcomes. Moreover, the department attorneys' advice to the hiring authority regarding the video evidence was exceedingly poor and lacked even a modicum of common sense.

We are unable to describe the events in further detail since this was advice given to their client, and the department has asserted the attorney-client privilege.

However, we are able to describe what the evidence established. The first officer acknowledged he was aware before going to escort the incarcerated person that earlier, that person had spat on another officer. The first officer nodded in the direction of the second officer during the escort. The second officer immediately rushed forward from behind to put both hands on the incarcerated person and started pushing him through the gate. The incarcerated person made no movements before the second officer rushed forward. The officers took the incarcerated person to the ground in a large area beyond the gate behind a tarp, which partially obstructed the view of the camera.

We see on the video the first officer on the ground punching the restrained incarcerated person. The first officer claimed that the incarcerated person bit his right hand hard enough to cause pain and that he could not get his hand free despite the fact the incarcerated person was wearing a spit mask and the officer was wearing a glove. The first officer claimed that he continued to strike the incarcerated person 10 to 12 times until he was able to remove his hand. However, despite the pain that was allegedly caused, the first officer had no noticeable injuries to his right hand. The first officer said he stopped striking the incarcerated person after he had freed his hand, yet there was a 16-second gap between the penultimate and final punches thrown by the officer. The second officer changed his story after the Office of Internal Affairs showed him the video that clearly showed the incarcerated person did not make the movement the second officer had previously described prior to him rushing up and then could not offer an explanation as to why he needed to move forward so quickly when he did. A preponderance of evidence established that the first officer and the second officer used unreasonable force and lied in their reports and during their interviews with the Office of Internal Affairs.

Five departmental executives ultimately reviewed the case, four of whom decided allegations should be sustained against the officers, while one did not. The warden and the associate director sustained allegations against the officers, and the department attorneys invoked executive review on both of them. The deputy director concluded that she did not see any misconduct, despite reviewing the video numerous times and despite the substantial amount of evidence described above. The OIG ultimately disagreed with this executive and elevated the matter to a director, who found that the officers used unnecessary force and lied about the incident; the director determined dismissal was the appropriate penalty. In response, the department attorneys elevated

**OIG** | OFFICE *of the* INSPECTOR GENERAL

*Roy W. Wesley*
Inspector General
*Bryan B. Beyer*
Chief Deputy Inspector General
*Independent Prison Oversight*

OIG № 20–04 | SENTINEL CASE | AUGUST 19, 2020

the matter again, bringing the case to the undersecretary.

The undersecretary ultimately decided that the officers used unreasonable force when they took the incarcerated person to the ground, but he did not sustain the allegations of dishonesty, and imposed against each officer a 60-working-day suspension. The OIG did not concur because the undersecretary did not sustain the allegations that the officers lied in their reports and in their Office of Internal Affairs' interviews, despite there being a preponderance of evidence to support the allegations based on the video evidence, physical evidence, lack of injuries to the first officer's right hand, and evolving stories provided by the second officer. The officers were not truthful or mistaken, but they were dishonest in their reports and interviews, and should have been dismissed.

The incarcerated person is left with an unjust guilty finding resulting from the first officer falsely accusing him of battery during this use-of-force incident. Meanwhile, these two officers continue to work as peace officers. The suspensions took effect on March 31, 2020. On April 8, 2020, the undersecretary decided to modify the suspensions to salary reductions. The OIG did not concur with converting the discipline into salary reductions, but did not elevate the matter.

Furthermore, the department failed to inform the OIG of a critical fact at the time of the modification: the OIG discovered on May 6, 2020, that the warden had redirected the first officer to work in a nonpeace-officer position in the mail room on March 23, 2020, and had referred new allegations involving dishonesty against the first officer to the Office of Internal Affairs on March 30, 2020. The first officer's suspension without pay took effect on March 31, 2020, but on April 8, 2020, the department voluntarily agreed to place the first officer in the mail room and pay him to work in



**Time Line of Events Pertaining to the Case, November 2018 to July 2020**

**2018**

**November 21** — First and second officers allegedly used unnecessary force on an incarcerated person and allegedly submitted false reports

**December 5** — Associate warden discovered potential misconduct, and investigative services unit started inquiry

**2019**

**January 24** — Hiring authority requested an investigation by the Office of Internal Affairs

**October 28** — The Office of Internal Affairs completed the investigation and referred it to hiring authority

**November 19** — Department attorney invoked executive review of warden's decision to sustain allegations of unreasonable use of force against first and second officers

**November 27** — Associate director reviewed case and sustained allegations of unreasonable use of force and dishonesty, and decided to dismiss first and second officers; department attorney invoked executive review a second time

**December 3** — Department notified first and second officers it intended to dismiss them

**December 18** — Deputy director reviewed case and did not sustain any allegations; the OIG invoked executive review

**2020**

**January 3** — Director reviewed case and sustained the allegations against first and second officers, and decided to impose dismissal; EAPT invoked executive review a third time

**January 21** — Undersecretary decided to sustain allegation of unreasonable use of force, but not dishonesty, and imposed 60-working-day suspensions on first and second officers

**February 7** — Undersecretary finalized his decision

**March 12** — Department served suspensions on first and second officers

**March 30/31** — Hiring authority referred new allegations against first officer to the Office of Internal Affairs; the next day, first officer's suspension without pay took effect

**April 8** — After first officer served one week of the suspension, undersecretary decided to modify the suspension to a salary reduction and returned first officer to work in mail room with reduced pay

**April 22** — The Office of Internal Affairs approved an interview of first officer regarding new allegations

**July 13** — Department entered into settlements with both officers, significantly reducing the imposed penalties

Case 2:19-cr-00107-KJM   Document 702-3   Filed 01/22/21   Page 7 of 7

| | | Roy W. Wesley |
|---|---|---|
| OIG | OFFICE *of the* INSPECTOR GENERAL | *Inspector General* |
| | | Bryan B. Beyer |
| | | *Chief Deputy Inspector General* |
| | | *Independent Prison Oversight* |

OIG Nº 20–04 · Sentinel Case · August 19, 2020

a nonpeace-officer position pending the outcome of the disciplinary process in his new case.

The department entered into settlements with both officers at a State Personnel Board settlement conference on July 13, 2020. In entering into the settlements, the department effectively ended the employees' disciplinary penalties as of the date of the settlements. In State service, formal discipline is almost always equated to a monetary penalty. Based on salary information provided by the department, as a result of the settlements, the department reduced the monetary penalty for the first officer's disciplinary action from a loss of pay of approximately $20,515 as a result of the originally imposed 60-working-day suspension to a loss of $4,650, and reduced the second officer's monetary penalty from approximately $16,882 for his originally imposed 60-working-day suspension to $3,264. Furthermore, as to the first officer, in addition to stopping the salary reductions as of the date of the settlement, the department also provided other considerations to him. The department agreed to remove the first officer's disciplinary action from his official personnel file six months from the effective date of the action, potentially preventing others who would review his official personnel file in the future (such as those who would review it for consideration of departmental promotions or other potential reviewers, such as outside law enforcement agencies) from being made aware of the specific facts and nature of the first officer's misconduct. In addition, the department also agreed to include a clause in the settlement that the first officer was not admitting fault by entering into the settlement. The OIG disagreed. Moreover, we are not only disappointed in the outcome of this case, but also concerned with the lack of transparency demonstrated by the department because it refused to allow the video of the incident and the details of the poor legal advice it received to be made public. OIG

---

### Comparison of the Department's Disciplinary Decisions as to the Two Officers and the OIG's Position

**Officer 1**

*Original Penalty*
60-working-day suspension

*Final Settlement*
A seven-day suspension, followed by a 5 percent salary reduction for one month, followed by a 10 percent salary reduction for two months, followed by a 5 percent salary reduction for one month; an agreement to remove the disciplinary actions from his official personnel file after six months; and a clause noting that the officer did not admit any fault

Penalty equivalent to **$20,515**

Penalty equivalent to **$4,650**

*OIG's Recommendation*
Dismissal

*OIG's Position Concerning the Settlement*
Did not concur

---

**Officer 2**

*Original Penalty*
60-working-day suspension

*Final Settlement*
A five-day suspension, followed by a 5 percent salary reduction for one month, followed by a 10 percent salary reduction for two months, followed by a 5 percent salary reduction for one month

Penalty equivalent to **$16,882**

Penalty equivalent to **$3,264**

*OIG's Recommendation*
Dismissal

*OIG's Position Concerning the Settlement*
Did not concur