# EXHIBIT D

DONALD SPECTER – 083925
RITA K. LOMIO – 254501
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621
Facsimile:    (510) 280-2704

MICHAEL W. BIEN – 096891
GAY C. GRUNFELD – 121944
THOMAS NOLAN – 169692
PENNY GODBOLD – 226925
MICHAEL FREEDMAN – 262850
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:    (415) 433-6830
Facsimile:    (415) 433-7104

LINDA D. KILB – 136101
DISABILITY RIGHTS EDUCATION &
DEFENSE FUND, INC.
3075 Adeline Street, Suite 201
Berkeley, California  94703
Telephone:    (510) 644-2555
Facsimile:    (510) 841-8645

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ARMSTRONG, et al., | Case No. C94 2307 CW |
| Plaintiffs, | **[REDACTED] REPLY DECLARATION OF JEFFREY A. SCHWARTZ, PH.D. IN SUPPORT OF PLAINTIFFS' MOTION TO STOP DEFENDANTS FROM ASSAULTING ABUSING AND RETALIATING AGAINST PEOPLE WITH DISABILITIES** |
| v. | |
| GAVIN NEWSOM, et al., | |
| Defendants. | |
| | Judge:  Hon. Claudia Wilken |
| | Date:    October 6, 2020 |
| | Time:    2:30 p.m. |
| | Crtrm.: Remote |

[3618106.1]

Case No. C94 2307 CW

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES – **REDACTED**

I, Jeffrey A. Schwartz, Ph.D., declare:

1.     I am Plaintiffs' retained expert.  I have personal knowledge of the matters set forth herein, and if called as a witness, I could and would competently so testify.  I make this reply declaration in Support of Plaintiffs' Motion to Stop Defendants From Assaulting, Abusing, and Retaliating Against People With Disabilities.

**INTRODUCTION**

2.     My name is Jeffrey A. Schwartz, Ph.D., and my office is at 1610 La Pradera Drive in Campbell, California.  I am the president of Law Enforcement Training and Research Associates, Inc. (LETRA), a criminal justice training and consulting organization that has had offices in the San Francisco Bay area since its incorporation in June 1972.  I have worked full time with law enforcement and correctional agencies across the United States and Canada for over 35 years, both as LETRA's president and as a private consultant.  The largest proportion of my work for the last 20 years has been working with prisons and jails and assisting them in applying national corrections standards to their operations.

3.     I previously submitted a declaration to this Court on June 3, 2020, concerning my review of CDCR investigations of staff misconduct at Richard J. Donovan (RJD) prison.  This declaration contains a similar analysis of CDCR staff misconduct investigations at California State Prison – Los Angeles County (LAC).  My experience, credentials and background have not changed since my earlier declaration and are included by reference in this declaration.  Most of the rest of the introductory paragraphs and the Method section are repeated here with changes to reflect differences in this more recent review.

4.     The largest substantive change in this declaration maybe be found in the analysis of the staff misconduct investigation cases at LAC.

5.     Nothing in this review of LAC cases contradicts the conclusions that I arrived at in my earlier declaration based on RJD investigative cases.  The failures are the same or remarkably similar.

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

6.      This review of LAC cases confirms my conclusion in my earlier declaration that the CDCR problems and failures in its systems of staff misconduct investigations and staff discipline are statewide rather than just at RJD.  Defendants' expert Matthew Cate criticized that particular conclusion, saying that I had not reviewed cases from other prisons and that my conclusion was just speculation without basis.  That was and is inaccurate.  My earlier declaration was clear that I had only reviewed RJD cases.  However, my declaration explicitly stated that I had also reviewed the Office of the Inspector General's (OIG) reports on staff misconduct investigations at Salinas Valley State Prison (SVSP) and at High Desert State Prison (HDSP) and that many of the serious problems identified in those OIG reports were remarkably similar to what I found at RJD.  Further, my declaration explained that many of the most serious failures I found in the cases I reviewed from RJD, were failures with the Office of Internal Affairs (OIA) and that OIA serves CDCR prisons statewide.  There was no basis to believe that OIA operated differently with RJD investigations than it did with investigations from any other prison.  Thus, while I was generalizing, I was doing so with a substantial amount of evidence that applied to CDCR prisons other than RJD.  I have now reviewed a body of investigative work at another CDCR prison, LAC.  I have also now reviewed Eldon Vail's declaration based on his review of a substantial number of inmate declarations, appeals, investigative files, videos, and health care records from multiple prisons including LAC, CCI, KVSP, COR, SATF, CIW, and SAC.  This current work, summarized in this declaration, strongly corroborates my earlier conclusions.

7.      I believe discovery with regard to this motion is ongoing.  I reserve the right to add to or change the opinions in this declaration if and when additional relevant information becomes available to me after the date of this declaration.

8.      In March 2020, I was retained by Don Specter of the Prison Law Office, in Berkeley, California, and Gay Grunfeld, of Rosen Bien Galvan & Grunfeld LLP of San Francisco, California to provide opinions on the California Department of Corrections and Rehabilitation's (CDCR) inquiry, investigation and disciplinary process as it relates to

1    allegations of staff misconduct and the discipline of staff for misconduct.

2        9.    Upon review, it became clear that my charge was to review and analyze three

3    separate though related systems: an inmate grievance/complaint system for staff

4    misconduct; a use of force review/investigation system; and a staff discipline system.  My

5    review was based primarily on the review of documents from RJD in San Diego County,

6    California.  I was subsequently asked by the same attorneys to extend my review and

7    analysis to a group of staff misconduct investigation cases from LAC.

8    **I.    METHOD**

9        10.    The crux of my effort in this current matter is the integrity and the

10   effectiveness of the CDCR investigations of inmate allegations of staff misconduct at

11   LAC.  I conducted a detailed review of 9 such investigations, including cases investigated

12   at the institutional level and cases handled at the Department level, by the Office of

13   Internal Affairs (OIA).  In addition, I reviewed the OIG Sentinel Case Number 20-04 and

14   reviewed the video footage of that incident, although I did not review the source

15   documents that were the basis for the OIG report.  In this report, I have included the

16   review and analysis of those cases, including five institution level cases and four cases that

17   were referred out of the prison to OIA, that best illustrate particular issues without

18   becoming redundant.

19       11.    I previously reviewed portions of the CDCR Department Operations Manual

20   (DOM) and particularly the sections on use of force, reporting requirements and employee

21   discipline.  I also at that time reviewed the declarations of Michael Freedman and of Eldon

22   Vail, both previously filed in this matter.  In addition, I had reviewed the California Office

23   of the Inspector General's (OIG) 2015 report on staff misconduct at California's High

24   Desert State Prison (HDSP) and the OIG's report in 2019 on staff misconduct inquiries at

25   the Salinas Valley State Prison (SVSP).  I had also reviewed two memoranda—a

26   December 10, 2018 memorandum from J.L. Bishop, Associate Warden at the California

27   Institution for Men, and a January 26, 2019 memo from Sgt. ████ of the Investigative

28   Services Unit (ISU) at the California Institution for Men—that summarized and discussed

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  inmate interviews that they conducted with many inmates at RJD, referred to in this

2  litigation as the "strike team."  CDCR has very recently promulgated emergency

3  regulations changing the grievance and the appeal process for inmates and parolees and

4  those new emergency rules will become effective in June 2020.  I have reviewed those new

5  regulations.  A summary of the documents I rely on in drafting this declaration is attached

6  as **Appendix A**.

7      12.    The case records I reviewed from the  LAC cases were sometimes

8  incomplete.  In the majority of cases I reviewed, medical records were not included

9  although the substance of the cases make clear that medical examination or treatment had

10 occurred.  There were other relevant records, some actually used by investigators in

11 reaching their conclusions, which were not provided.  It is my understanding that these

12 records, such as video interviews of use of force appellants, were not provided to

13 Plaintiffs' counsel at the time this report was drafted.

14     13.    In reviewing the investigations and inquiries, I again used essentially the

15 same methods that I currently use and have been using for four years in reviewing use of

16 force incidents, reviews and investigations in the Los Angeles County jails and in the San

17 Bernardino County jails.  In Los Angeles, our three-person monitoring team selects and

18 reviews 25 or more cases per quarter, looking at each case in great detail at everything

19 from reporting requirements to the quality of the review and/or investigation to the

20 appropriateness of discipline imposed if the case resulted in sanctions.  My review of use

21 of force cases for the last year and one half in San Bernardino County is very similar

22 except it is a two person monitoring team and we review 20 to 40 cases every six months.

23 For a typical case, I read all Officer reports, medical records, inmate disciplinary reports,

24 supervisory summaries, analyses of the case by watch commanders and command level

25 staff, reviews by internal affairs and/or executive review committees and watch video of

26 the incident from fixed security cameras and/or handheld camcorders, video interviews

27 with the subject of the use of force and video interviews with inmate witnesses.

28     14.    With the CDCR cases I reviewed here, the information that is produced and

reviewed by CDCR in making staff misconduct decisions was not comparable to the cases discussed directly above in Los Angeles and San Bernardino.  The information relied on by CDCR staff is incomplete and does not include the detail and depth of the information that is documented and relied on in those two counties on all use of force cases.  The most glaring example is the lack of video evidence available in CDCR cases because CDCR has no statewide video surveillance system.  An additional problem is that CDCR staff do not appear to review or rely on medical records to corroborate alleged injuries, aside from the Form 7219, which is a custody document completed by medical staff to record a visual inspection of injuries.  Nevertheless, enough information was available to determine what conclusion CDCR reached regarding the staff misconduct allegation and to form an opinion as to the process and the basis for that conclusion.

## II.     EXPLANATION OF CDCR STAFF MISCONDUCT SYSTEM

15.     My understanding of the staff misconduct complaint process used system wide in CDCR has not changed since my earlier declaration and is incorporated by reference herein.  Doc. 2947-9, pages 5-7.

## III.    OPINION: THE CDCR SYSTEM FOR INVESTIGATING MISCONDUCT AND IMPOSING DISCIPLINE IS NOT EFFECTIVE

### A.     The System is Not Holding Staff Accountable and Protecting People with Disabilities

16.     The CDCR inquiry, investigation and disciplinary process as it relates to allegations of staff misconduct by people with disabilities and the discipline of staff for misconduct, including the complaint/appeal/grievance component (the "System") does not work.

17.     As I wrote in my earlier report, our country is in the midst of a national reckoning over law enforcement misconduct and racial justice brought on by the death of George Floyd at the hands of police officers.  I was and am struck by the similarities between that awful case and what is unfolding in CDCR; multiple allegations of staff misconduct against responsible officers and an utter failure to hold staff accountable before it is too late.

**B.    The Situation at RJD is Horrifying; LAC is Not Substantially Different**

18.    RJD and LAC house large numbers of special populations, specifically including prisoners with disabilities, mentally ill inmates and developmentally disabled inmates.

19.    For obvious reasons, these are among the most vulnerable inmates in the CDCR population.

20.    There is substantial evidence that these vulnerable inmates are targeted and preyed upon by a significant number of staff at RJD and LAC.

21.    In most correctional facilities, the units housing mental health inmates, developmentally disabled inmates and inmates with physical disabilities are staffed with individuals who gravitate toward those inmates because of empathy and specialized skills. At RJD and at LAC, it appears the opposite is true.

22.    These vulnerable inmate populations have been the subject of statewide class action litigation resulting in a dozens of court orders on behalf of inmates with disabilities. Despite years of litigation, *Armstrong* and *Coleman* class members have not been, and are not, protected from staff abuse.

**C.    California is Deliberately Indifferent to the Inmates That the System is Supposed to Protect**

23.    The state of California is and has been on notice for years that the system does not work, and that inmates are getting hurt.

24.    CDCR's own "strike team" confirmed reports of very serious problems, including alleged gang behavior among officers at RJD.  While Plaintiffs' counsel has raised similar reports of custody staff brutality and abuse against people with disabilities at LAC, it does not appear that CDCR has made a concerted effort to determine the scope of the problem at LAC.

25.    I continue to believe that, if California did nothing more than to install cameras in all of their prisons, it would be a huge step towards identifying bad actors in the system, and exonerating staff who are wrongfully accused.

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

26.     At LAC, CDCR has done little to nothing in the face of widespread, consistent reports of fear of staff, brutality and even officer gang behavior.

27.     As I continue to review these painful and sometimes horrific cases, and as I analyze obvious but chronic problems, there is one almost haunting question: How can management let this continue?

28.     At RJD, specific and continuing allegations of self-appointed groups of staff enforcers acting like gangs has been met with little to no response from management.  At LAC, there was no Strike Team investigation to identify staff gangs or subcultures if they are there, but it is clear from my review of LAC cases that staff do act in concert with regard to false reporting and cover-up, and with regard to planned retaliation.

29.     The only people who want and need the system to work are the inmates that the system should protect, but they have no ability to change it.

30.     The OIG has produced critical reports that highlight many of the problems that I have observed.

31.     I have reviewed and actively worked with county jails and state departments of corrections across the United States on use of force investigations, inmate grievance systems and staff discipline, for more than 30 years.  CDCR's system is the worst that I have seen in that time.

## IV.   OPINION: CASES REVEALED SIGNIFICANT PROBLEMS AT ALL LEVELS OF THE STAFF MISCONDUCT INVESTIGATIONS AND DISCIPLINARY PROCESS

### A.     Organization of Opinions

32.     As indicated in the introduction to this declaration, my opinions and conclusions have not changed but have been reinforced by my review of cases at LAC. There is no need to repeat all of the explanation from my earlier declaration.  Thus, I have provided those conclusions from the review of RJD cases, but included the details only by reference.  Based on my analysis of LAC cases, contained in this declaration, I have reached some additional conclusions or points of emphasis and those are presented below.

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1

**B.      Myriad Problems with Investigations Conducted by Both Institution-level Staff and OIA Investigators**

2

3        33.      Staff bias against inmates is deep and ubiquitous.  *See, e.g.*, cases below

4   regarding ███████████████████████████████████████████████.

5        34.      Investigators do not discover all the available facts or reach reasonable

6   conclusions based on the evidence.  *See, e.g.*, cases below regarding ████████████

7   ██████████████████████                                              ▪

8        35.      Investigations are incomplete.  *See, e.g.*, cases below regarding ██████████

9   ████████████████████████

10       36.      Physical evidence is ignored.  *See, e.g.*, cases below regarding ██████████

11   and Mr. █████████

12       37.      Plagiarism in staff reports and other collusion is ignored.  *See, e.g.*, cases

13   below regarding Mr. █████████    and Mr. █████████

14       38.      Investigations do not attempt to reconcile discrepancies.  *See, e.g.*, cases

15   below regarding Mr. ███████████████████████████████

16       39.      Inmate testimony is discounted or ignored.  *See, e.g.*, cases below regarding

17   Mr. ████████████████████████████████████████████████

18       40.      Investigators emphasize the disciplinary histories or other negative

19   information about inmates filing complaints but never mention the disciplinary histories or

20   other negative information about the staff alleged to be involved in misconduct.  *See, e.g.*,

21   case below regarding Mr. ██████████

22       41.      Long, unnecessary investigation delays undermine the ability to sustain

23   allegations.  *See, e.g.*, case below regarding Mr. ████████

24       42.      There is no mandate that medical staff must report injuries that appear or are

25   alleged to be the result of violence from staff or use of force.

26       43.      CDCR investigations, both at the institution-level and the OIA-level, are

27   designed to exonerate staff rather than get at the truth.  The Chief Deputy Warden of LAC

28   admitted as much in an email to his investigative lieutenant:

[3618106.1]

Case No. C94 2307 CW

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

"Due to the number of inmate witnesses agreeing with inmate ███
allegations of excessive UOF, <u>I believe we need to con███ dditional
interviews to show due diligence on our part to refute ███ allegations</u>."
(emphasis added)

### C.   Myriad Problems with Discipline

44.   Imposition of staff discipline is often inappropriate or inconsistent.

45.   Based on my review of cases from LAC, I found further evidence that the Hiring Authority's disciplinary determinations were inappropriate.

46.   Staff, against whom credible allegations are made, continue to work their posts even when under active investigation.

47.   No referrals are made for criminal investigations even in clear situations of assault under color of authority.

48.   In the small number of cases resulting in staff discipline, there was video evidence that could not be ignored, or it was staff reporting the misconduct.  Discipline was not sustained based on inmate testimony.

### D.   Myriad Problems with OIA Rejection of Cases

49.   A central problem is OIA rejection of referrals for investigations from Hiring Authorities (Wardens).

50.   The conclusion, whether there is a reasonable belief that staff misconduct occurred, should be the end result of an investigation but it is instead used as the overarching criterion to determine whether or not an investigation should occur.

51.   In my review of RJD cases, I identified multiple cases that were rejected by OIA and should not have been.  In the LAC cases, OIA accepted the case involving Mr. ███ for an administrative investigation and then six weeks later the investigator recommended rejecting the case—after doing exactly zero investigation.  Why was the case accepted in the first place?  The case record was the same when OIA accepted the case as it was when they rejected the case.

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

E.     **Inmates Are Actively Discouraged from Filing Grievances/Complaints by Staff and by the System Itself**

52.     The staff misconduct complaint system has little credibility among inmates.

1.     **Fear of Retaliation for Filing Complaints**

53.     Staff retaliation for using the system is rampant.

54.     Inmates are afraid to file grievances/complaints and afraid to provide testimony during investigations.

55.     Inmates at RJD describe staff subcultures, tantamount to gangs, engaging in vigilante-like activities against inmates and enjoying impunity from management.  The staff retaliation evident in the OIG Sentinel Case Number 20-04 is another example of staff self-appointed vigilantes and receiving trivial sanctions even after the matter was escalated to the highest levels of CDCR management and legal staff.

56.     It is not just inmates who are actively discouraged from reporting staff misconduct.  That is also true for staff.  The LAC case involving Mr. ███ presented below, provides chapter and verse of the pressure put on staff who report other staff for misconduct.  It is diagnostically significant that the pressure in that case is not restricted to staff at the facility but also clearly emanates from the OIA investigators as well.

2.     **Structural Barriers that Discourage Complaints**

57.     The system is complex, illogical and substantially misleading in terminology.

58.     At RJD, I found that, if an inmate alleges unnecessary/excessive force, the investigation is for "staff inefficiency."  The inmate may be informed that the appeal (now called a grievance in Defendants' new AIMS regulations) is "partially granted" when the substance has been totally rejected.  In Mr. ███ case at LAC, below, the inmate allegation was that he was beaten twice, in two separate and unnecessary uses of force.  The OIA investigation defined the case as about escort policy, completely ignoring one use of force and giving the other short shrift.

59.     Almost every investigation, whether institution-level or OIA, includes a

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

"synopsis of incident" at or near the beginning of the investigation report, However, it is not actually a "synopsis." It is a summary or recitation of the staff version of events.

60.     According to memos that appeared in files I reviewed showing when a staff member is reassigned, and evidence of subsequent allegations of misconduct, staff members accused of serious misconduct are almost always left in their current assignment while an investigation is underway.

61.     The CCPOA contract further discourages the reporting of misconduct because it requires allegations against staff, including any supporting documents, videotape, etc., to be shown to the staff member, furthering an environment of fear of retaliation.

## V.     OPINION: CASES REVEALED ADDITIONAL SIGNIFICANT STATEWIDE INADEQUACIES IN OTHER AREAS OF CDCR'S STAFF MISCONDUCT INVESTIGATION AND DISCIPLINARY PROCESS

### A.     CDCR Has No Early Warning System in Use (EWS)

62.     EWS are data driven algorithms designed to identify high risk staff members early on so that corrective or remedial measures can be employed to reduce the likelihood of serious preventable incidents and also so that the careers of those individuals may be protected.

63.     EWS have been used by law enforcement and correctional agencies for decades

64.     It is stunning that the largest correctional agency in the United States, CDCR, has no EWS in 2020.

65.     The situation at RJD is an excellent example of the failure to employ an EWS.

66.     Based on my review, a number of officers were the subject of two or more referrals to OIA.

67.     In the case involving Officer ███████ at RJD, CDCR Headquarters staff submitted a referral for investigation after Plaintiffs' counsel detailed dozens of allegations against Officer ███████

[3618106.1]

Case No. C94 2307 CW

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

68.     CDCR does not currently track these statistics and has nothing in place to protect inmates from those staff consistently engaging in borderline conduct or high frequency preventable incidents, nor does CDCR have anything in place to protect those Officers from future termination because of such incidents.  In their Opposition to the RJD Motion, Defendants touted their newly-created Enterprise Risk Management Branch of the Office of Audits and Court Compliance, whose responsibilities would include data-collection and operating an EWS.  I have not reviewed any evidence that indicates that this system is operational.  Defendants seem to suggest in their Statewide Opposition that their new Allegation Inquiry Management System (AIMS) could be used for this purpose.  But, for reasons discussed below and in my prior report, AIMS will not include all staff misconduct cases and thus will not work as an EWS.  Plaintiffs' counsel have also represented to me that Patricia Ramos, Chief of Headquarters Operations for OIA, testified in her February 4, 2020 deposition that OIA has never used information from its case management system to provide institutions with early warnings of misconduct. Defendants also suggest that the Office of the Inspector General already collects this data. If that is true, I see no evidence that CDCR is using this information for the purpose I find necessary.

**B.     The CDCR Staff Discipline System Is Inconsistent and Irrational**

69.     CDCR uses an Employee Disciplinary Matrix to assist hiring authorities in determining what discipline may be appropriate based on the misconduct charges.

70.     For example, endangerment of an inmate is only a level three offense out of nine on the Matrix.

**C.      The Hiring Authority Retains Too Much Control in the Process.**

71.     The HA (Warden) has the final say in staff discipline.  This is inappropriate in any disciplinary system.

72.     On those infrequent instances in which discipline is imposed by a Warden, having the Warden in control of the process can result in discipline that is inconsistent.

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

**D.      CDCR's Case Records are Abysmal**

73.      The allegations in many of these cases are most serious.  Yet the records assembled for these cases are not kept as retrievable packages.

74.      The investigative files provided by Defendants were frequently missing key elements, whether medical assessments or interview recordings or other evidence.

75.      The CDCR files were completely unorganized and did not appear to contain any semblance of uniformity.

76.      It also led me to conclude that the lack of uniformly organized, kept, and maintained, files must also make it difficult for CDCR to conduct any quick and meaningful post-hoc review of misconduct cases.

77.      Put simply, the dismal state of the CDCR investigative records is a significant barrier to accountability.

## VI.      THE PROBLEMS WITH INVESTIGATIONS AND THE DISCIPLINARY SYSTEM ARE DEPARTMENT-WIDE

78.      I have now reviewed cases at LAC as well as my initial review at RJD. The huge problems at RJD, overwhelming bias against inmates, incomplete investigations, incompetent investigators, inadequate or non-existent discipline, staff preying upon physically and/or psychiatrically disabled inmates, unjustified conclusions, retaliation, pressure to not file or withdraw complaints and lack of timeliness are all evident at LAC even though I reviewed a much smaller sample of cases.

79.      The OIG reports for HDSP, SVSP, and █████ document the exact same problems evident at RJD and LAC, including serious and troubling allegations of staff abuse and the failure of the staff misconduct system to protect inmates by identifying the bad actors and holding them accountable.  The declaration of Eldon Vail similarly identifies the same problems in his review of cases from other prisons including LAC SATF, █████ KVSP, COR and CIW.  When that evidence from these other prisons is combined with the OIG reports from three separate additional prisons and the profound OIA failures, which are statewide, it is clear that the horrific problems at RJD and LAC are

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

not idiosyncratic but are characteristic of CDCR throughout the prisons it operates across California.

80.     The problems identified regarding OIA rejection of cases and bias in investigations are also endemic statewide because that process is centralized and applies to all prisons.

81.     Cameras do not exist statewide and, as evident in my review of individual cases, is a common and necessary factor in identifying misconduct and holding staff accountable.

## VII.   CDCR'S NEW ALLEGATION INQUIRY SYSTEM (AIMS) WILL NOT FIX THE PROBLEMS OUTLINED ABOVE

82.     It appears that in the face of widespread criticism and litigation, CDCR has developed AIMS as a new system for investigating allegations of staff misconduct, and approved that system through emergency regulations.

83.     It is not clear yet how AIMS will operate but it is clear that fatal flaws with AIMS already exist.

84.     The most important: frequently allegations of staff misconduct concern use of force incidents.  However, it appears AIMS excludes multiple types of alleged staff misconduct including staff use of force (except those that cause serious bodily injury or are unreported).  That makes no sense.

85.     The new inquiry, review and investigation process also appears to be restricted to grievances filed by inmates (602s).  That is also illogical.

86.     Based on my review of cases in this matter, including both OIA cases and institutional level investigations, and based on my review of the OIG reports from High Desert and Salinas Valley, I am skeptical that AIMS will constitute a significant improvement in the current situation.  There is no indication that CDCR has the investigative expertise or capacity required and there is similarly no indication that CDCR recognizes that deficit.

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

87.     It is particularly troubling that AIMS is intended to get cases involving SBI but at LAC, cases in which an inmate's SBI had obviously resulted from a staff use of force were redefined, against all evidence and logic, to suggest that the inmate had caused his own SBI.  If AIMS had been in use at the time, those cases would not have gone to AIMS and, with no external review, there would have been little chance anything would have happened with those cases.  It must be emphasized that AIMS relies on OIA and OIA is biased, incompetent and dysfunctional.

## VIII.   CDCR MUST TAKE ACTION TO END ITS DYSFUNCTIONAL STAFF CULTURE

### A.     Install Cameras

88.     In law enforcement and in corrections, dashboard cameras, body-worn cameras and fixed security cameras have been in use for many years.  They are no longer controversial.

89.     In my current work as part of a three person panel of Monitors working for and reporting to the Federal Court on the status of a consent decree on the Los Angeles Jails, we submit reports to the Court every six months.  Our most recent report, filed June 1 of this year, included the following paragraph:

> "The Panel reiterates that it cannot stress enough the importance of having cameras in all of the common areas of the County's jails.  The vast majority of the force incidents have been captured on CCTV videos that are sufficiently clear to show the nature and extent of the force used by Department members and to enable the Panel to assess the reasonableness of the force.  Further, the cameras deter assaults by inmates and excessive force by Department personnel."

90.     The majority of cases I reviewed in this matter, and perhaps over 85%, would have been definitively answered had there been security camera video footage.

91.     RJD and LAC already use camcorders.  They are relatively inexpensive, small, easy to store and easy to use.  Requiring that camcorders be brought to the scene of any staff inmate confrontation, inmate-on-inmate assault or staff use of force, as quickly as practical, would provide visual evidence of what actually occurred in many of the situations that are currently characterized by contradictory allegations by staff and inmates.

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

92.     Ultimately, officers should be required to wear and activate body cameras in situations that have the potential to escalate.

**B.     Improve Use of Force Reviews**

93.     Every use of force should result in a competent, thorough and unbiased video interview with the subject of the use of force as soon as possible and usually within two hours of the use of force.

94.     Staff use of force reports and witness reports should require detailed description of force used by other staff, to the extent known; detailed description of injuries to staff and inmates, to the extent known or observed; and identification of all potential inmate witnesses/

95.     All supervisors and managers assigned to review or investigate use of force incidents should be required to have completed a minimum of a 24-hour course on use of force investigations.

96.     Supervisors, managers and administrators should be held accountable for reviewing and approving use of force reviews or misconduct investigations that are biased, incomplete or otherwise incompetent.

97.     To ensure improvement in these areas, objective and external reviews of use of force incidents, including a review of CDCR's internal review process, should be adopted.

**C.     Implement an Early Warning System**

98.     CDCR should institute an EWS now.

**D.     Require Reporting of Documented Injuries**

99.     By policy, require medical and mental health staff to immediately report to custody management and the Receiver any case in which inmate injuries appear to be the result of violence and any case in which an inmate tells medical or mental health staff that his or her injuries resulted from staff use of force.  In my review of LAC cases I again note multiple examples of class members whose injuries were not documented by medical staff.

### E.   Remove Suspected Staff Sooner

100.   By policy, require that any staff member accused of serious misconduct be reassigned or placed on leave so that he or she is not in continuing contact with the inmate or inmates who have lodged the complaint.

101.   These are examples of important changes that could be instituted quickly and/or inexpensively.  It is not an exhaustive list.

## IX.   ADDITIONAL ISSUES BASED ON LAC CASES

102.   Instances in which a staff member reports improper force by one or more other staff numbers should be responded to with recognition for professionalism, and perhaps incentives, rather than with harassment and pressure to recant.  *See, e.g.*, case below regarding Mr. ███.

103.   All interviews in misconduct cases should be video recorded rather audio recorded or not recorded.

104.   Crisis intervention procedures, and particularly de-escalation techniques, should be trained to a high level and front line staff and supervisors should be accountable for using them effectively during staff-inmate interactions.  *See, e.g.*, cases below regarding Mr. ███████████████.

105.   CDCR policy should specify that after a use force or a non-force serious confrontation, the officer or officers involved should not escort the inmate subjects to medical, a holding cell or anywhere else unless extenuating circumstances exist, which should be documented.  *See, e.g.*, cases below regarding Mr. ███████.

106.   Intentionally falsifying reports should be regarded as an integrity issue and as a potentially terminating offense.  Collusion in report writing should also be categorized as an integrity issue.  *See, e.g.*, cases below regarding Mr. ███████.

107.   Management should assert the authority to override union bid procedures with regard to assignments supervising disabled or primarily disabled inmates, with preference and incentives given to staff volunteering for those assignments, in general.

108.   An inmate's disciplinary history should not be used in investigations of staff

1  misconduct unless officer(s)' negative history is open to be used in the same manner.  *See,*

2  *e.g.*, case below regarding ████████

3      109.   CDCR should discontinue all investigator training until a new and competent

4  comprehensive training program for investigators can be developed.  It should then be

5  required of all OIA investigators who are able to pass a screening procedure assessing bias.

6  Institution-level investigators should complete that training after OIA training has been

7  completed.

8      110.   The two OIG Sentinel cases, 20-03 and 20-04, expose most serious problems

9  at the top management levels of CDCR and at the CDCR Office of Legal Affairs.  I have

10  no answers.

11  **X.**   **CASES**

12      **A.**   ████████   **Incident on October 1, 2019, OIA Case No. S-LAC-1515-**

13

14      111.   Over the last several months, I have reviewed approximately fifty CDCR

15  cases, with each case representing an investigation of misconduct allegations against

16  CDCR prison staff.  I have analyzed more than 25 of those cases in detail.  If I were to

17  choose a single case to demonstrate what is wrong with the CDCR investigation of staff

18  misconduct allegations process, the CDCR staff discipline process and the underlying

19  operation of the CDCR prisons, it would be this case.

20      112.   The investigation in this case was conducted by OIA, so CDCR cannot claim

21  that the problem are because this was a local investigation by less well trained staff.  The

22  investigation into the allegations of ████████ was carried out by the department-level

23  specialists that CDCR has identified as the answer to prior overwhelming problems with

24  departmental investigations and discipline.  That is, CDCR has proposed AIMS

25  (Allegation Inquiry Management System) as the cure for prior failures but the major

26  change with AIMS is that a larger percentage of allegations of staff misconduct will be

27  investigated by OIA rather than at the local level.  However, as this case makes clear, OIA

28  itself is hopelessly broken.

[3618106.1]

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

113.   The case of ███████ is not unusual in that it is about staff use of force and more specifically about an allegation of unnecessary and excessive force by staff.  The case is unusual in that there are almost no undisputed facts.  The staff version of events and the inmate version of events have almost nothing in common.  Further, they are directly contradictory on most points so they cannot both be true.  The investigation should have been, first and foremost, an inquiry into which version was true and which was false.  Of course, even though the two versions are contradictory, it is possible that both are partially true and both are partially false.

114.   The staff version of events is more simple.  On October 1, 2019, Facility C at the California State Prison at Los Angeles County was on lock-down.  Correctional Officer (CO) ████ was delivering meal trays to individual cells.  As he walked past the cell of ██████████ Mr. █████ threw a cup of liquid containing feces at Officer █████ with the liquid hitting the officer in the face and shoulder.  Officer █████ had been walking behind Officer █████ and she was also hit with some of the liquid as it was thrown through the perforated metal cell door.  Officer █████ saw Mr. █████ reaching for a second cup in his cell and, fearing that he would be "gassed" a second time, he unholstered his Mark IX OC dispenser and sprayed Mr. █████ through the cell door.  He then ordered Mr. █████ to back up to the cuff port in the cell door and submit to handcuffs, which Mr. █████ did.  Then Officer █████ signaled to the control booth officer within the cell block to open the cell door and then ordered Mr. █████ to come out of the cell backwards, which he did.

115.   According to Officer █████ he then began to escort Mr. █████ off the cell block.  After they had taken a few steps, according to Officer █████ Mr. █████ turned and pulled away from him.  Officer █████ said that he reacted by taking Mr. █████ by the shoulder and upper arm and pushing him to the floor and that Mr. █████ hit the floor face first.  Sergeants █████ and █████ responded to the alarm that had been set off and Sergeant Ramsey went to the scene of the incident while Sergeant █████ went outside to turn off the building alarm.  Sergeant █████ directed █████ █████ and █████ to

1  escort Mr. ███ to a holding cell in the gymnasium.  Those two officers said that as they

2  were escorting Mr. ███ into the gym, he planted his feet to stop his forward motion and

3  began to twist his body from side to side trying to break loose from their hold while telling

4  them, "I'm not going in that fucking cage!" The two officers said that in order to overcome

5  his resistance, they took Mr. ███ to the ground face first and he then stopped his

6  resistance.  They escorted him to the holding cell in the gymnasium after which he was

7  taken to the prison's triage and treatment area.  When he was examined there it was

8  determined that he should be sent outside to a community hospital for further examination

9  and treatment.

10      116.    The inmate version of events is very different.  According to Mr. ███ the

11  day prior to the use of force, he was on the exercise yard when inmates came up to him and

12  told that him that if he stayed in that facility, he was going to be stabbed.  He said that he

13  took that threat very seriously and told Officer ███ about it.  He said that Officer ███

14  responded by saying, "I don't give a fuck."  Mr. ███ said that that evening he told a staff

15  member that he had to get off of that living unit.  Nothing was done.  The next morning, he

16  saw a female officer at breakfast and told her what had happened the day before.  She told

17  Mr. ███ that staff would get him out of that living unit.  Two hours later, nothing had

18  happened but the female officer returned to Mr. ███ cell and he told her that he was

19  suicidal.  The female officer then went to get a mental health staff member and,

20  approximately two hours later, Mr. ███ clinician came to his cell front and told

21  Mr. ███ to hold on and that Mr. ███ would be moved to a crisis bed.  That was at

22  approximately 10 AM.  When nothing had happened by 5 pm that afternoon, Mr. ███

23  was increasingly frightened and formed a plan to get moved off the unit by engaging in

24  serious misbehavior, specifically by "gassing" an officer.  As dinner trays were being

25  distributed, Mr. ███ yelled, "When are you guys going to get me out of here?" And then

26  followed that with, "I'm going to gas you, if you don't let me out."

27      117.    According to Mr. ███ Officer ███ responded by locking the food port

28  door to Mr. ███ cell and telling Mr. ███ that he was not going to get dinner.

[3618106.1]

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   Mr. ███ then yelled at Officer ███ to return and when he did, Mr. ███ threw feces

2   and liquid on him through the cell door.  Officer ███ then sprayed Mr. ███ with OC,

3   also through the cell door, and ordered him to lie on the ground and crawl out of the cell on

4   his hands and knees, which Mr. ███ did.  The officer then told him to put his hands

5   behind his back but the officer punched Mr. ███ in the face twice with a fist.  Then

6   Officer ███ put Mr. ███ in handcuffs.

7        118.   Mr. ███ said that four officers including Officer ███ took him out of

8   the housing unit and took him into the gym.  He said that once they were in the gym they

9   knocked him to the ground and began kicking him and punching him in the face and body.

10  At one point they knocked him unconscious.  After that, the officers put him in a holding

11  cell and then later took him to the triage and treatment building to be evaluated by medical

12  staff.  They noted that he had a possible fracture to the right orbital bone in his face in

13  addition to bruises, scratches and abrasions to his face and body.  He told the nursing staff

14  that he had been assaulted by correctional officers.

15       119.   The medical staff at the prison sent Mr. ███ to a community hospital

16  where he was X-rayed and found to have multiple fractions to the right side of his face, to

17  the orbital and zygomatic bones.  He needed nine sutures to close the lacerations around

18  his eye.  In addition to the broken facial bones and nine sutures, the medical report

19  specified a laceration on one side of his forehead, dried blood on the right side of his face,

20  a laceration above his right eye, a laceration below his right eye, swelling to his nose area,

21  bruising to his right shoulder, abrasions to his right bicep, upper-chest, left shoulder, right

22  mid back, abrasions to his right upper and lower back area, and abrasions to his right

23  elbow.  If the staff version of events is to be believed, Mr. ███ received all of those

24  injuries as a result of being taken to the ground face first outside of his cell and then later

25  being pushed to the ground by the two officers escorting him.

26       120.   In the aftermath of this incident, ███ filed a complaint alleging that

27  he was beaten in two locations and that he suffered substantial injuries.  A sergeant at LAC

28  conducted an interview of Mr. ███ the day after the incident.  That was required because

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  Mr. ██████ had suffered serious bodily injury.  The interview was useful, although poorly

2  done.  It took a total of six minutes and that includes the time to introduce the interviewer

3  and the camera operator and other introductory information.  The sergeant conducting the

4  interview did ask Mr. ██████ to state, in his own words, what had transpired.  Mr. ██████

5  provided a summary of what had happened and then, after asking for staff witnesses and

6  inmate witnesses, the sergeant terminated the interview.  He never asked Mr. ██████ why

7  he wanted to get off the living unit so badly.  He never asked if he had threatened or

8  assaulted any of the staff after the gassing.  The interview was superficial and incomplete,

9  particularly since it was about an incident that had resulted in very serious injuries.

10  Further, the sergeant never asked Mr. ██████ about his psychiatric history or whether he

11  was on psychiatric medication.  He failed to ask Mr. ██████ if there was any history

12  between Officer ██████ and Mr. ██████.

13       121.   As a result of the complaint by Mr. ██████ LAC referred this case to OIA on

14  October 10, 2019 and some two months later, on December 18, 2019 the Central Intake

15  Panel (CIP) approved an administrative investigation and two weeks later assigned Special

16  Agent ██████ to the case.  The allegations were that Officer ██████ used unreasonable

17  force on Mr. ██████ that Officer ██████ opened Mr. ██████ cell door when he should

18  not have, and that Sergeants ██████ and ██████ allowed Officer ██████ to escort

19  Mr. ██████ after the officer had just been gassed by Mr. ██████.

20       122.   Although the allegation against Officer ██████ was unreasonable force, the

21  OIA investigator quickly transformed the investigation into a question into whether or not

22  Officer ██████ was justified in trying to escort Mr. ██████ out of the living unit.  That

23  change in the central question in this investigation meant that the investigator had assumed

24  that the staff version of events was correct and that the inmate version of events was not

25  worth consideration.

26       123.   Officer ██████ acknowledged opening Mr. ██████ cell door when asked

27  by Officer ██████ even though there were no other officers at the cell front yet and Officer

28  ██████ had seen the gassing and the subsequent OC spray.  Officer ██████ should have

[3618106.1]

Case No. C94 2307 CW

1   turned on the building alarm when the gassing occurred.  That is what his report said he

2   did.  However, he changed his testimony months later in an OIA interview to say that he

3   had actually waited until the physical altercation between Officer ███ and Mr. ███

4   and then turned on the building alarm.  That is a crucial difference in understanding what

5   happened in this incident.  In any event, the investigator ignored both of those issues with

6   Officer ███ performance and recommended no findings or discipline with regard to

7   Officer ███ even though Officer ███ statements in interviews with OIA

8   investigators were inconsistent with the version of events reported in his incident report,

9   raising the possibility that he was intentionally dishonest in either his interview or his

10  incident report about the event.

11         124.   Sergeant ███ was alleged to have wrongly allowed Officer ███ to

12  escort Mr. ███ away from the cell but that was never a serious issue because Sergeant

13  ███ did not get to the incident scene until after any purported escort by Officer ███

14  was over (according to this staff version of things) and Mr. ███ was on the floor near the

15  cell front.  There are a number of questions which would have been relevant for Sergeant

16  ███ if the focus in the interview was whether the staff version of events was correct or

17  whether the inmate version of events was correct: what Sergeant ███ saw as he

18  approached the incident scene, whether Mr. ███ injuries were consistent with striking

19  his face on the floor, and more.  Those issues were not explored.

20         125.   It should be noted that when an inmate gasses an officer, it is a highly

21  emotional incident.  In addition to the revulsion of having someone else's feces thrown on

22  you, there are worries about contagious diseases, including AIDS.  It is also widely viewed

23  as demeaning.  It is not just the officer who is "gassed" who will react.  Other staff are

24  frequently emotional and angry.  Because of that, it is predictably necessary for a

25  supervisor or mid-manager on scene to take control as quickly as possible and prevent

26  retaliation.  Since Mr. ███ alleged severe retaliation, the investigator should have

27  inquired about Sergeant ███ decision to have two officers who were at the scene of

28  the investigation shortly after it occurred, escort Mr. ███ across the yard and into the

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

gym without any supervisory presence to forestall retaliation on their part. That subject was never raised by the investigator.

126.   Sergeant ██████ responded to the building alarm at approximately the same time that Sergeant ██████ did. However, Sergeant ██████ did not go to the incident scene but instead went directly to the door to the building, exited and once outside the building, turned off the building alarm. Sergeant ██████ said that the building alarm is loud and distracting and that since Sergeant ██████ was in route to the incident scene, he thought it would be better if he turned off the building alarm. That makes little sense. At that point Sergeant ██████ did not know the nature of the incident or whether it was under control. He did not know how many inmates were involved, whether there were injuries or whether there were weapons. He should have responded to the incident scene, not away from it. If, when he had arrived, the incident was under control, the leaving the building to turn off the alarm might have made good sense. None of that was explored by the investigator.

127.   The day after the incident, on October 2nd, Mr. ██████ had told the sergeant interviewing him on video tape that one of the three officer who was beating and kicking him in the gymnasium was Officer ██████ and that he did not know the names of the other two officers. In spite of the information, Officer ██████ was not identified at any point as a target of the inmate's allegations. Similarly, Officer ██████ was not regarded as a subject of the investigation although he and Officer ██████ reported that they were the two staff who took Mr. ██████ to the gym and put him in a holding cage in the gym.

128.   The two inmate witnesses identified by Mr. ██████ were interviewed the next day, October 3rd, and both interviews were extremely brief and of no real import.

129.   If the poor quality and incomplete interview of Mr. ██████ by an LAC Sergeant was troubling, there was no reason for the OIA investigator not to re-interview Mr. ██████ He was the complainant and he had been seriously injured in the incident. The OIA Investigator, ██████ ██████ did not do that and, rather astonishingly, he did not

1  watch or listen to the video tape interview of Mr. ███ conducted the day after the

2  incident.  Mr. ███ and Officer ███ were at the center of this incident.  It makes no

3  sense for the investigator to interview Officer ███ and consider Officer ███ written

4  report but never speak with Mr. ███ or look at the interview of Mr. ███ that was done

5  locally.

6       130.   The same situation occurred with regard to the inmate witnesses.  The

7  interviews of ███ and ███ two days after the incident produced almost no

8  information.  The investigator could have and should have chosen to re-interview them.

9  He did not.  Instead, he ignored all potential inmate witnesses.  When Mr. ███ wrote his

10 investigative report on March 20, 2020, it contained no information from other inmates

11 either corroborating or contradicting Mr. ███ version of events.  One week after

12 Mr. ███ had written his report, CDCR's legal office received a letter from the Law Firm

13 of Rosen, Bien, Galvan & Grunfeld LLP, on behalf of their client and EOP class member

14 ███ That letter contained detailed statements from three different inmates,

15 including ███, corroborating Mr. ███ version of his events with Officer ███

16 Those statements are consistent with each other and with Mr. ███ interview and they

17 are compelling.  OIA could have reopened the investigation so that the investigator, ███

18 ███ could have verified that information by interviewing ███ and the other two

19 inmates.  It should have been apparent that the inmates were willing to talk at length, and

20 with detail, if given the opportunity.

21      131.   The result of all of this, up to this point, is that Mr. ███ never considered

22 the version of events told by ███ and corroborated by three other inmates.  He did

23 not even dismiss that version of events; he simply never acknowledged that it existed.

24 Instead, Mr. ███ distilled this serious situation and allegation of multiple unjustified

25 beatings of an inmate with serious mental health issues that resulted in terrible injuries into

26 a single almost trivial question of whether Officer ███ was justified in attempting to

27 escort ███ immediately after the gassing occurred.  The answer to that question

28 was, of course, "No" but it was of little consequence.  The Warden (The Hiring Authority)

decided on a penalty for Officer ███ of a five percent salary reduction for six months. Then, at the ███ hearing, the hearing officer reduced that to a five percent reduction for three months. That reduction was based on Officer ███ agreement to forgo his rights to appeal the discipline but in July 2020, he declined that offer and there is no further information in the case file I have reviewed to indicate whether the original penalty of a five percent salary reduction for six months has been imposed or whether there is an appeal underway or perhaps some other disposition of this matter.

132.    A fundamental premise of investigation procedures is that an investigator should prepare carefully for the interview of witnesses, victims or suspects by first reviewing available reports, photos and other existing evidence. Special Agent ███ did not do that. He did not look at the videotape interview of the complainant, Mr. ███ although it was available. He chose not to interview inmate witnesses. Those two decisions meant that the only version of the events of October 1 that were available to him were from staff interviews and staff reports. The exception was that he did have photos of Mr. ███ after the incident and medical reports from CDCR medical staff and from the community hospital. That information raised the most obvious question in this entire investigation, namely, how could Mr. ███ pattern of injuries have occurred under the staff version of events? Sergeant ███ in his interview, said that he was angry about Mr. ███ allegations of excessive force and that "it's impossible" that Officer ███ beat Mr. ███ Sergeant ███ also said that if the officer had beaten Mr. ███ there would have been bruises and he would have seen it but the injuries were entirely to Mr. ███ eye. In reality, the medical staff documented swelling to Mr. ███ nose area, a laceration on his forehead, bruising to his right shoulder and abrasions to six different areas of his arms and torso, in addition to the three lacerations that needed sutures near his eye.

133.    In his complaint, Mr. ███ was explicit that he was punched in the head by Officer ███ in the cell block but then kicked and punched after his escort to the gym so severely that he lost consciousness. It is beyond comprehension that the charges that were

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

conveyed to OIA for investigation did not include any consideration of excessive force by the officers who escorted ██████ to the gym.  Then, to compound that matter, the charge of excessive force by Officer ██████ in the cell block was given short shrift and the emphasis on the investigation was on Officer ██████ decision to escort Mr. ██████ out of his cell.  One of the two officers who escorted Mr. ██████ to the gym, Officer ██████ reported that he was injured during the incident.  His injury was a swollen hand.  That is not proof of anything but it is certainly consistent with Mr. ██████ allegation that he was punched and kicked in the gym.  None of the staff involved either in the cell block or at the gymnasium report that Mr. ██████ was slammed to the ground or anything like that.  On both occasions when he was taken to the ground, he was handcuffed behind his back. Officer ██████ said in his interview that when Mr. ██████ was pushed by Officer Oliver, he fell and hit the ground with his chest and face.  How, then, does Mr. ██████ have a pattern of deep lacerations, bruises and abrasions over his head, face and half of his body?

134.   Special Agent ██████ never interviewed either Officer ██████ nor Officer ██████ That may be the single most egregious failure in this case.  In his interview, Sergeant ██████ told the investigator that after the incident he talked with Mr. ██████ in the gym and he said that he had told staff he was going to gas them.  That is consistent with the inmate version of events but inconsistent with the staff version of events. Sergeant ██████ was not asked whether he followed up to ask Mr. ██████ why he had threatened staff with gassing.  In the entire investigation, that is the only place in which anything is mentioned that might begin to explain why Mr. ██████ had gassed Officer ██████ That was an obvious question for the investigator, particularly since officers described Mr. ██████ as a quiet inmate who was not a problem.  Sergeant ██████ also told the investigator that Officer ██████ had lost control of Mr. ██████ and then Mr. ██████ fell. The investigator did not ask Sergeant ██████ about the extensive pattern of injuries that was so obviously inconsistent with Mr. ██████ having "fallen."

135.   When Officer ██████ was interviewed by the investigator, he said that he had gotten "tunnel vision," and that that was why he had not activated his building alarm

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1    immediately when he was gassed, and why he had sought to take Mr. ████ out of his cell

2    and escort him by himself.  There are other obvious inconsistencies.  Officer ████ said in

3    his interview that when Mr. ████ gassed him, he also yelled "fuck you" and some other

4    things at him.  Officer ████ in the tower, said in his interview that he saw the gassing

5    occur but did not hear Mr. ████ say anything.  More importantly, ████ ████ was

6    directly behind Officer ████ when the gassing occurred, and within a foot or two, which

7    is why she also was hit with the liquid feces mixture.  She heard Officer ████ sternly

8    order Mr. ████ to "cuff up" but said that she had not heard anything prior and that the

9    first thing she knew was when she realized that liquid had been thrown on her.

10       136.    Officer ████ was working in the control booth in Building 3 when this

11   incident occurred.  His report said that when he saw the gassing, he called a Code 1 over

12   the radio and activated the building alarm.  That was typical procedure and proper.  His

13   report says that following that, Officer ████ sprayed Mr. ████ handcuffed him through

14   the food port and then asked for the cell door to be opened.  When he was interviewed,

15   Officer ████ recanted that version of events and said that he actually had not turned on

16   the building alarm until Mr. ████ was out of his cell and resisting.  It should have raised a

17   serious question that Officer ████ waited more than four months after the incident and

18   then remembered that his detailed report written on the day of the incident was incorrect.

19   Neither the investigator nor anyone reviewing this case commented about that.  In

20   explaining why he had done the wrong thing, waiting to initiate the building alarm and

21   opening the cell door with only Officer ████ at the cell front, according to his revised

22   testimony, Officer ████ like Officer ████ said that he had had "tunnel vision."

23   While Officer ████ did not hear Mr. ████ swear at Officer ████ he did hear

24   Officer ████ tell Mr. ████ to cuff up.

25       137.    With this kind of incident, and these allegations, it would be most important

26   to investigate exactly how the multiple serious injuries to Mr. ████ had happened, even if

27   the second alleged use of force, in the gym, was ignored.  Individuals interviewed should

28   have been asked whether they saw Mr. ████ hit the floor in the cell block, and if they did,

1   how hard he seemed to hit and whether it appeared he was falling on his chest and face as

2   Officer ▆▆▆▆ testified.  Each individual present should have been asked what

3   Mr. ▆▆▆▆ wounds looked like and when they first saw that he was bleeding (because the

4   photos make it clear that he was bleeding profusely).  None of that was done.

5         138.    The problems in this case are not exclusively those of OIA.  For example,

6   Exhibit 13 of the OIA investigation report is the "Incident Commander's Review/Critique:

7   Use of Force Incidents."  That is a standard form which was completed on the day of the

8   incident.  Some of the answers are questionable or simply wrong.  Question 1 asks whether

9   force was necessary and what was its purpose.  The Incident Commander has checked

10   "subdue an attacker," which is questionable because the officer could have moved away

11   and then, if the inmate was not compliant, a controlled use of force could have been used.

12   "Gain compliance with a lawful order" has also been checked but there is no indication in

13   this case that Mr. ▆▆▆▆ was given a lawful order and refused compliance.  The third

14   question identifies the force as immediate instead of controlled, which was what happened

15   but it is not clear that it should have occurred that way.  Question 7 asks, in part, whether a

16   video interview has been conducted.  Two answers are checked, "Yes" and "Not

17   applicable."  There is no explanation of why the question was not applicable.

18         139.    Another part of Officer ▆▆▆▆ version of events should have been closely

19   examined and questioned by the investigator.  Officer ▆▆▆▆ testified that when he was

20   gassed, he saw Mr. ▆▆▆▆ reaching for a second cup and thought that he was about to be

21   gassed a second time.  His reaction was to unholster his mark IX chemical agent dispenser

22   and spray Mr. ▆▆▆▆ with OC through the perforated cell door.  The first question is why

23   Officer ▆▆▆▆ did not take a few steps to either side of the cell door, as did ▆▆▆▆

24   ▆▆▆▆    The second obvious question is how Officer ▆▆▆▆ was able to spray Mr. ▆▆▆▆

25   so quickly.  If Mr. ▆▆▆▆ threw a cup of liquid feces on Officer ▆▆▆▆ and then reached

26   for and picked up a second cup, he would have been able to throw that cup at the officer

27   substantially faster than the officer could have unholstered his Mark IX and sprayed the

28   inmate.

[3618106.1]

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

140.   Another indication of either bias or incompetence in this investigation is that, as was the case in several investigations I reviewed from R. J. Donovan, there is clear evidence of collusion among some of the officers and their reports.  The two officers who escorted Mr. ████ to the gym both wrote reports explaining why they had to take Mr. ████ to the ground.  Officer ████████ writes, "In order to overcome ████ active physical resistance and prevent myself and Officer ████ from being battered by an elbow or shoulder …."  Officer ████ writes the same thing, verbatim.  Collusion in report writing violates departmental policy and is an integrity issue.  Evidence of collusion should weigh against the officers involved.

141.   The conclusion is inescapable that the investigator, from the outset, either assumed that there had been no excessive force by staff or recognized that was likely and set out to conduct an investigation that would establish that it was not so.  I am raising a stark and ugly possibility but it must be said.  There is a point at which incompetence and bias in an investigation is an inadequate conclusion and active participation in a cover-up must be considered.  Here, Mr. ████ alleged that after he admittedly threw feces on two correctional officers, he was severely beaten twice, once into unconsciousness, and that he received very serious injuries including broken bones in his face and requiring nine sutures to three different lacerations on his face.  In response, OIA ignored one of the two alleged beatings, never so much as interviewing the staff members that Mr. ████ identified as responsible.  The other beating was never pursued in any meaningful way.  OIA ignored inmate witnesses.  Worse, OIA did not re-interview Mr. ████ and the investigator did not bother to review the video interview conducted with Mr. ████ the day after the incident.  While Mr. ████ admitted gassing the two officers, he had a reason: he was afraid for his life.  His version of events was consistent with the pattern of injuries he received.  It was corroborated in some detail by three different inmate witnesses.  Perhaps the most extraordinary aspect of this entire situation is that there are CDCR records that confirm Mr. ████ version of events.  Early in the morning of October 1st, Mr. ████ talked to a female correctional officer and told her what he had told at least one officer the afternoon

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  and evening before, that his life had been threatened by other inmates and that he had to be

2  moved off that particular living unit.  She was never interviewed although it would have

3  been easy enough to determine the identity of that officer.  She evidently did the right

4  thing and asked Mr. ███████ clinician to see him because he was so upset.  The clinician

5  talked to Mr. ██████ about moving him to a crisis bed on a mental health unit, as did a

6  psychiatrist on that same day.  Both the psychiatrist and Mr. ███████ clinician properly

7  recorded their interactions in medical progress notes in Mr. ██████ file, as they were

8  required to do.  Those files were available to the investigator, Special Agent Oden, and

9  would have demonstrated the validity of much of Mr. ██████ version of events.  Within a

10  week of the time Mr. █████ completed his investigative report, the CDCR Office of Legal

11  Affairs received a letter from attorneys representing Mr. ██████  In part, that letter

12  highlighted both of those medical progress notes.  They were ignored by the Office of

13  Legal Affairs and by OIA and this case continued to lumber toward wrong conclusions.

14  Quite simply, this case by itself is a most serious indictment of CDCR, OIA and their

15  investigation and staff discipline practices.

16      **B.      ███████ Incident on September 9, 2019, Local Inquiry into Incident
           C-D04-19-09-0806**

17

18      142.  ███████ is a forty eight year old inmate at LAC.  He is a Coleman class

19  member on EOP status with a history of depression, anxiety and periods where he is

20  suicidal.  He is subject to seizures and has a lower bunk restriction and a ground floor

21  restriction.  On September 9, 2019, Mr. █████ was a porter on D-yard, Building 4, at LAC.

22      143.  On that date, September 9, Mr. █████ had just learned that his father had

23  been diagnosed with terminal cancer and Mr. █████ was very upset.  In fact, his father died

24  some two months later.  He was sent to his cell from his porter job and wanted to know

25  why.  Officer █████ mocked him and he told the officer he wanted to speak to a sergeant.

26  He had been yelling and banging his hand on the cell door trying to get staff attention

27  before Officer █████ and other officers approached his cell.  Officer █████ sprayed him in

28  the face with OC through the perforated cell door and then told him to cuff up, through the

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   food port.  The control booth officer opened his cell door and three officers rushed into the

2   cell and began kicking and punching him.  He was beaten unconscious.  Other inmates told

3   him later that he was dragged out of the building.  He was taken to the cage, or holding

4   cell, in the gym by Officer ███.

5          144.    Medical staff came to see him there and had him taken to TTA.  The doctor

6   at TTA said that he needed to go to an outside hospital.  Then Sergeant ███ and a

7   lieutenant arrived and spoke to the doctor.  They told Officer ███ that he was not to go

8   to the outside hospital and to take him to administrative segregation instead.  ███

9   asked for a copy of the 7219 medical evaluation form and asked for a video interview.

10  Both were denied.  Three days later he went to medical where an x-ray confirmed that he

11  had a fractured shoulder.  He was referred to an orthopedist but could not get an

12  appointment until November 9th or 10th, almost two months later.  The orthopedist told him

13  that his shoulder had healed incorrectly and gave him medication and asked for him to

14  return in six weeks for another examination.  At that time, he was told that the shoulder

15  needed to be rebroken and have a pin inserted.  That surgery was scheduled for late March

16  2020, but was then postponed and as of May, when Mr. ███ signed his declaration,

17  nothing had happened to fix his shoulder.

18         145.    That is Mr. ███ version of the story and it is contained in his signed

19  declaration under oath.  Two days after the incident on September 9, he received an RVR

20  for "battery on a non-inmate."  The disciplinary report said that he was pepper sprayed

21  because he had been banging his head on the cell door and that he had punched Officer

22  ███  He said he plead guilty to the disciplinary charge because Officer ███ had

23  told him that if he did, there would be no more issues and Mr. ███ thought he might also

24  get his property back.  He also wanted to get out of the administrative segregation unit.  He

25  did get his property back and a television was put in his cell.  An officer told him that he

26  got his TV "because you kept your mouth shut and took your lumps."  Mr. ███ said that

27  he was also told that he could stay on the yard if he was willing to say that he was not

28  threatened by officers.

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

146.   Mr. ███ waited six months to file a 602 complaint about the use of force because he was afraid of retaliation.  That was denied on the grounds that it was no longer timely.  That does not make sense because Plaintiffs' counsel sent a letter to the CDCR Office of Legal Affairs on November 24, 2019, detailing Mr. ███ complaint about the use of force incident.  That letter was some six weeks after the incident itself.  Why was that letter not accepted as a timely complaint about excessive force and investigated as such?

147.   There are other troubling aspects of Mr. ███ allegations.  He said that when he went to TTA for medical evaluation, he started to tell the nurses that he had been beaten by correctional officers but they did not want to hear it and said "okay 'no comment'."  Mr. ███ also said that when he got out of administrative segregation the retaliation began.  He said that at one point he and three other inmates were handcuffed while they searched each of their cells.  Officers found a knife in one of the other inmate's cells but Mr. ███ was also sent to segregation and told he had to stay there "even if it's bullshit" by a captain.  He was released twelve days later with no disciplinary charges. Officer ███ told him "The knife could have been found in your cell."

148.   In early March 2020, Mr. ███ told his clinician what had actually happened in September.  In April 2020, Mr. ███ was finally interviewed for the first time.  However, LAC completed a review of the September 9 incident on March 24, 2020 with a report saying that there were no issues and that the use of force had been appropriate.  That was prior to Mr. ███ being interviewed for the first time.  Then, shortly after that investigation review, there is an April 17 letter from the ISU investigator to Warden Johnson recommending that the case be closed without any charges and the Warden signed off on that recommendation.

149.   Mr. ███ description of these events is a rich tapestry but there are too many threads to follow.  My analysis is limited to the use of force on September 9.

150.   The staff version of events, as reflected in the incident reports of Officers ███ and ███ is relatively simple.  The three officers went to Mr. ███

cell because he was banging his head against the cell bloodying his head and they were worried that he might seriously injure himself. When verbal commands were ineffective they used OC spray through the cell door. That also had no effect and Mr. ▮▮▮ head banging continued. They told the control booth officer to open the cell and went in to put cuffs on Mr. ▮▮▮ They said that it appeared he was going to comply but then he turned around and punched Officer ▮▮▮ in the chest. The officers responded by taking him to the floor, handcuffing him and then escorting him to the holding cage in the gym. That is essentially the staff version of events.

151. Some of that does not make sense. If the officers found Mr. ▮▮▮ hitting his head on the cell door hard enough that it was already bloody, they should have called for a supervisor immediately, and likely summoned medical to the scene. They should have sounded the alarm when they decided to use OC spray but they did not initiate the alarm until somewhat later. When the first application of OC was ineffective, they could have used a second application immediately, because that would have been a quicker and safer intervention if it had worked. Also, Mr. ▮▮▮ extensive injuries and particularly his fractured shoulder, were inconsistent with two officers simply taking him to the ground even with the addition of injuries he might have suffered hitting his head on the cell door.

152. None of these issues is even mentioned in the ISU investigation. Here, once again, the ISU investigation is substantially incomplete and dramatically biased. It is something of a charade. Throughout the investigation report there are a number of "investigator's note" entries. In general, these are places where the investigator comments on events that do not follow institutional practice, things that should have happened but did not or, conversely, things that happened that should not have, and more than anything else, on discrepancies in the evidence. It is extraordinary that not one of the "investigator note" entries discusses a problem with the staff version of events. Every entry is to criticize or raise doubt about the version of events presented by ▮▮▮ ▮▮▮ and corroborated by a number of inmate witnesses. There really is no investigation. The letter from Plaintiffs providing Mr. ▮▮▮ allegations of staff misconduct in detail was responded to by the

1    department six months after it was received, explaining that they did not have ███ ███

2    allegations until March 2020, when they were no longer timely.  The letter they were

3    answering had provided them with those allegations six months prior.

4            153.    The interview of ██████ was conducted the month after the

5    "investigation" was completed.  It is not clear why it was conducted.  The investigator

6    went to some lengths to tease out inconsistencies in the interview testimony of the inmate

7    witnesses.  He does not mention that the interviews were seven months after the incident

8    and that it would have been more suspicious had the inmate witnesses agreed on almost

9    every detail.  That explanation is used frequently in other cases when staff testimony is

10   inconsistent.  Similarly, although this was a sudden and violent event, there is no

11   consideration given to inmates having "tunnel vision."  Evidently that only happens with

12   staff.  Also, I have seen evidence of a double standard applied to investigations where

13   inmates are expected to report every instance of misconduct, to name names and not worry

14   about retaliation.  When inmates do not report everything in a timely and thorough manner,

15   it is used to discount or dismiss any complaints or allegations they may make.  The

16   department is more interested in finding ways to disqualify inmate complaints than to get

17   at the truth underlying inmate allegations.  That is not a matter of policy or procedure, it is

18   a question of values.

19           154.    Finally, there are two other major issues and this case is an exemplar of both.

20   Under the hellish conditions in the CDCR prisons, the most able of people would likely not

21   be reliable reporters of fact.  However, in the cases I am reviewing these are not the "most

22   able of people"; they have physical disabilities, afflicted with long-term severe mental

23   illness and or impacted by years locked in cells in jails and prisons.  They are unlikely to

24   be reliable reporters but that does not mean bad things are not being done to them or that

25   much of what they say may not be true.  The other issue is simple.  Far too often the

26   department's conclusion about what occurred does not begin to explain the inmate injuries.

27   If two officers "take an inmate to the floor" because the inmate, although in handcuffs,

28   tried to twist out of the grasp of the two officers, that will not produce injuries to both sides

1   of the inmate's face, bruising to the back of the inmate's head and a broken collar bone.

2   You do not need to be an orthopedist or an internal medicine specialist to know that

3   something is wrong with that conclusion.

4        155.   Six inmates were interviewed in this case.  One of these, Mr. ███ did

5   not see the incident in question and had no relevant information.  The other five inmates all

6   corroborated Mr. ███ version of events to varying degrees.  These inmate interviews

7   were not done until April 2020, seven months after the incident occurred.  Considering

8   Mr. ███ recitation of events and the evidence from the five inmate interviews, it is

9   clear that there are some discrepancies in each.  That should have been expected after that

10  much time had passed and with regard to reconstructing a sudden, violent and unexpected

11  event.  Instead, in each case, the investigator used the discrepancies to disqualify all five of

12  the inmate witnesses.  In listening to the entire audio recording of each of the five inmate

13  interviews, it is the agreement and corroboration with Mr. ███ allegations that are

14  much more persuasive than the discrepancies.

15       156.   In Mr. ███ interview, he said that Mr. ███ was yelling and the

16  officers came to his cell front and that when they went in, Officer ███ kicked Mr. ███

17  in the head three or four times then handcuffed him and dragged him out of the cell.  He

18  does not remember pepper spray.  Mr. ███ said that Officer ███ was the other

19  officer who went in the cell and that he was pretty sure both officers went in but not

20  certain.  He was asked where in the cell the assault occurred and he described it specifi-

21  cally as having taken place just past the toilet which was at the end of the bunk in the cell.

22  The "investigator's note" at the end of the interview states that the investigator identified

23  multiple inconsistencies in this account.  Actually, he only discusses two inconsistencies.

24  The first of these is that Mr. ███ said that he did not see pepper spray being used.

25  However, it is plausible that Mr. ███ had looked away for the perhaps three second

26  duration of the OC spray and it is perhaps more likely that he had not yet given his

27  attention to Mr. ███ cell front and did that beginning when the cell door was opened,

28  which would have been after the OC spray was used.  It is of course also possible that he

1  did not remember the events completely after seven months and it is also possible that

2  Mr. ███ was lying and Mr. ███ was trying to support his story and doing so less than

3  perfectly.  The second discrepancy is that Mr. ███ said Mr. ███ was handcuffed after

4  the door was opened and the officers were in the cell while Mr. ███ had said that he was

5  handcuffed through the food port after the OC spray but before the door was opened.  That

6  is a real discrepancy but hardly a basis for disqualifying everything that Mr. ███ said.

7       157.   Mr. ███ was interviewed by cellphone and the audio quality is not good

8  but it is intelligible.  Mr. ███ said that he was in the shower and heard Mr. ███

9  yelling for ten or fifteen minutes or perhaps twenty minutes.  He said four or five officers

10  were at the cell front and that Mr. ███ was told to cuff up, which he did.  He said the

11  officers then had the door opened, sprayed Mr. ███ beat him and then took him away.

12  He did not know details and did not know how they took him out of his cell.  He said he

13  thought it was ugly to spray him and beat him up after he had cuffed up.  He was asked

14  specifically how long it was after the officers got to his cell front that they went in his cell.

15  He said it was less than a minute.  Two other things are noteworthy about this interview.

16  Mr. ███ said that he could not provide details because he did not have his glasses and

17  without them he cannot see beyond four or five feet and the distance was greater than that.

18  The investigator should have taken enough time to distinguish between what Mr. ███

19  did see and how much of it he could see and those things that he either assumed or inferred

20  but did not actually see.  The investigator did not do that.  The second point is that the

21  investigator did not let Mr. ███ tell him what he knew of the incident, which is what

22  the investigator said he wanted at the beginning.  Instead, Mr. ███ was interrupted

23  frequently and sometimes mid-sentence.  Almost all of the investigator's additional

24  questions or attempts at more specificity were designed to hone in on potential

25  discrepancies.  Here again, the "investigator's note" begins by referencing multiple

26  inconsistencies in Mr. ███ testimony.  In fact, the investigator again discusses only

27  two issues in his note.  He emphasizes that Mr. ███ confirmed that he cannot see five

28  feet in front of him but says that Mr. ███ claimed he saw what occurred in front of

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   Mr. ███ cell.  The investigator says the distance was considerably greater than five feet

2   but does not say whether it was eight feet or eighty feet.  Also, when Mr. ███ says that

3   he cannot see beyond five feet, it is not clear if he means that he cannot see facial

4   expressions, or faces themselves, or anything.  When Mr. ███ said that there were four

5   or five officers outside Mr. ███ cell front, we do not know whether Mr. ███ saw

6   individuals or uniforms or silhouettes or what he based his statement on.  The investigator

7   would have us believe that Mr. ███ saw none of what he reported.  There is no

8   justification for that conclusion and it is a question that the investigator could have

9   explored in depth if he were not biased and incompetent.  The second discrepancy is that

10  Mr. ███ has the pepper-spraying occurring after the door was opened while Mr. ███

11  and other witnesses have said that the pepper spray occurred through the door before it was

12  opened.  Again, the investigator could have asked an additional question or two about that

13  to make sure that Mr. ███ was certain of that fact.  He did not.  At any rate, even if

14  Mr. ███ had misremembered when the OC spray occurred in the sequence of events,

15  that should hardly disqualify all of his testimony after seven months.

16      158.   The interview with Mr. ███ begins with his stating that he sent a letter about

17  this incident to Sacramento and asking why the interviewer does not have a copy of that

18  letter.  Mr. ███ is upset about that and states that he did receive confirmation from

19  Sacramento that they had received his letter.  Mr. ███ is obviously concerned that

20  something he wrote about this incident soon after the incident occurred, would be

21  important whether to provide details or to refresh his memory.  The investigator says that

22  he will check on it and find the letter later but that is the last word about it in the entire

23  investigation.

24      159.   Mr. ███ names all three officers at the cell front and says that they told

25  Mr. ███ to cuff up, sprayed him, then went into the cell and "beat the shit out of him"

26  until he was unconscious.  Then he says that they beat him additionally.  After that, he

27  describes one of the officers as coming back to Mr. ███ cell and taking a bloody shirt

28  out of the cell and putting it in a red hazard-disposable bag but taking no photos of the cell

1   nor preserving any evidence.  He mentioned that Mr. ▉▉ was a porter and was yelling at

2   his cell front for perhaps twenty or twenty five minutes before the officers came and that it

3   was only perhaps twenty seconds after they arrived at the cell front before Officers ▉▉

4   and ▉▉▉ went in.  The twenty to twenty five minutes of yelling and the very short

5   duration of time before the officers used OC spray were both consistent with other inmate

6   witnesses.  Mr. ▉▉ said that he could not see into the cell and did not see the actual

7   beating but he heard it and saw Mr. ▉▉ dragged out of the cell with his face bloody.  He

8   also said the officers did not hit the alarm until after they dragged him out of the cell.  That

9   is an important point because it appears to comport with other evidence and if the officers

10  were going to beat Mr. ▉▉ in retaliation for his yelling, they would not have wanted to

11  follow policy and initiate the alarm when they first used OC spray or had the cell door

12  opened, because too many other staff would have arrived while they were beating

13  Mr. ▉▉.

14          160.   It is telling that Mr. ▉▉ described Mr. ▉▉ as being dragged out of the

15  cell unconscious and then that there was some additional use of force against Mr. ▉▉

16  and that the investigator never pursued that.  Mr. ▉▉ acknowledged that he could not see

17  directly into the cell and thus did not see the beating administered to Mr. ▉▉ but said

18  that after more than twenty years in prison, he had heard enough beatings to know what

19  they sounded like and that he was sure of what had happened in the cell.  The

20  investigator's note at the end of Mr. ▉▉ interview summary emphasizes that he said

21  Officers ▉▉ and ▉▉▉ entered Mr. ▉▉ cell while two other inmate witnesses

22  said that the two officers who went into the cell were Officers ▉▉▉▉▉.  All of

23  the incarcerated people who witnessed the beating inside the cell said that it was

24  administered by Officer ▉▉  If there was some disagreement about the identity of the

25  second officer who went into the cell, that would not seem to be a fatal flaw in this series

26  of corroborative interviews.

27          161.   ▉▉ ▉▉ was interviewed and said that he was in the day room talking

28  with another inmate and there were a group of officers in the day room.  He said they

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  cuffed Mr. ████ went into his cell and beat him and then dragged him out of the cell

2  bloody and unconscious.  He mentioned there was a delay in setting off the building alarm.

3  When he was asked for some details he said that before the incident, Mr. ████ had been

4  yelling at the officers.  He also said that when they dragged him out of the cell unconscious

5  they took his handcuffs off and then Officer ████ stepped on his head and at that point

6  he, Mr. ████ objected verbally and asked Officer ████ why he was doing that.  In

7  response, the officers took Mr. ████ to the floor and then escorted him to the holding

8  cage in the gymnasium.  As he was being escorted there, he met Mr. ████ being escorted

9  back from the gymnasium with his head bandaged.  In response to other questions,

10 Mr. ████ said that Mr. ████ was a quiet inmate who was never a problem and that he

11 did not give the officers a bad time.  He said that Mr. ████ was sprayed with OC through

12 the perforated door.  He also said that once the officers were at the door of Mr. ████

13 cell, it was less than a minute before they sprayed Mr. ████

14       162.   Here, again, the investigator is trying to establish that Mr. ████ could not

15 have seen what he is describing.  Mr. ████ emphasizes that he is only two cells away

16 from where the action was happening.  When he is asked about the OC spray, because the

17 investigator has made the point that some other inmate witnesses have that out of

18 sequence, Mr. ████ says that Mr. ████ was sprayed while he was in his cell and that

19 there was no reason, since he was locked in his cell, to spray him or to go into the cell to

20 beat him.  In spite of the frequent interruptions, Mr. ████ says that all of the officers put

21 their gloves on before they approached the cell front, names three of the four officers who

22 were at the cell front and says they sprayed him, cuffed him up then opened the door and

23 kicked him back into the cell and punched and kicked him in the cell.  The investigator

24 twice suggests that Mr. ████ should say that Mr. ████ was sprayed after they went into

25 the cell and both times Mr. ████ corrects him and says no, he was sprayed before they

26 went in.  Mr. ████ also describes Mr. ████ as being bounced from the bunk to the wall

27 to the toilet like a ping pong ball in response to being hit by them.  By the end of the inter-

28 view the investigator asks whether Mr. ████ was usually a problem and Mr. ████ said

[3618106.1]

40                                 Case No. C94 2307 CW

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  that he was not that he was quiet and kept to himself and that the reason he was yelling that

2  day was that a heavyset Hispanic officer had come to his cell and had been talking a lot of

3  trash to Mr. ████ and that Mr. ████ had finally exploded and started yelling.

4       163.   In this case the investigator's note at the end of the interview summary says

5  that Mr. ████ described ████ as handcuffed in his cell and then having his handcuffs

6  removed outside the cell and then being handcuffed again.  The investigator describes this

7  as a contradiction with Mr. ████ who said he was handcuffed once while he was in his

8  cell.  That is specious reasoning.  Mr. ████ said that as a result of the beating he was

9  unconscious at some points.  Mr. ████ said that he saw Mr. ████ dragged from the cell

10  unconscious.  If Mr. ████ was taken from the cell unconscious and the handcuffs were

11  taken off outside the cell at that time and then he was re-handcuffed, there is every reason

12  to believe that Mr. ████ might not have remembered that because he was unconscious

13  when it happened.  Then the investigator asserts that Mr. ████ was standing next to ████

14  ████ during the incident and that Mr. ████ says that he saw Officer ████ stomp

15  on Mr. ████ head while he was in the cell.  The investigator says, "it is reasonable to

16  conclude ████ would have witnessed the same as he was standing next to ████████

17  That is false reasoning on two grounds.  First, Mr. ████ said that at the beginning of the

18  incident he was in the day room standing next to and talking with ████████ but he

19  then said that during the incident he moved to the C section of the cell block.  He did not

20  say that Mr. ████ moved with him and there is no indication that they necessarily

21  would have had the same vantage point or seen exactly the same things.  Second,

22  Mr. ████ does describe Officer ████ as stomping on Mr. ████ head while he was

23  in the cell but Mr. ████ describes Officer ████ as stepping on Mr. ████ head after

24  Mr. ████ was dragged out of the cell.  It is frankly ridiculous for an investigator to

25  disqualify all of the testimony of an eyewitness based on the rather minor temporal

26  dislocation of Officer ████ stepping on or stomping on Mr. ████ head, in interviews

27  seven months after the incident occurred.

28       164.   I listened to the interview with ████████ last, after I had heard the

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   other inmate witness interviews and reviewed almost all of the other evidence in this case

2   file.  I found Mr. ███████ interview to be detailed and credible.  He began by saying

3   that by coincidence that morning he had talked with another staff member, his clinician,

4   about Officer ████ and his poor conduct with inmates.  He described Mr. ████ as yelling

5   from his cell front and then he said that three officers all put on their gloves before going

6   to the cell front.  He described ████ ████ spraying OC in ██ ████ face, through the

7   door and said that he sprayed him a second time as well.  He said that he was able to see

8   the whole incident and saw Officer ████ kicking Mr. ████ in the head in the cell and

9   that Officer ████ was punching Mr. ████  He described Officer ████ as at the

10  door of the cell attempting to pull Officer ████ out of there.  He said that Mr. ████ was

11  unconscious and bleeding, as Mr. ████ had described him.  In response to specific ques-

12  tions from the investigator, he said that Officer ██████ was trying to talk to Mr. ████ at

13  the cell front when Officer ████ sprayed him and that they pulled Mr. █████ out of the

14  cell by his arms, unconscious.  Mr. ██████ also described that after the incident he got

15  into a verbal argument with Officer █████ about Officer █████ conduct and then he,

16  Mr. ██████ told a sergeant what he had seen but that there was no follow-up.

17          165.   In this case, the investigators note at the end of the interview attempting to

18  discredit Mr. ██████ testimony focused on three things.  First, Mr. ██████

19  described ████ as being handcuffed at the end of the incident although Mr. ████ said that

20  he was handcuffed through the food port at the beginning of the incident.  It is certainly

21  possible that Mr. █████ version of events is accurate and that Mr. ██████ saw

22  Mr. ████ being handcuffed for the second time at the end of the incident.  The

23  investigator's second point is that Mr. ██████ describes Officer ████ as stomping on

24  Mr. ████ head during the incident.  The investigator says that the medical evaluation

25  shows "a laceration to his facial area with active bleeding."  The investigator suggests that

26  if Officer █████ had stomped on his head, there would have been more substantial injures.

27  Perhaps, but perhaps not.  We do not know how detailed the medical evaluation was and

28  the investigator was at fault for not asking more detailed questions about the "stomping."

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   Certainly, if Officer ███ had been jumping up and down on Mr. ███ head, the

2   injuries would have been much more serious.  I served as an expert witness in a case in

3   which an inmate was killed by another inmate in exactly that manner.  However, we do not

4   know whether Mr. ███ meant that Officer ███ kicked him in the head, and how

5   hard, or whether he meant that he stood on his head with part of his weight, or that he used

6   his foot to grind his face into the floor, etc.  This is something of a Catch-22 in which the

7   investigator conducts a very poor, brief and incomplete interview resulting in part in

8   ambiguous answers and then those ambiguous answers are used to discredit the individual

9   being interviewed.  The final point is that Mr. ███ said that Officer ███ pepper

10  sprayed Mr. ███ twice and he is correct that that is inconsistent with what Mr. ███ said

11  but it is a minor point of disagreement many months after the incident occurred.

12      166.   It is noteworthy that when inmate witnesses recounted details that were

13  completely consistent with other witnesses or with Mr. ███ allegations, there are no

14  investigator notes emphasizing the consistency of the corroboration.  As is true with many

15  of the cases I have reviewed, the most important parts of this case are the parts that are

16  missing.  Where are the interviews with the officers involved and the scrutiny over their

17  consistency?  There are no such interviews because there was no real investigation in this

18  case and, from the outset, the officer reports were accepted as true statements of what

19  occurred.

20      167.   Another missing element in this investigation is any reference to the punch to

21  the chest that the officers report as initiating the use of force in the cell when they entered.

22  That is, the officers describe going into the cell and Mr. ███ turning around suddenly

23  and punching Officer ███ in the chest with his right fist.  The medical evaluation of

24  Officer ███ does not reflect even the slightest bruise, abrasion or reddened area on the

25  officer's chest.  That is never discussed by the same investigator who made much of the

26  fact that the inmate's injuries were not as severe as they would have been if the staff had

27  done what the inmate said they did.

28      168.   The investigation report to the Warden includes the investigator's

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

conclusions, which state in part, "It appears ███ allegations of excessive force have no merit and are being driven by ███ not wanting to be held accountable for his actions, specifically committing the act of battery on a peace officer."  Also, "A review of all documents relative to the incident in question indicate staff's actions prior, during and following the use of force were in compliance with the current department use of force policy, procedure and training… "Staff utilized force on ███ in an effort to prevent him from further injuring himself and to subsequently subdue his attack."  "It is noted multiple staff sustained injuries as a result of ███ actions."  That is a seriously misleading conclusion.  One staff member reported an injured arm but did not report that it was because Mr. ███ had kicked, punched or otherwise assaulted him.  It was injured at some point in this incident and unexplained.  Officer ███ was allegedly punched in the chest but had no evidence of any injury nor did he complain of any.  The other staff member who was injured had broken bones in his hand and the most probable explanation for those is that he punched Mr. ███ in the head.  He did not allege that his hand was injured as a result of assaultive behavior by Mr. ███

169.    The investigator concludes the report to the Warden with a recommendation that there be no further investigation in this case and that the allegations be deemed "not sustained."  Is it the CDCR policy that an investigator should reach conclusions and recommendations, as happened in this case, or is it CDCR policy that an investigator should simply present the results of the investigation and specifically refrain from conclusions and recommendations, as the OIA investigators do?  It should be one way or the other but not both.

**C.    Mr. ███ Incident on August 27, 2019, Local Inquiry into Incident Log No. L   C-D04-19-08-0762**

170.    This case is unusual in that it is the first opportunity for me to review a case that has also been reviewed by Defendants' experts.  Defendants submit testimony from their expert, Matt Cate, as well as an inquiry, attached as Exhibit V to the ███ Declaration, Dkt. 3077, to contest the Declaration of ███  In my review, I found

[3618106.1]

1  that Defendants' evidence failed to establish that the misconduct expressed in Mr. █

2  declaration did not occur.  To the contrary, in my review of the entire case file, I found that

3  there was sufficient evidence to conclude that the misconduct occurred as alleged by

4  Mr. █

5       171.   █ █ is a twenty-nine-year-old inmate currently housed at R.J.

6  Donovan but the incident in question occurred at LAC on August 26 and 27, 2019.

7  Mr. █ is a *Coleman* class member with a history of depression, anxiety and panic attacks

8  and he is assigned to EOP care.  He is likely an *Armstrong* class member as well, by virtue

9  of his mobility disability, though he is not identified by CDCR with a code.  He was hit by

10  a car some ten years ago and suffered injuries to his right leg.  He has knee braces and uses

11  a wheelchair intermittently, particularly when longer distances are involved.  In January

12  2019, Mr. █ was diagnosed with cancer and began chemotherapy the following month.

13       172.   On the evening of August 26, 2019, Mr. █ arrived back at LAC after

14  receiving chemotherapy.  He described himself as weak, jaundiced and notes that he had

15  lost all of his hair including his eyebrows.  At LAC that evening, he went to pill call to get

16  his prescribed morphine medication.  It was not there and he was advised to get it in the

17  morning.  At 6:00 a.m. on August 27, he went back to the pill call window but his

18  medication was again not there.  The nurse advised him to have breakfast and then return

19  to the pill call window for his prescription.  After breakfast he was told for the third time

20  that his prescription was not there.  He was upset and in pain and went "man down"

21  requesting to see a doctor.  He was taken to the CD medical building in a wheelchair.  He

22  did not see a doctor and was sent away after a nurse took his vital signs and conducted an

23  EKG exam.  He was put in a wheelchair and an "ADA worker" (inmate) pushed him to his

24  housing unit and left him at the unit office at his request.

25       173.   Mr. █ says that he told the officers in the unit office that he was recovering

26  from chemotherapy and requested a move to Building 1 or 2 because pill call on those

27  units was on the living unit rather than at the pill call window on the yard.  He explained

28  that walking across the yard was difficult in his weakened condition.  In Mr. █ sworn

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  declaration, he recounts that Officer ███ did not answer his request and instead

2  responded, "So you shaved your eyebrows like a queer, huh?" Mr. ██ says that he was

3  "stunned and angered" at the officer's hostility and responded in kind with, "Hey, fuck

4  you."

5        174.    Mr. ███ declaration continues that he reiterated his request to move to

6  another unit and when the officers continued to be unresponsive he changed his request to,

7  "I want to talk to the sergeant." Then, Mr. ██ alleges that Officer ████ grabbed him by

8  the arm and threw him out of the wheelchair onto the floor and then sounded his alarm.

9  According to Mr. ██ Officer ████ then jumped on top of him pressing his knee into

10  Mr. ██ back and handcuffed him and then other officers arrived in response to the

11  alarm. Officer ████ and another officer picked him up from the floor and dragged him

12  across the yard toward the D-yard gym with other officers following them. The escort was

13  very painful because the officers were pulling up on his arms putting pressure on his

14  shoulders and as they went into the gym. Inmates often refer to that escort procedure when

15  handcuffed behind the back as being "chicken-winged," and when the officers exert

16  upward pressure on the arms as "spicy chicken-wing." Mr. ██ says that he yelled out

17  "You're going to break my shoulders" twice. Then Officer █████ Officer ████ and

18  two other officers dropped him on the ground and began kicking and punching him in the

19  head, face and chest.

20        175.    Mr. ███ declaration states that he had deep bruising and abrasions on his

21  legs, chest and face and a possible concussion from the officers slamming his head into the

22  door of the holding cage. He was told to take off his clothes and a few minutes later a

23  psychiatric technician came to the cage and asked him to turn around so she could see his

24  injuries. As he attempted to tell her what had happened, she said, "Alright, no comment"

25  and walked away. Later, when he was escorted back to his housing unit, one of the

26  officers told him to never "step out of line" again. He did not receive treatment for his

27  injuries but, later in the week, had an x-ray taken of his jaw.

28        176.    Mr. ██ describes his hearing for his RVR over this incident. Two inmate

1    witnesses both testified that he had not been resisting.  According to Mr. ███ the hearing

2    officer said "I still have to believe my officer."  Mr. ███ declaration also emphasizes that

3    he was too weak from chemotherapy to have resisted in the manner the officer claimed,

4    and that the officer's report failed to note that he was in a wheelchair at the time of that

5    initial use of force.  ███ ███ also said that he did not file a complaint about the use of force

6    until he had been transferred out of LAC, because he was afraid of retaliation.  Finally,

7    Mr. ███ states that this incident changed the way he interacts with custody staff, that it has

8    exacerbated his mental health problems and that he is convinced that the LAC officers

9    target prisoners with disabilities.  That is the extent of Mr. ███ version of the events in

10   this case.

11           177.   The staff version of events is brief.  Only Officer ███ observed the initial

12   use of force in the housing unit and no officer describes any subsequent use of force in the

13   gym.  Officer ███ report states that he was preparing for yard release, that Mr. ███

14   was in front of the officer's office in Building 4 and that he gave Mr. ███ a direct order to

15   return to his cell.  Mr. ███ according to Officer ███ report, said, "I ain't locking up,

16   fuck that, I ain't going in."  Officer ███ then ordered Mr. ███ to submit to handcuffs

17   while he placed his right hand on Mr. ███ wrist and attempted to get him into handcuffs.

18   Mr. ███ suddenly pulled away and began to twist toward the officer.  The report continues

19   that "fearing for his safety and unaware of Inmate ███ intentions" Officer ███ used

20   his strength and body weight to take Mr. ███ to the floor, utilizing his forward momentum.

21   The report states that Mr. ███ fell on the floor on his right shoulder and facial area and that

22   Officer ███ fell on top of him landing on his upper back.  At that point Officer

23   ███ states that Mr. ███ was compliant and was handcuffed and that with Officer ███

24   Officer ███ escorted Mr. ███ to the facility D gym.

25           178.   Defendants' expert Matthew Cate has submitted a declaration that begins

26   with an analysis of this case.  Mr. Cate makes errors of omission and commission, some

27   with regard to details and some with regard to larger issues.  Mr. Cate begins to recount the

28   staff version of this case at paragraph 61, "According to staff reports, this was a relatively

[3618106.1]

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  routine matter" (emphasis added).  That is misleading because there is only one staff

2  report, that of Officer ███ about the use of force in the housing unit that is at the

3  center of this case, not multiple reports from staff on that use of force.  Next, in the same

4  paragraph, Mr. Cate reproduces the alleged response from Mr. ██ when told to return to

5  his cell by Officer ████ "I'm not locking up, fuck that, I told you I'm not going in."

6  The problem is that is not what Officer ████ report states.  Officer █████ has that as

7  "I ain't locking up.  Fuck that.  I ain't going in."  Mr. Cate has reproduced this quote

8  inaccurately and in doing so has "cleaned up" Mr. ███ grammar as reported by Officer

9  ███  It is an interesting difference.  Listening to the nine and one half minute

10  interview with Mr. ███ he never uses the contraction "ain't" and instead appears to have a

11  much more careful and less colloquial speech pattern.  The quote "cited" by Officer

12  ███ at least raises a question of the veracity of Officer █████ report and Mr. Cate

13  has changed that portion of the report in a manner that would remove that issue from

14  consideration.

15      179.  Officer █████ report is central to any analysis of this case.  That report is

16  directly contradicted by testimony from several inmate witnesses as well as Mr. ██

17  himself and, as Mr. Cate's review acknowledges, the first major question in this case is

18  whether Officer █████ version of events is correct or whether Mr. ██ and the other

19  inmate witnesses are correct.

20      180.  In discussing Officer █████ report, Mr. Cate ignores several important

21  issues.  First, Officer █████ provides no reason or context for "I gave ██ a direct order

22  to return to his assigned cell."  If Officer █████ was doing something else, as he has

23  written, and found Mr. ███ standing in front of the officer's office, why would he not have

24  asked Mr. ██ "What do you want?," or "Are you waiting for something?" or even

25  "What's up?".  This is not the biggest issue in this case but why would you order someone

26  to go back to their cell if you had no idea why they were in front of your office, whether

27  standing or in a wheelchair?  Next, Officer █████ report states "I ordered Inmate ██ to

28  submit to handcuffs as I immediately placed my right hand on ██ right wrist and

[3618106.1]                                           48                        Case No. C94 2307 CW

1   attempted to place ███ into handcuffs." That does not make good sense and is not good

2   security practice. If an officer orders an inmate to submit to handcuffs, the officer should

3   give the inmate a few moments to comply by turning around, putting hands behind his or

4   her back, etc. The point of telling someone to comply with handcuffing is exactly so that

5   there is no need to grab someone unexpectedly which often results in the individual

6   recoiling or pulling away, which is then interpreted as resistance, and a use of force is on.

7   Frankly, it is a new officer mistake. Perhaps the actual event was reasonable and Officer

8   ███ simply wrote his report badly, but it is also possible that he did grab Mr. ███

9   wrist causing Mr. ███ to pull back and that was all that was required for Officer ███ to

10  decide to take Mr. ███ to the floor. Next, Officer ███ describes taking Mr. ███ to the

11  floor "utilizing his forward momentum." What forward momentum? Officer ███ has

12  described Mr. ███ as twisting "his shoulders and upper body towards me." Then the report

13  states, "I placed my left hand on ███ left shoulder before ███ could turn his body

14  completely around." According to Officer ███ Mr. ███ was in the process of trying to

15  turn toward him, not moving forward. Mr. Cate does not discuss any of these issues.

16      181.   Even the use of force itself is poor and that is not discussed by Mr. Cate

17  either. If in handcuffing an inmate, the inmate pulls away, not with a verbal threat or

18  taking a fighting posture, but just recoils, as here, why not take two or three steps away,

19  unholster your OC and direct the inmate to move against the wall, or to just turn around.

20  Why go immediately to a take-down that could result in a serious injury to the inmate or

21  the officer or trigger a wild fight, particularly when you are the only officer on the scene?

22  Back-up staff is already en route, where's the fire? This is poor staff safety and poor

23  inmate safety.

24      182.   There are at least three other questionable aspects of Officer ███ report

25  that are related to policy and procedure. First, Mr. ███ is an *Armstrong* class member

26  whether CDCR has classified him as such or not. He does have a mobility disability. If he

27  was at the officer's office to request a housing move so that he would not have to get

28  across the yard in order to get to the pill call window and secure his morphine medication,

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   then that was a request for an accommodation.  Whether he made that request and was

2   rudely insulted rather than answered appropriately, as Mr. ██ has testified, or whether he

3   never got to make that request because Officer ████ ordered him away without asking

4   him why he was at the office, that is in either case a violation of the *Armstrong*-related

5   policies about inmates with disabilities making requests for accommodation.  Mr. Cate

6   states in the last paragraph of his analysis (¶ 68) that this case is not about Mr. ████

7   disability.  It is exactly about his disability.

8       183.   Second, officers are required by policy to include all salient facts in their

9   incident reports.  In this case, Mr. ██ had an abrasion that we know was clearly visible on

10  his face because Psychiatric Technician ████ noted it on the 7219 while looking at

11  Mr. ██ from outside the holding cage in the gym.  Officer ████ denies there was any

12  use of force at the gym so the abrasion must have occurred during the use of force in the

13  housing unit.  Officer ████ was on top of Mr. ██ on the floor, according to both their

14  accounts, and handcuffed Mr. ██ and then escorted him across the yard and into the

15  holding cage in the gym.  He had to have noted the abrasion on Mr. ████ face and he was

16  obligated to report it but he did not, nor did ████ ████  Finally, there is the escort.  The

17  CDCR protocol is that if an officer is involved in a use of force with an inmate, or even a

18  verbal confrontation, then that officer will not be involved in escorting the inmate to a

19  holding cell or to medical after the incident, for obvious reasons.  The inmate may still be

20  angry with the officer over the incident and try to assault the officer during the escort and

21  the opposite is also true.  The protocol is simply common sense prevention and is widely

22  recognized across American corrections.  In this case, once Mr. ██ was handcuffed, there

23  was no reason for him to participate in the escort, along with Officer ████  An officer

24  from an adjoining unit or a yard officer or a search and escort officer could have joined

25  Officer ██ in the escort and, if that proved impractical, Sergeant ████ could have

26  accompanied Officer ████  There were no indications of extenuating circumstances in the

27  staff reports and if there were, at least the sergeant should have explained that in his report.

28  The entire point of the protocol is to avoid the kind of situation that Mr. ██ testifies

[3618106.1]

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

happened here, where the officer using force is centrally involved in a second use of force that may be a product of the officer's anger or resentment at the initial situation.  Again, Mr. ███ analysis ignores all of these issues, some of which, like the escort issue, are blatant.

184.    In all of the discussion and analysis of this case, the most outrageous single element is the conclusion of the ISU investigator, Lieutenant ██████ about the inmates who corroborate Mr. ███ version of events.  Lieutenant ██████ writes, "Although not proven, the evidence collected alludes that their testimonies may have been coerced by ███ accounts of what allegedly occurred."  There is no evidence to suggest, imply or even hint at that conclusion.  It is invented out of whole cloth from the investigator's bias against inmates and in favor of staff.  Yet, Mr. Cate does not even comment on that part of the investigator's conclusions.

185.    The investigation in this case was awful.  There are no interviews of the officers involved.  There is no review of records prior to the use of force in the housing unit, although those tend to corroborate Mr. ███ account.  Major and minor issues in the staff reports and discrepancies between the staff reports and Mr. ███ version of events are in many cases ignored, as is true of all of the issues I have discussed above with regard to Mr. ███ analysis.  The interviews of witnesses and of Mr. ███ are very badly done. Mr. Cate acknowledges some of these problems with the interviews straightforwardly and accurately but concludes "The investigation procedures could have been improved."  Yes, as could the Titanic's course across the Atlantic.  In addition to the leading questions, lack of follow-up and hurried nature of the interviews, the investigator talked too much, interrupted witnesses and most importantly did not attempt to get a complete or detailed picture of events from each witness.  Both the ISU investigator and Mr. Cate make much of the inconsistencies in various witness testimony but the event occurred in September of 2019 and the interviews in May of 2020.  Neither the investigator nor Mr. Cate adequately considers the eight-month delay in weighing the various inconsistencies.  Mr. Cate is critical of the investigator for not getting a complete statement during the interview of

1   Mr. ■■ and the investigator emphasized that Mr. ■■ was evasive.  He also discussed

2   Mr. ■■ answering questions by beginning with "um" or "uh."  In fact, listening to the

3   entire interview with Mr. ■■ my impression was that he was thoughtful and articulate but

4   that two other factors characterized his interview.  One was that he was weak and tired and

5   that should have led to the interview either being rescheduled or being conducted in two or

6   more parts.  Is there anyone who does not know that long-term chemotherapy for cancer is

7   debilitating?  The second factor is that he said he had been interviewed a number of times,

8   sometimes by two officers and he was uncomfortable going through the same information

9   again.  It would have made sense for the investigator to check with others at the facility

10  and the records and to ask Mr. ■■ in more detail and try to determine who else had

11  interviewed him and when.

12      186.   Mr. Cate's analysis states that the inmate witnesses corroborating Mr. ■■ are

13  inconsistent in several important respects but then writes "Meanwhile, the officers' reports

14  are all consistent, but only the officer using force witnessed the entire incident."  That is

15  substantially misleading because it is the portion of the incident that was only witnessed by

16  Officer ■■■■ that is at issue in this case (excluding the gym situation) and it is that

17  portion of the incident about which some of the inmate witnesses are in part inconsistent.

18  Thus, "The officers' reports are all consistent" is meaningless and suggests corroboration

19  when there is none.

20      187.   With regard to the psychiatric technician, there is a stark contradiction

21  between Mr. ■■ account and Ms. ■■■ account.  Mr. Cate writes, "Unless this

22  healthcare worker was conspiring with the correctional staff and made a false report, it is

23  obvious that this alleged beating was fabricated or greatly exaggerated."  Mr. ■■ contends

24  that she did exactly write a false report but that is neither impossible nor farfetched.  In my

25  work with other correctional agencies I have, not frequently but occasionally, encountered

26  situations in which nursing staff, in particular, did the bidding of custody staff, sometimes

27  through fear and sometimes through over-identification.  I plainly do not know what

28  happened in that gymnasium at the holding cage but I would point out that I have reviewed

1   two other CDCR cases in the last few months in which inmates reported that they tried to

2   tell nursing staff about being beaten by officers, only to have the nursing staff refuse to

3   hear them out and then write "no comment" on the 7219 form, where the form asks how

4   the injury occurred.

5          188.    Mr. Cate also states that Mr. ██ "does not assert that the incident occurred

6   because of his disability." In fact, that is exactly what Mr. ██ has asserted. He has

7   explained in great detail in his sworn declaration that he was having trouble getting his

8   prescribed pain medication and was at the officer's office in Building 4 specifically to

9   request an accommodation of being moved closer to the medication line because of his

10  mobility disability and that the officers ignored that request and insulted him and then

11  assaulted him. How can anyone conclude that the incident alleged was not about his

12  disability?

13         189.    Perhaps Mr. Cate's central point of emphasis is that the inmates described

14  Mr. ██ as arriving at the office in Building 4 in a wheelchair and described the use of

15  force as having been initiated while Mr. ██ was sitting in the wheelchair. In contrast, the

16  staff's statements do not mention a wheelchair. Mr. Cate writes, "Most importantly, no

17  officer or clinical staff mentioned anything about a wheelchair." That is, again, seriously

18  misleading. There are no reports or interviews from any clinical staff witnessing what

19  happened at the Building 4 officer's office. Then Mr. ██ writes "If a wheelchair had

20  been involved in the use of force, even tangentially, or was just sitting next to the inmate in

21  an unexpected place during the use of force, it is reasonable to expect that at least one

22  officer or clinician would have mentioned it." As noted, there were no clinicians present,

23  so none could have reported it and that is something of a red herring. With regard to the

24  officers, it would only be surprising that Officer ██ did not discuss it. When the

25  other officers arrived, they described Officer ██ on the floor on top of or next to

26  Mr. ██ and handcuffing him or having already handcuffed him. If that occurred six or

27  eight feet from a wheelchair that was sitting there, even though Mr. ██ might have been in

28  the wheelchair when the use of force began, there would be no way for any of the

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   responding officers to know that and report anything about the wheelchair.  They did not

2   report anything else about the physical situation, such as whether the office door was open

3   or closed or how close Officer ████ and Mr. ██ were to various walls, etc.  The only

4   exception may have been Officer ████ the control booth officer, but his report said

5   that he did not see anything until ████ ████ and Mr. ██ were falling to the floor and

6   that he was hampered by distance from seeing details of the situation.  Mr. Cate writes

7   "Again, under Mr. ████ version of the facts, the officers would have had to conspire to get

8   their stories straight that no wheelchair was present."  That is simply not true.  If Mr. ██

9   was in a wheelchair at the beginning of the use of force, as he alleges, only Officer

10  ████ would have been obligated to report that.  Finally, Mr. Cate also writes "… the

11  presence of a wheelchair would not be so important as to typically warrant this kind of

12  action" (that is, conspiring to get stories straight).  Mr. Cate is making the point that there

13  was no motivation for staff to lie about the wheelchair.  Unfortunately, that is also not true.

14  As explained immediately above, the question of reporting that the incident began in the

15  wheelchair or that a wheelchair was involved in the incident, only applies to one staff

16  member, Officer ████  Because of the monitoring activities of the attorneys involved

17  in the *Armstrong* case, there have been a number of tours of LAC and those have often

18  involved asking line staff and supervisors about various issues related to *Armstrong*

19  provisions.  In short, every experienced officer at LAC would have known that there was

20  specialized scrutiny of incidents involving inmates with disabilities.  Thus, there was

21  motivation for Officer ████ not to report that this use of force began with Mr. ██ in a

22  wheelchair.  It cannot be proved beyond dispute that that was the case but there is clearly a

23  substantial amount of evidence in favor of Mr. ██ on that issue, and Mr. Cate's assertion

24  that multiple staff corroborated Officer ████ report on this issue and that Officer

25  ████ had no motive to dissemble are both wrong.

26       190.  ████████████████ each said clearly that the use of force

27  began with ██ia in his wheelchair.  There was no contradiction on that point.

28  Importantly, while the ISU investigator suggested that these three inmates had conspired to

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   support ███ story, and Mr. Cate has failed to refute that conclusion, there is another

2   inmate, ███, who does not corroborate ███ story.  In fact, the information he

3   provides is somewhat negative about Mr. ██ in that he did not remember much about the

4   "take down" or which officer did that, but he did remember that Mr. ██ was being

5   disrespectful to the officers.  Importantly, Mr. ███ also testified that Mr. ██ was in a

6   wheelchair and that may be the most important individual testimony on that question.

7        191.   If either the investigator or Mr. Cate had reviewed the case record more

8   thoroughly, it might have affected their conclusions.  They both emphasized that Mr. ██

9   did not file a complaint (a 602) until some six months after the incident occurred.  They

10  ignored his statements about waiting until he was at a different prison to file his complaint

11  because he was afraid of retaliation at LAC.  They inferred that his delay suggested that it

12  was not an inappropriate use of force situation.  However, there is a mental health progress

13  note in Mr. ███ file from September 3, approximately one week after the incident in

14  question.  That progress note, signed by ███ ███ psychologist, states in relevant part,

15  "As a recent stressor, IP reported that he was attacked by a CO on his first day on this yard

16  for asking for a bed move, negative interaction, refusal to rehouse, and an RVR."  That

17  should conclusively answer the allegation that Mr. ██ did not contest any of this until

18  many months after the incident.  It is noteworthy that this short summary of Mr. ███

19  comments about the incident to his psychologist are completely consistent with the

20  complaint that he filed and his testimony many months later.  There is another reference in

21  his mental health history about mentioning the same assault by an officer.  That occurred

22  on August 30, 2019 but the information is cumulative.

23       192.   There are two other sources of indirect evidence regarding the wheelchair.  A

24  SOAPE note entered on August 18, 2019, one week before the incident in question, states

25  in part, "Comment: weakness after hospital visit for anemia.  IP able to stand temporarily

26  and uses temporary wheelchair."  Then, on September 5, 2019 just over one week after the

27  incident in question, a nursing "face-to-face" report indicates, "Mode of arrival:

28  wheelchair."  While this is inferential, Mr. ██ was using a wheelchair on August 18 and

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

was using a wheelchair on September 5.  For some of the time in between those dates he was receiving chemotherapy.  It seems at least likely that he would have been using a wheelchair on August 27, as he and multiple witnesses testified he did.

**D.** ███████, **Incident on June 13, 2019, OIA Case No. S-LAC-379-19-A**

193.   This case is a travesty and an indictment of both LAC and OIA.

194.   Nothing illustrates this case better than a brief, two sentence email found in the middle of the case file.  It is from the Chief Deputy Warden at LAC, Donald Ulstad, to one of the investigative lieutenants at the facility.  It says, "Lieutenant, I am forwarding a report of findings for incident log #LAC-D04-19-06-0520 your way for review.  <u>Due to the number of inmate witnesses agreeing with inmate ███████ allegations of excessive UOF, I believe we need to conduct additional interviews to show due diligence on our part to refute ███████ allegations.</u>" (emphasis added)  This does not say "we need to do additional interviews to get at the truth."  It does not say "we need to exercise due diligence."  Instead, it says that we need to be able to <u>show</u> due diligence <u>while we refute</u> the inmate allegations.  Refuting the inmate allegations is not in question, it is a given.  If this were a criminal matter, this would be a smoking gun.

195.   The overview of this case is that ███████████ a thirty nine year old inmate at LAC who is both an *Armstrong* class member and a *Coleman* class member with a history of severe, debilitating mental health problems and suicide attempts, alleged that he was the victim of excessive force by two correctional officers.  His complaint was investigated locally and appeared to be on the verge of being dismissed when a sergeant at LAC interviewed a number of inmate witnesses and recommended that the case be referred to OIA for further investigation because the inmate witnesses supported Mr. ██████ allegations and contradicted staff witnesses.

196.   OIA accepted the case for administrative investigation and assigned a special agent who conducted a number of additional interviews both with individuals involved in the incident and with staff and inmate witnesses.  The OIA investigation was biased and incomplete despite its length and detail.  Nevertheless, it demonstrated that Mr. ██████

1  allegations were valid and that four LAC staff members lied in their reports and then lied

2  in subsequent interviews with the OIA investigator, all to coverup excessive force by two

3  of those staff.  The Warden at LAC received the OIA investigation, reviewed it and,

4  inexplicably, cleared all four staff members of all allegations.

5      197.   On June 13, 2019, Mr. ████ was having auditory hallucinations in his cell

6  and asked that he be moved to segregation housing because he did not feel safe.  He was

7  taken to the holding cage within the D-yard gym and left there to wait for a mental health

8  assessment.  That did not happen but two medical nurses did talk to him there.  He told

9  them that he was under stress, hearing voices and depressed.  Rather than refer him for a

10  mental health assessment, they instead cleared him to be returned to his cell.  Officers

11  ████████ were delegated to escort him back to his cell.  According to

12  Mr. ████ in the middle of the yard they were making fun of him and harassing him,

13  telling him "you're a wacko" and more.  He responded, "If you want to see crazy, I'll show

14  you crazy."  He said they laughed at him.  He was handcuffed and it is undisputed that he

15  was taken across the yard without any use of force on the officers' part and without any

16  resistance on his part.  When they got into Building 4, and approached his cell, an officer

17  was inside his cell searching it but also throwing his things out of his cell and trashing

18  them in the process.  Mr. ████ said that he yelled at them, "Why are you destroying my

19  stuff while you search?," and then Officer ████ told him to "shut the fuck up."  He

20  responded, "Fuck you."  Then, still according to Mr. ████ Officer ████ and Officer

21  ████ grabbed him and slammed him face first into the ground, opening a deep cut on his

22  chin.  Then Officer ████ straddled him and punched him in the side of the face and the

23  head two or three times or more.  Mr. ████ had a black eye, bumps on his head and a gash

24  on his chin which required three stitches, all as a result of the use of force.

25      198.   According to Mr. ████ immediately after the use of force, Officer ████

26  and the other officers involved took him to the D-yard gym and put him in a holding cell.

27  Nurses came to evaluate him and Officer ████ told them not to take him to TTA

28  (Triage and Treatment Area) or to the medical area for the C-and D-yards.  Instead he told

the nurses to just use ointment.  The nurses left but returned about thirty minutes later and he told them that his chin was still bleeding, which they could see.  He was taken from the gym for medical evaluation and then to a doctor.  His chin wound needed three stitches to close it.  When he was returned to his housing area he asked for a video interview and the officers refused to arrange that and when he asked to talk with a lieutenant they said "no" to that as well.  Two days later, he was given a video interview.  However, he had decompensated after the use of force and said that he was anxious and fearful of the staff who had assaulted him.  The same day he was interviewed on video, he swallowed three razor blades and cut his neck and had to be taken to the hospital.

199.    ███████████  had been at LAC on EOP (Enhanced Outpatient Status) but after this incident he could not adjust on that status and by July 12, 2019, one month after this incident, he was transferred to Salinas Valley State Prison where he has been on PIP (Psychiatric Inpatient) status and spent most of his time in a mental health crisis bed.  He has made other suicide attempts.  It is obvious from his history and from at least two recorded interviews with him, that are part of this case record, that in prison he has a quite tenuous hold on life and it is not clear why anyone would want to tease him or harass him about his mental health status, let alone to use force on him in a retaliatory manner.  Interestingly, in his interviews it appears that he may not be capable of dissembling.

200.    The two investigations in this case, one locally at LAC and then one by OIA, are both lengthy but uninformative.  The staff reports by Officers ███████████  and the RVR (disciplinary report) on Mr. ████  all say the same thing.  They describe the two officers as taking Mr. ████  from the holding cage in the gymnasium and escorting him across the yard toward Building 4, in handcuffs.  According to the officers, he was upset with them and swearing at them from the outset, for no reason they knew.  They describe Mr. ████  as behaviorally compliant throughout the escort although he continued to be verbally abusive.  When they got to the front of his cell in Building 4, they both said that he began to twist violently from side to side, trying to break away from them, and that they were in fear of being battered by a shoulder or an elbow so they both grabbed him by the

arms and shoulders and used their body weight to take him to the floor, unintentionally striking his chin on the floor.  The officers said that once on the floor, he was immediately compliant and as other officers came to the scene to assist them, they stood him up and escorted him out of the building into another holding cage in the gym.  The report of the senior officer in Building 4 at that time, Officer ██████ said that he saw Mr. █████ begin to resist and struggle with the officers and saw them take him to the floor.  A fourth officer, the control booth officer in Building 4, Officer █████ reported seeing the same series of events.  That is, his report says that Mr. █████ came into the building escorted by the two officers, that he began to twist his body aggressively and that the two officers forced him to the ground using their strength and body weight.

201.   In the immediate aftermath of the incident, no video interview was done because Mr. █████ injuries did not meet the criteria of death, great bodily injury or serious bodily injury as defined by CDCR.  Parenthetically, it makes no sense that when a use of force results in lacerations deep enough to require stitches, that that does not trigger a requirement for an interview of the injured party.

202.   There is a "Review and Further Action Recommendations" form used by the IERC (Institutional Executive Review Committee) for use of force incidents at the facility. In this case, question number eight which asks if there are allegations of excessive force was answered "Yes" but then all of the sub questions to number eight, a through h, were left blank.  All questions about use of force were answered indicating that it was appropriate and without problem.  Question number ten on that form asks whether the injuries were consistent with the reports from the incident and that question was answered "Yes."  The answer should have been, "No" because Mr. █████ in his video interview that was conducted three days after the incident, said that not only had he received the deep laceration on his chin, he had also received black eyes and bruising on his face and head. The video interview shows his black eye clearly as well as the chin laceration.  The black eye is consistent with his report that he was punched in the face and head by Officer █████ after he was thrown to the floor, but it is completely inconsistent with the staff

[3618106.1]

Case No. C94 2307 CW

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   reports.  The log from the holding cell was included with the documents reviewed by the

2   IERC.  None of the observations while Mr. ████ was in the holding cell and before he

3   was taken to have his wounds stitched mentioned that he was bleeding obviously and

4   continuously from his chin.

5          203.   At LAC, following the incident on June 13, the Incident Commander's

6   Review/Critique: Use of Force Incidents, was completed the same day without speaking to

7   the inmate or reviewing his injuries.  It simply said that everything was fine with this use

8   of force.  The "Manager's Review – First Level: Use of Force Incidents" is a form that was

9   filled out four days after the incident, on June 17, and it also indicated that there were no

10  problems with the use of force.  That same day, June 17, the "Manager's Review – Second

11  Level: Use of Force Incidents" was also completed and indicated that there were no

12  problems.  The only difference between the first level review and second level review was

13  that the former was signed by a Captain while the latter was signed by an Associate

14  Warden.  Three days after that, on June 20, the Institutional Executive Review Committee

15  (IERC) completed the "Critique and Qualitative Evaluation," which acknowledged that the

16  inmate had been injured but otherwise reflected no problems.  That was signed by the

17  institution's Use of Force Coordinator and then by the Warden six days later.  The same

18  situation holds for the IERC "Use of Force Review and Further Action Recommendations"

19  which also was signed by the use of Force Coordinator on June 20th and by the Warden on

20  June 26th.

21         204.   All of these forms appear to be empty exercises.  They allow a variety of

22  mid-managers and managers to check off boxes without ever analyzing what actually

23  occurred in a use of force incident.  The fact that different individuals signed different

24  forms is not a check and balance; it appears to simply diffuse responsibility for the failure

25  to do serious reviews.  For example, in Mr. ████ situation, the Incident Commander's

26  "Review/Critique: Use of Force Incidents" included the following two comments signed

27  by a lieutenant on the day of the incident: "after reviewing all reports received, it appears

28  that staff's actions in this incident before, during and after the use of force was applied,

[3618106.1]
                                            60                    Case No. C94 2307 CW
REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   was in compliance with the use of force policy and procedure and training standards.  The

2   relationship between the need for force and the amount used was appropriate and

3   reasonable."  If the Lieutenant, the Captain, the Use of Force Coordinator, the Associate

4   Warden or the Warden had taken five minutes to talk with Mr. ██████ or looked at the

5   video interview of Mr. ██████ any of those individuals would have realized that the

6   conclusions in these various forms was substantially disputed.

7          205.   It appears that Mr. ██████ might never have been given a video interview

8   about the incident except that one of the lieutenants was at a clinical intervention meeting

9   about Mr. ██████ a few days after the use of force incident.  The lieutenant recognized that

10  Mr. ██████ wanted to allege excessive force and asked Mr. ██████ if he had been

11  interviewed on video.  When Mr. ██████ said that he had not, the lieutenant immediately

12  directed that that interview take place.  During that interview, Mr. ██████ identified three

13  inmate witnesses to the incident.  A sergeant then interviewed those inmates and one of the

14  three said that he had not seen the incident.  However, the other two inmates corroborated

15  what ██████████ had said, in some detail.  The sergeant then wrote a conclusion to his

16  interview report stating that Mr. ██████ allegations were inconsistent with the facts of the

17  incident and that the stories of the two inmate witnesses were also flawed and not

18  believable.  The sergeant based this on the fact that one of the two inmate witnesses could

19  not have seen from his cell into Mr. ██████ cell, forgetting that the incident actually

20  occurred outside Mr. ██████ cell and could have been seen from inside the inmate

21  witness' cell.  The sergeant's other two reasons were that Mr. ██████ and the inmates he

22  referred to as "his witnesses" did not mention a second officer as being involved in the use

23  of force.  Actually, both inmates and Mr. ██████ knew that two officers had slammed

24  Mr. ██████ to the ground.  The sergeant had not done extensive enough interviews with the

25  inmate witnesses to get all of their relevant information.  The sergeant's third reason was

26  that if Mr. ██████ had been punched in the head and face he would have had large areas of

27  bruising and swelling on his head and face and those were not noted in the medical

28  evaluation form completed prior to his being taken for stitches.  It is rather ironic that the

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  sergeant uses that argument to discount Mr. ███ credibility and that of the other two

2  inmates who corroborated his story, because it is the sergeant's video interview of

3  Mr. ███ that clearly shows his black eye and appears to show some other bruising on his

4  face and head.  The sergeant concludes his "review of evidence in conclusion" with,

5  "Based on my supervisory review, I conclude that the allegations made by ███ and his

6  witnesses are inconsistent and false accusations."

7         206.   It is not completely clear from the record but it appears that Captain

8  ███ recommended that no further action was necessary on this case but that

9  Associate Warden Jordan disagreed and referred the case to the Investigative Services Unit

10  (ISU) at LAC.  In one of the important positive steps in this case, ISU expanded the

11  investigation substantially.  The ISU expanded investigation was pursued in spite of a four

12  page letter from Lieutenant ███ to the Warden concluding, "….a thorough review of

13  the allegations presented in this appeal has been completed."  That was followed by, "The

14  allegations have been thoroughly reviewed and determined no further investigation is

15  required.  According to the information received, there was no evidence or convincing

16  testimony that would prove staff violated policy.  Staff/inmate testimony revealed that staff

17  misconduct did not occur as alleged."  Those are extraordinary conclusions based entirely

18  on staff bias.  In the body of that letter, Lieutenant ███ summarizes ███ ███

19  allegations and then recounts the interviews with four different inmate witnesses, each of

20  whom described Mr. ███ being thrown to the floor face first without provocation and

21  then punched repeatedly in the face and head.  None of those four inmate witnesses

22  provided any information that was contradictory to Mr. ███ version of events or to

23  each other.  In spite of that, Lieutenant ███ followed his summary of those inmate

24  interviews with, "The results of the interviews revealed staff did not subject the appellant

25  to unnecessary/excessive use of force as alleged and are determined to be hearsay."  There

26  is nothing to explain why the staff version of events should not similarly be considered

27  "hearsay."  Lieutenant ███ clearly does not know what the word "hearsay" means—

28  information received from other people that one cannot adequately substantiate—yet uses

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   the word to dismiss all of the eye-witness reports from inmates about what happened.

2       207.    After the Warden's formal referral to ISU on July 22, requesting an

3 allegation inquiry with additional information needed, the case was assigned to Sergeant

4 ███████████    His expanded investigation is unbiased and commendable.  He began

5 with a document review and a review of the interviews that had already been completed

6 with both staff and inmates.  Sergeant ███████ then augmented the investigation with

7 seven additional inmate interviews.  Sergeant ████████ chose the seven inmates based on

8 their cell location and proximity to the incident.  Five of the seven inmates did not witness

9 the incident and could not provide relevant information.  However, two inmates saw the

10 incident and each provided detailed corroboration of Mr. █████ allegations.  When taken

11 in conjunction with the earlier interviews, there were six inmate witnesses corroborating

12 the allegations with several of those inmates providing detailed accounts of the incident

13 and none of those six inmates providing contradictory testimony.  Sergeant ██████████

14 conclusion was, "Based on my review with all associated information including physical

15 evidence, I have concluded that there appears to be some inconsistencies between staff

16 reports and inmate testimony surrounding the alleged use of force.  After review of inmate

17 testimony and inmate interviews, the inquiry revealed that further investigation is

18 warranted."  He added, "This conclusion is supported by several accounts of inmate

19 witnesses that corroborate █████ allegation of staff misconduct."  He recommended

20 referral to OIA.  Warden Johnson concurred with that recommendation.

21       208.    Before considering the OIA investigation, it should be emphasized that this

22 work by Sergeant ████████ is exactly the kind of thoughtful and unbiased review of a use

23 of force situation that has been so sorely lacking in so many cases that I have reviewed.

24 █████  █████████ had made these conclusions and recommendations in spite of a

25 recommendation from a lieutenant strongly recommending to discount the inmate version

26 of events and close the matter without further consideration.  It is noteworthy, however,

27 that in the █████ case that I discuss below, Sergeant ████████ displayed some of the

28 worst investigative bias and incompetence that I have reviewed in this matter.

[3618106.1]                          63                    Case No. C94 2307 CW

209.   The investigation as referred to OIA is close to a "he said-he said."  Four staff reports and the interviews with those staff all say the same thing, that when Mr. ███ was escorted into Building 4 by Officers ███ and ███ without resistance but with verbal abuse toward the officers.  All four staff members say that when the escort reached the front of Mr. ███ cell, he suddenly began to twist side to side aggressively although he was in handcuffs.  The two officers reacted by taking him to the floor face first and his chin accidentally struck the floor and was injured.  He was compliant and the incident was over.

210.   The inmate version of events according to ███ ███ and six other inmates in the vicinity was that when the two officers escorted Mr. ███ into Building 4 and approached his cell, Officer ███ was in his cell searching it but also throwing his things out of his cell onto the floor and trashing them.  Mr. ███ verbally objected to that and had a verbal interchange with Officer ███ after which Officer ███ or both officers threw Mr. ███ to the floor, face first, injuring his chin and Officer ███ then straddled or got on his knees next to Mr. ███ and punched him in the face and head multiple times.

211.   In addition, OIA was given an analysis by Lieutenant ███ at LAC that said that the inmate allegations were not credible because Officer ███ was at the podium when the escort entered the building, not in or at Mr. ███ cell, and also because Mr. ███ did not have any head or facial injuries except to his chin and that was inconsistent with his having been punched repeatedly in the face or head.  On the other side of the ledger is the video interview with Mr. ███ which clearly shows a black eye and perhaps other visible bumps or bruises on his head and face, which is consistent with his allegation but inconsistent with the staff version of events.

212.   There are other obvious questions about the staff version.  Officer ███ report states that he escorted Mr. ███ to the holding cell in the gym after the incident but does not mention anything about an obvious injury to Mr. ███ or his bleeding substantially from his chin.  Sergeant ███ ███ report says that he also escorted

1   Mr. ███ from Building 4 to the holding cell in the gym after the incident and that

2   Mr. ███ was subsequently taken to TTA for medical care but his report does not mention

3   observing the chin injury or bleeding from the face when he responded to the Building 4

4   alarm and saw Mr. ███

5         213.   OIA Special Agent ███ interviewed Officer ███ who does not

6   remember details of the incident.  He was the control booth officer.  He says that the cell

7   door was open and Mr. ███ refused to go into the cell.  No other staff member reported

8   that.  He says that he does not remember if there was a cell search going on and the

9   investigator reminds him his report has the correct information.  He says that he does not

10  remember or know the position of the officers who took Mr. ███ to the floor and in his

11  report he says that he can't see their hand placement because of the distance but his report

12  also said that Mr. ███ became complaint once he was on the floor.  The investigator does

13  not ask how he could see that from his distance.

14        214.   The interview of Officer ███ by Special Agent ███ is crucial.

15  Officer ███ is the lead officer in charge of Building 4.  In his interview, he says that

16  when he knew they were escorting Mr. ███ back to Building 4, he was concerned that

17  Mr. ███ might try to cut himself and so he directed Officer ███ to go into his cell

18  and check for anything that Mr. ███ might be able to use to cut himself.  He also said

19  that the officers stopped the escort in order that Officer ███ could check out the cell.

20  Then, according to Officer ███ he told the two officers to put Mr. ███ into the cell.

21  None of that is consistent with the reports or interview information with Officer ███

22  Officer ███ or Officer ███  The obvious next step for an investigator would have

23  been to interview Officer ███  None of the other involved staff place him at the

24  incident but Officer ███ has him in Mr. ███ cell when the escort arrives at the cell.

25  Importantly, that is partially consistent with the inmate allegation that an officer was in the

26  cell searching it and trashing Mr. ███ belongings.  Special Agent ███ ignores

27  those obvious inconsistencies and does not interview Officer ███  Additionally, in the

28  interview, Officer ███ describes Officer ███ and ███ on each side of

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  Mr. ▮▮▮▮ in some detail, but does not mention Mr. ▮▮▮▮ bleeding substantially from a

2  major cut on his chin after being taken to the ground.

3       215.   When Special Agent ▮▮▮▮ interviews Officer ▮▮▮▮ the officer

4  does not mention Officer ▮▮▮▮ or mention Officer ▮▮▮▮ telling him to stop the escort

5  while Officer ▮▮▮▮ checks Mr. ▮▮▮▮ cell.  The investigator does not ask him about

6  either of those issues.  Officer ▮▮▮▮ says that he never saw a cell search.  That is in

7  direct contradiction to the interview given by Officer ▮▮▮▮  Officer ▮▮▮▮ describes

8  being on his knees next to Mr. ▮▮▮▮ after Mr. ▮▮▮▮ is taken to the ground, and says that

9  Mr. ▮▮▮▮ is compliant but never mentions the laceration on his chin or the substantial

10  bleeding, and the investigator does not ask about that omission.

11       216.   In his interview, Officer ▮▮▮▮ repeated what he and Officer ▮▮▮▮ had

12  said in their reports, that they used their weight, or weight and strength, to take Mr. ▮▮▮▮

13  down.  It is standard correctional practice that when an individual is handcuffed behind his

14  back, and being escorted, the two officers stay on either side of the individual, not only to

15  control him but also in case the individual trips, or must navigate stairs, etc., and the

16  officers have a firm enough hold that they can prevent the person from falling face first

17  into the ground or floor.  If an individual is large and wild or has otherwise broken away

18  from an escort, an officer may "tackle" the individual and the person may go to the ground

19  or floor in almost any way.  In that situation the officers will not be able to protect the

20  individual from a head injury.  That was not the situation in this case.  The officers

21  remained on either side of Mr. ▮▮▮▮ he was not an unusually large or strong individual

22  and they had a grasp of his shoulders and upper arms because they both testified that is

23  how they took him to the floor and that is undisputed in all accounts of the incident.  The

24  question the investigator should have explored was why the investigators, knowing that

25  with handcuffs behind his back Mr. ▮▮▮▮ could not break his own fall, did not take him to

26  the floor in a controlled manner so that he would not be in danger of striking the floor hard

27  with his face or head, which is what happened.

28       217.   Essentially, Special Agent ▮▮▮▮ had conducted four staff interviews

[3618106.1]

66

Case No. C94 2307 CW

and four inmate interviews.  All eight of those individuals had been interviewed previously during the institution level investigation.  The investigator's bias is apparent during his interviews of staff members in terms of what he does not ask and his failure to follow up on or try to reconcile discrepancies such as the Officer ███ testimony about ███ ███ and the cell search.  His bias is also apparent during the inmate interviews but it is quite different.  He interrupts frequently, at times preventing the inmate being interviewed from completing a statement, almost badgering the witnesses at times and also stops them to suggest alternative versions of events from those they are testifying to.  When Mr. ███ is interviewed and provides a detailed description of the situation and states that it happened right in front of him, the investigator stops him just as he is saying that there was one officer in Mr. ███ cell and two outside of his cell and that the officer in the cell was removing his things.  From there on, the interviewer will not let Mr. ███ talk freely. Mr. ███ says that Mr. ███ was not upset about the search of his cell but was simply advocating for himself but the investigator will not accept that (*see* approximately eleven minutes, twenty four seconds into the audio recording) and the investigator keeps interrupting Mr. ███ and arguing with the testimony he is attempting to provide.

218.   The investigator's bias is similarly on exhibit in his interview with Mr. ███  The investigator suggests that Mr. ███ was upset when he was escorted across the yard toward Building 4.  Mr. ███ continues to deny that he was upset and explains what he was saying to the officers escorting him, and why, and what the officers were saying to him.  The investigator simply does not want to hear that testimony. Mr. ███ also suggests that Mr. ███ was trying to get away from the officers when the incident occurred in front of his cell but Mr. ███ continues to deny that.  When Mr. ███ describes his injuries as a result of the incident, the investigator points out that the medical evaluation record from prior to when Mr. ███ received stitches, does not reflect anything but the chin injury but Mr. ███ continues to explain that he had a black eye and other bruises.  In short, Mr. ███ style with the inmate witnesses and particularly ███ ███ and Mr. ███ was closer to interrogation than interview at a

[3618106.1]

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  number of points.  At one point, the investigator explores an alternate explanation for

2  Mr. ████ black eye, asking him twice whether it was possible that he got his black eye

3  separately from and after the incident in question.  He repeatedly refers to Mr. ████ as

4  "████ and his tone is simply disrespectful.  There was none of that in the staff

5  interviews.

6       219.   The investigative report by OIA reaches no conclusions.  It should have.

7  This is a major flaw in the CDCR investigative process.  If the investigator is not going to

8  conclude the investigation with findings or conclusions, then some other person at OIA

9  should review the entire investigation carefully and arrive findings or conclusions.  The

10  current practice, which is to simply send the entire investigation to the hiring authority

11  (Warden) at the facility where the incident occurred, so that that person can make

12  decisions, is unrealistic.  It took me a number of hours to review this case; just listening to

13  the interviews in real time, once, involves hours of time.  To go back through those

14  interviews comparing them with each other and cross referencing them with the

15  voluminous documentary evidence in this case involves many hours if the review is to be

16  thorough.  It is unrealistic that a Warden will do that in all or most cases.  Further, some

17  Wardens may have no training in investigative procedures, which may limit their ability to

18  effectively analyze this kind of investigation.

19       220.   In this case, the investigative report does not highlight that ████

20  said that he stopped ████ from putting Mr. ████ in his cell while

21  he had Officer ████ check for potential weapons or cutting instruments in that cell.

22  That is directly contradictory to the two officers' reports and testimony that Mr. ████

23  stopped the escort by suddenly becoming resistive and aggressive.  The report does not

24  highlight that none of the four officers writing reports mentioned Officer ████ or

25  ████ ████ at or in Mr. ████ cell.  It does not highlight Mr. ████ testimony that

26  Officer ████ told the nurses who came to the gym to evaluate Mr. ████ medical

27  needs after the incident that they should not take him to TTA or to the CD medical

28  building and that they should "just put ointment on it."  Instead of those key issues, the

report does intersperse some investigator notes throughout the report, but each of those is an attempt to underscore an inconsistency or problem with inmate testimony.

221.    In this case the investigation establishes clearly and well that Mr. ██ allegations are valid and accurate.  The OIA investigation could have and should have gone farther and, in my opinion, that would have solidified the conclusion beyond any doubt.  The OIA investigator "didn't want to go there," and didn't, because he did not want to nail down staff culpability.  The correct conclusion in this case, based on ample evidence, is that two staff used excessive force on Mr. ██ in order to retaliate for his verbal statements to them and then they and two other staff failed to report the unnecessary and excessive force and wrote false reports and then provided false information during interviews with an OIA investigator.  All of this was done as an orchestrated coverup of the improper use of force.  In response to this investigation, the Warden dismissed all allegations and cleared all four staff members.  That is a misuse of investigative procedures and considering Mr. ██ mental health condition and his fragility, and what has happened to him since this incident, this case is disgusting.

**E.        ██, Incident on December 9, 2018, Local Inquiry into Appeal AC-B-18-06451**

222.    This case concerns ██ a thirty-four-year-old inmate at LAC. He is an *Armstrong* class member who had back surgery in August 2018 and then in August 2019.  He uses a wheelchair and/or walker and has had a back brace since the 2018 surgery.  Notably, Mr. Cate states that, although there were a number of deficiencies in CDCR's investigation into Mr. ██ allegation., he believed that a "finding of misconduct could not be sustained based on the evidence found."  I disagree with Mr. Cate's finding.  The preponderance of the evidence available in this case clearly demonstrated that officers had committed misconduct against Mr. ██ in the manner alleged.

223.    On December 9, 2018, some three- and one-half months after his initial back surgery, Mr. ██ asked the inmate in an adjoining cell for a glove so that he could clean

1  his toilet.  He took the glove through the cell door, because he was locked in his cell but

2  his neighbor's cell was open, and then Mr. ██████ sat on the toilet to urinate.  He could not

3  urinate standing up because of his back problem.  He finished, flushed the toilet, and heard

4  an officer call out to have his cell door opened.  Officer ██████ was at his cell front and as

5  the door opened, told him to come out of the cell.  Mr. ██████ told the officer that he

6  needed to wash his hands first but Officer ██████ stepped into the cell, grabbed him by

7  the shoulder, pulled him closer and then slammed him to the ground just outside the cell

8  door.  Mr. ██████ landed on his back in severe pain and was flipped over and ██████

9  ██████ put a knee on his back and handcuffed him.  Mr. ██████ told the officer he was in

10  pain and that he had just had back surgery and asked why the officer had thrown him to the

11  ground.  Officer ██████ expression and manner changed and went from angry to

12  neutral.  Officer ██████ said, "Just give it to me" which Mr. ██████ took to mean

13  contraband and he told the officer that he did not have any and did not know why he was

14  asking about that.  Officer ██████ backed away from him and began talking quietly with

15  other officers who had arrived.  Mr. ██████ had been aware that a second officer was with

16  Officer ██████ at his cell front initially but a large number of officers arrived in response

17  to the alarm, at least nine.

18       224.   Mr. ██████ was in too much pain to stand but he did ask to see medical staff.

19  After ten or fifteen minutes of remaining on the ground, Officer ██████ and other officers

20  picked him up and put him in a wheelchair and took him to the mental health office.  At

21  the mental health office he was strip searched and no contraband was found.  By then,

22  Mr. ██████ understood that Officer ██████ had likely seen him get a glove from the

23  inmate in the next cell and thought that they were exchanging contraband.

24       225.   After the strip search, Mr. ██████ was in continuing serious pain.  He was

25  medically assessed by a nurse and he estimates that after approximately twenty minutes he

26  was taken back to his cell in his wheelchair by Officer ██████ He asked to see a doctor

27  but Officer ██████ told him to fill out a medical request form.  Two days after the

28  incident he was taken to see Doctor ██████ who told him that he had an injury to his spine

[3618106.1]

70

1   and would need another surgery.  Mr. ███████ surgery in August 2019 was because of the

2   injury caused by this December 2018 use of force incident, according to Mr. ███████ sworn

3   declaration.  Mr. ████ also states that he can now only walk approximately fifty feet

4   without a walker or a wheelchair and that he is incontinent as the result of nerve damage

5   that occurred during the surgery to repair the disc in his spine.

6        226.   In January 2019, the month following the use of force incident, Mr. ███████

7   states that he received an RVR for disobeying an order.  According to Mr. ███████ Officer

8   ████████ falsely alleged in the RVR that Mr. ████ refused to exit the cell when ordered

9   and then turned and fell and that when Officer ███████ asked him if he needed medical

10  attention, he said "no."  Mr. ████ emphasized that he was in pain and would not have

11  refused medical attention.  At the RVR hearing, Mr. ████ said that he had eight witnesses

12  who had seen the assault and were willing to testify but that the hearing officer said that he

13  had no right to witnesses.  He was found guilty.

14       227.   On January 1, 2019, Mr. ████ submitted a grievance about the use of force

15  by Officer ███████ Later that day, a lieutenant told him that ISU would investigate the

16  matter but they never interviewed him.  He received a written response three months later

17  that said that there had been an ISU investigation and that they gave credence to Officer

18  ████ version of events.  Mr. ████ submitted second level and third level grievances

19  which were also denied.

20       228.   Finally, since this incident, Mr. ████ has experienced additional

21  discrimination because of his ADA status from Officer ████ who works weekends, and

22  refuses to release inmate porters for their work if they are disabled and refuses to allow

23  disabled inmates to have access to the showers during her shift.  Mr. ████ also has

24  continuing contact with Officer ████ because he sees him on the yard five days a

25  week.  He knows the other officers work to protect each other and he fears retaliation, so

26  he is no longer comfortable talking to the officers or being out of his cell unless he needs

27  to and he feels that he has to "watch his back."

28       229.   That is the extent of Mr. ████ version of these events.  A summary of the

[3618106.1]

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  staff version of events is that Officer ████ and Officer ████ saw something passed

2  from the cell next door to Mr. ████ and went to his cell front and told the control booth

3  officer to open that cell door.  Then Officer ████ ordered Mr. ████ to come out of the

4  cell but he refused and then, without Officer ████ touching him, he fell down on the

5  floor just outside his cell door.  The building alarm went off, Mr. ████ was handcuffed

6  and then additional officers arrived in response to the alarm.  Mr. ████ was helped into a

7  wheelchair and then taken off the unit into the mental health office for a strip search.

8        230.   There are three separate institution-level investigations.  This case was never

9  referred to OIA.  It is bizarre that there were two LAC investigations of the incident with

10  Mr. ████ and they were going on at the same time.  Sergeant ████ at LAC was

11  conducting a use of force inquiry, interviewing witnesses and looking into Mr. ████

12  allegations.  At the same time, (January 2019) Lieutenant ████ was conducting an

13  allegation inquiry into the same event and interviewing many of the same witnesses.

14  There is no explanation in either of these two investigations why two were necessary or

15  why the other was going on.  At the end of these two investigations, the situation was

16  referred to ISU at LAC and the following month, February 2019, ISU conducted the third

17  investigation of the same incident, an allegation inquiry.  In spite of very strong evidence

18  that Mr. ████ allegations were well-founded and that the staff version of events was not

19  truthful, none of the three investigations reached that conclusion and there was no referral

20  to OIA.

21        231.   In reviewing this case, one thing stands out above all others.  Mr. ████ has

22  said that he was in his cell with the cell door closed when this incident began and that

23  Officers ████████ came to his cell front, had the cell door opened and wanted

24  him to come out of the cell.  Officers ████████ are in complete agreement with

25  that much of the fact situation.  Of the eight inmates who said that they saw the incident

26  occur, seven of the eight said that Mr. ████ was in his cell with the cell door closed at the

27  beginning of the incident.  While there are disagreements about what happened to get

28  Mr. ████ out of his cell and about some details, there is no disagreement among the

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1    complainant, either officer who was on the scene. or seven of the eight witnesses that

2    Mr. ███ was in his cell with the door to the cell closed when this began.  One of the

3    inmate witnesses, identified by the staff rather than by Mr. ██████████████.  In

4    Mr. ██████ taped interview, he says clearly that he was returning from the shower when

5    he saw Officer ██████ order Mr. ████ to go into his cell and Mr. ████ refused, after

6    which Officer ██████ gave him the same direct order a second time and then Mr. ████

7    fell down.  Mr. ██████ testimony should have no credibility because ten other people,

8    including the inmate witnesses, the inmate complainant and both officers on the scene, all

9    agree that Mr. ████ was in his cell with the door shut when the incident began.

10          232.    Either Mr. ██████ misremembered this event in some major way, or was

11   confused, or he falsified his testimony in order to help the officers.  That is not all that

12   shocking.  What is beyond shocking is that Sergeant ██████ and Lieutenant ██████

13   both of ISU, conducted that interview with Mr. ██████ and then summarized it carefully

14   not mentioning the part of the interview about Mr. ██████ being out of his cell and Officer

15   ██████ giving him direct orders to go into his cell.  Instead, the summary of the interview

16   that is presented by Sergeant ██████ and Lieutenant ██████ becomes the strongest

17   eyewitness account disputing Mr. ██████ and the other inmate witnesses, and supporting

18   the two officers versions of events, even though the actual interview directly contradicted

19   the officers.  Sergeant ██████ and Lieutenant ██████ write, "Inmate ██████ states he

20   was exiting the lower C section shower during daytime recall.  Inmate ██████ explains, he

21   observed Officer ██████ walk towards Inmate ██████ cell and Inmate ██████ 'just fell

22   down'.  Additionally, Inmate ██████ states Officer ██████ did not grab Inmate ██████

23          233.    These two ISU investigators, a sergeant and a lieutenant, have simply lied,

24   completely mischaracterizing the statements of an inmate witness, statements that

25   contradict all other inmate witnesses, in order to create evidence that would support the

26   officers.  Perhaps these two investigators assumed that no one would actually listen to the

27   audio recording of the interview.  Frankly, I do not understand how Mr. Cate could have

28   overlooked this problem.  Mr. Cate wrote that in this case, "Investigators should have

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

followed up on inconsistencies in the officers' statements, but did not." It must be assumed that Mr. Cate took the trouble to review the audio interviews themselves before he drew conclusions about this case. This does not have to with whether someone is a plaintiff's expert or a defendant's expert. Any expert should be outraged about what was done here.

234. There are serious problems with the staff version of events in this case, while Mr. ████ recitation has an unusual amount of detailed corroboration from eye-witnesses. First, there is the RVR. The RVR is written and given to the inmate before any investigation is undertaken. However, in the investigations, the fact that the inmate got an RVR is cited as evidence of the inmate's culpability. That appears to be a classic Catch-22.

235. The biggest problem with the officers' version of events is that the two officers who were at the cell front contradict each other. Officer ████ says that when he ordered Mr. ████ to exit the cell, then Mr. ████ said "no" and then turned and fell through the open cell door landing outside the open cell on the floor. In his January 5 interview, Officer ████ said that when the cell door was opened, Mr. ████ attempted to evade the cell door by going toward the back of the cell, "causing himself to fall to the ground directly outside the cell." That does not make sense. If ████ was trying to evade the cell door (where Officer ████ was standing) and Mr. ████ was moving toward the back of the cell, then he could not have fallen in the opposite direction through the cell door landing outside the open cell. ████ ████ was also interviewed about this event by Lieutenant ████ He said "Inmate ████ began to question Officer ████ as to why he should exit the cell." Officer ████ went on, "Suddenly, Inmate ████ stumbled out of the cell and fell to the ground." Officer ████ reported to Lieutenant ████ that he was standing to the side of the cell door and did not witness how Mr. ████ stumbled out of the cell. In the two interviews, Officer ████ has given substantially different versions of events. In one interview he said that Mr. ████ was moving toward the back of the cell when he fell. In the second interview he said that

1  Mr. ███ stumbled and fell out of the cell.  Those descriptions have Mr. ███ moving in

2  two opposite directions.  Neither of his stories comports with Officer ███ version of

3  events.

4        236.   There are a number of other problems with the staff version of events.  First,

5  if an officer was talking to a disabled inmate and the disabled inmate fell to the ground

6  without the officer so much as touching the inmate, why would the officer handcuff the

7  inmate rather than help him to his feet?  Second, if an inmate fell to the floor, and there

8  was no use of force involved, why would anyone turn on the building alarm?  Perhaps the

9  inmate was uninjured, and was about to bounce up and continue talking with the officer.

10 Almost certainly, the building alarm was turned on because there was a use of force.  No

11 one would have yet determined that the inmate was injured.

12       237.   During the RVR hearing, Officer ███ stated that when Mr. ███ fell,

13 he offered Mr. ███ medical attention and Mr. ███ refused.  However, when he was

14 interviewed about the incident, Officer ███ did not mention offering medical

15 assistance to ███ ███ or that Mr. ███ refused that offer.

16       238.   The inmate witnesses constitute a huge problem for the staff version of

17 events.  Nine inmates were interviewed who said that they saw all or some part of this

18 incident.  Seven of those nine inmate witnesses said that they saw the cell door being

19 opened and that they then saw Officer ███ grab Mr. ███ and slam him to the ground

20 outside the cell door.  Further, several of these witnesses described Officer ███ as

21 grabbing Mr. ███ by the shirt, shoulder, back of the neck, etc.  There was strong

22 agreement about how Officer ███ grabbed Mr. ███ as he threw him to the ground.

23 There was also agreement among several of the witnesses that upon throwing Mr. ███ to

24 the ground, Officer ███ held him down with a knee on his back.  One of the seven

25 corroborating witnesses, ███ ███ recanted his eyewitness version during his second

26 interview and said that actually, he was already in his cell on the second tier and had only

27 heard the incident happening.  He should have been asked why he had described it

28 differently during his first interview, and also given other follow-up questions, but the

1  investigators did not do that.  Of the other two inmate witnesses who did not corroborate

2  Mr. ████  story, one was Mr. ████ whose testimony should have been disqualified as

3  grossly inaccurate, but it was instead rewritten falsely to make it appear that he was

4  contradicting Mr. ████ as described above.  The other inmate witness, Mr. ████ simply

5  said that Mr. ████ "came out of the cell stumbling, with dramatics."  He added that

6  Officer ████ ████ not grab Mr. ████

7          239.    The primary issue with inmate witnesses is whether there are eyewitnesses

8  and whether they will corroborate the complainant's allegations.  There are almost always

9  some inmates, in almost any jail or prison, who will corroborate staff's stories, whether

10 they actually saw them or not.  For example, in the ██ case that I have reviewed within

11 this report, Mr. ██ found a television in his cell and was told that it was in response to his

12 having accepted a beating from staff without filing a complaint.  Staff control a wide range

13 of incentives that may cause some inmates to do their bidding with anything from false

14 statements to assaulting other inmates, as was the case at RJD.

15         240.    There is another portion of this case that is extraordinary.  It is the audio

16 recordings of interviews conducted by Sergeant ████ and Lieutenant ████ both of

17 ISU at LAC.  These interviews are so poorly conducted, and so deeply biased, that they

18 could be archived and used in training courses for investigators as examples of what not to

19 do.  The first interview was with Mr. ████ He says that Mr. ████ fell out of a chair.

20 That has no relation to any other testimony in this case and doesn't make sense.  However,

21 the investigators are pleased enough with what he has said that they accept it without

22 details or follow up.  The interview lasted from 10:55 until 10:57, all of two minutes.  That

23 is absurd.  The inmate was not asked what prompted Mr. ████ fall out of his chair,

24 where the Mr. ████ himself was, whether there were injuries that were obvious, what

25 other staff were present and when, what happened after the inmate fell or whether an alarm

26 went off and when.  That is only a sample of the questions that should have been asked if

27 the investigators had any real interest in finding out what actually happened in this

28 situation.

241.   The interview with Mr. ███ lasted three minutes.  He said that he had not actually seen what transpired because he was already in his cell.  The investigators were satisfied with that and failed to even ask him why he had said during his first interview that he had seen Mr. ███ thrown from his cell.

242.   The interview with Mr. ███ is different because Mr. ███ is an excellent witness for Mr. ███ and the two investigators are heavily invested in proving that Mr. ███ did not see what he continues to say he did see.  Mr. ███ submitted a declaration which was hand written.  The investigators ask him if he wrote it and he said he did not but that he read it and signed it.  Then the investigators pressed him on whether Mr. ███ had written the declaration for him to sign.  He said no, that he did not know who wrote it.  Rather than asking him to recount what he had seen or heard during the incident, the investigators instead read the declaration to Mr. ███  On two more occasions, they press him to admit that Mr. ███ wrote the declaration and on both occasions Mr. ███ denies that and says that he signed the declaration because that is what happened.  In preparation for this interview, Sergeant ███ has taken photos from Mr. ███ cell trying to establish that Mr. ███ could not have seen an incident occurring at the front of Mr. ███ cell.  However, Sergeant ███ is not in the same location as Mr. ███ and has sent those photos somewhere, expecting that Mr. ███ would have access to them during the interview.  He does not and Lieutenant ███ does not have the photos to show to Mr. ███  As an alternative, Sergeant ███ tries to press Mr. ███ to admit that he could not see the incident out the front of his cell.  Mr. ███ says that he could and did see the incident and that he could see it through the side of the cell door.  The investigator asks him if the inmate fell out of his cell and Mr. ███ says no, he was dragged out.  The investigator presses him to describe the officers and Mr. ███ says he does not know their names but when asked whether one was a Black officer he says no.  Then the investigator wants to know how Mr. ███ was pulled out of his cell and suggests perhaps Officer ███ used a bear hug.  Mr. ███ denies that.  Then the investigator wants to know whether the inmate was pulled out with both of the officer's

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

hands and tries asking that question a second time.  Then he asks whether the inmate was pulled to the middle of the day room.  Mr. ███ says no.  Then the investigator asks was he pulled down inside his cell and Mr. ███ says no to that as well.  The investigator goes back to asking whether Mr. ███ ███ if the officer involved was White or Hispanic or Black, although Mr. ███ had already said quite certainly that the officer was not Black.  At that point ███ ███ goes back to whether Mr. ███ had written the declaration, and for the third time Mr. ███ says that he didn't write it but he did read it and sign it.  When he is asked where the officer put his hands on the inmate's back, Mr. ███ says that he could not see that and then the sergeant suggests that when Mr. ███ has said that the officer had his knee on the inmate's back after throwing the inmate on the ground, that perhaps Mr. ███ was misinterpreting and that officers sometimes go to secure an arm and it is misconstrued!

243.    There is no sense going through the other interviews done by the two ISU investigators because the analyses would be cumulative.  In general, they challenged the inmate witnesses who corroborated Mr. ███ story, interrupting them, pressing them and suggesting even far-fetched alternative explanations.  When they found an inmate whose interview information was helpful to the officers involved, they challenged nothing, suggested no alternative explanations, did not press them or ask the same questions repeatedly and ignored context and details.  In a number of cases I reviewed both at LAC and earlier at RJD, I concluded that the institution-level investigations were actually no worse than the OIA investigations.  This was worse.

244.    The end result of this investigation is that nothing happened.  That is in spite of the fact that six inmate witnesses confirmed what Mr. ███ said, several of them in great detail, while the two officers involved contradicted each other and did not hold to the same story.  There were other aspects of the situation that strongly suggested that Mr. ███ allegations were true and that the officers' reports and interviews were not.  If the standard for a referral to OIA is "reasonable belief that misconduct occurred" then the evidence in this case from the three investigations, taken together, is far beyond that

1  standard.  In light of that, it is particularly difficult to understand Mr. Cate's conclusion

2  that "… a finding of misconduct could not be sustained based on the evidence found."  If

3  the "evidence found" in this case does not sustain a finding of misconduct for Mr. Cate,

4  how would he ever find that a misconduct finding was justified in any case?  I also remain

5  concerned that Mr. Cate would not be personally appalled by two ISU investigators

6  intentionally fabricating the results of an investigative interview.

7        **F.**      **Mr. █████ Incident on January 15, 2020, OIA Case No. S-LAC-121-20-R**

8       245.   This case is a welcome counterpoint to most of the cases I have reviewed

9  because there were no serious injuries and the situation is not extremely emotional, at least

10  in so far as the evidence that is available.  At the same time, this rather brief incident

11  highlights some of the deep problems with investigations at both the local level at LAC

12  and OIA.

13       246.   This case centers on an incident that occurred at LAC on January 15, 2020.

14  Officers █████ and █████ were escorting █████████ through the prison yard from

15  Receiving and Release (R&R) to housing unit D-4 in Facility D.  Mr. ████ was in a

16  wheelchair and tied into the chair with sheets.  According to both officers, without

17  warning, Mr. ████ turned and spit in the face Officer █████.  Both officers said that they

18  saw Mr. ███ sucking in his cheeks and thought that he was preparing to spit at Officer

19  █████ again.  Officer █████ reacted by taking both of the wheelchair handles and

20  pushing the wheelchair over onto its side, with Mr. ████ falling onto the ground on his

21  stomach as the sheets tying him to the wheelchair broke.  Continuing with the officers'

22  version of events, Officer █████ held Mr. █████ face down on the ground until Sergeant

23  █████ responded to the scene and took out a spit hood and place it over Mr. ████'s head.

24  Then Officer █████ and Sergeant █████ got Mr. ████ back into the wheelchair and

25  took him to administrative segregation after Sergeant █████ had directed Officer █████

26  to go to medical.

27       247.   When the Shift Commander, ████████████ wrote his summary of the

28  incident, he wrote that Mr. ████ had spit at Officer █████ but he did not say specifically

[3618106.1]

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  that the spit had landed on Officer ████'s face.  Both Officer ████'s and Officer

2  ████'s incident reports did state that.  Lieutenant ████ categorized the incident as

3  aggravated battery on a peace officer, by Mr. ████.

4       248.    In reviewing this incident, Captain ████ noted that there was no

5  explanation of why Mr. ████ was in a wheelchair or was in "soft restraints," in Lieutenant

6  ████'s incident summary.  He also noted that Lieutenant ████ wrongly

7  determined that the force used on Mr. ████ was appropriate.  He reasoned that Lieutenant

8  ████' description of Officer ████ knocking the wheelchair over in order to prevent

9  more ongoing harm, was incorrect since Lieutenant ████ had not described any harm

10  at all, let alone "ongoing harm."

11       249.    The Warden concurred with Captain ████n and referred the case to OIA.

12  The referral alleged that Lieutenant ████, Sergeant ████, Officer ████e and

13  Officer ████ did not properly document the use of force that occurred on January 15,

14  2020, with Mr. ████.  On March 10, 2020, the referral was accepted by OIA's Central

15  Intake Unit for an administrative investigation.  OIA did no interviews nor did they do any

16  other independent investigative activity.  The OIA investigator noted that both the incident

17  report of Officer ████ and the incident report of Officer ████ did specifically

18  describe Officer ████ getting hit in the face with spit by Mr. ████e.  Sergeant ████'s

19  report, based on what the two correctional officers told him as he arrived on the scene, also

20  specified that Mr. ████ had spit in Officer ████'s face and that Officer ████e had

21  been sent to medical because of that.  Based on reading those three brief incident reports,

22  the OIA investigator concluded that it was unlikely that staff misconduct had occurred and,

23  on April 22, 2020, he recommended that OIA reject the case (although they had already

24  accepted it a month and a half prior).  In his recommendation for rejection, the OIA

25  investigator noted that Warden Johnson at LAC, who had originally requested the

26  administrative investigation, had then written in mid-March to OIA indicating that he no

27  longer believed any staff misconduct was involved.

28       250.    One salient fact that is ignored in the documentation I reviewed revolves

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  around the spit on Officer ███'s face.  The incident paperwork states that the incident

2  occurred at 7:25 p.m.  Eighteen minutes later, at 7:43 p.m. Officer ███ was examined

3  by medical staff and documented as having "bodily fluids" on his face.  That raises

4  questions.  First, upon Mr. ███ spitting on Officer ███'s face, Officer ███ would

5  have typically and instinctually reacted by wiping the spit from his face.  According to the

6  documentation, however, Officer ███ did not do so, and instead, kept the spit on his

7  face for eighteen minutes.  The second discrepancy is that no photographs were taken of

8  Officer ███'s face.  Under the "Evidence" section of the incident report, "N/A" was

9  listed.  This is bad correctional practice.  Anytime it is alleged that an inmate batters an

10  officer – be it through physical force, gassing, or spitting – best practices dictate that

11  available evidence, including photographic evidence of injuries, should be gathered by

12  staff.  These issues are not addressed in the officer reports or by Captain ███ or the

13  OIA investigator.

14      251.    There is also no explanation in the documents I reviewed for why any force

15  was used against Mr. ███, let alone tipping him over out of his wheelchair.  Mr. ███ was

16  restrained in his wheelchair.  Once Mr. ███ spit on Officer ███ (if that in fact

17  occurred), all that the officers had to do to eliminate any risk to themselves was to move

18  away from him in his wheelchair.  In fact, because Mr. ███ was immobilized, any force

19  used against Mr ███ should have been a controlled use of force.

20      252.    Without discounting or trivializing the impact of an inmate spitting in an

21  officer's face, there very well may have been nothing more serious than that involved in

22  this incident, but the case still seems to be a comedy of errors.  We don't know whether

23  other factors or something more serious was involved in large part because no one ever

24  spoke with Mr. ███.  When Captain ███ had questions about this incident, he or one

25  of the LAC investigators could have interviewed Mr. ███ but they did not.  When OIA

26  accepted this case, the OIA investigator could have interviewed Mr. ███ early on to help

27  determine the nature and scope of the case.  That did not happen either.  Was Mr. ███

28  injured when he was thrown out of the wheel chair?  Did he, in fact, spit on Officer

1  ████ ?  Was there retaliation for his allegedly spitting on Officer ████ ?  Why was he,

2  as described by Officer ████ and Officer ████ , upset and irate at R&R?  Did he get

3  in the wheelchair compliantly or was he put in the wheelchair with a use of force?  Bed

4  sheets are not approved as "soft restraints," so why was a wheelchair the choice instead of

5  a gurney, a transportation chair or a restraint chair?  That last question is obviously for the

6  two officers rather than the inmate.  A number of those questions should have been asked

7  of Mr. ████ and of both officers.

8         253.    Another obvious question in this case is why Captain ████ , with access

9  to reports of both officers, the sergeant and the medical staff, all of which reported that

10  Officer ████ was in fact spit upon, recommended a major investigation based upon

11  those staff having either falsely reported or having improperly used force?  Beyond that,

12  the questions the Captain raised were valid and important.  What did happen at R&R as a

13  prelude to this incident on the yard?  The questions could have been answered directly and

14  easily at the institution-level without the OIA referral, unless the answers to questions

15  suggested other misconduct.  Then, once the referral was made, OIA could have easily

16  answered the relevant questions and brought this case to a clear disposition.  Instead, they

17  did nothing and simply punted the case back to the institution where it was closed without

18  answers.  There is no further information available to me about this case and I assume it

19  was dropped.

20         **G.    Sentinel Case 20-03, published June 15, 2020**

21         254.    The Office of the Inspector General (OIG) has oversight responsibility for

22  CDCR.  The OIG's office intermittently issues reports on its specific issues that they have

23  investigated and found to be of serious concern.  Those reports are public.  In addition,

24  when the OIG's office reviews a case involving investigation into staff misconduct and

25  finds that it, the OIG's office, has strong disagreement with the findings and or the

26  discipline imposed, it can issue a report specifically on that case.  The OIG's office calls

27  those "Sentinel Cases."  They are not particularly frequent.  For example, the case

28  discussed below was published in June 2020 but was only the third sentinel case in the first

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   five or six months of the year for all the CDCR's prisons.

2          255.   I have reviewed two sentinel cases from the OIG's office thus far.  I am

3   impressed.  Unlike the OIG use of force and disciplinary monitoring reports that are issued

4   on an annual and semiannual basis, respectively, the  Sentinel Cases I have reviewed

5   display a rigorous methodology and analysis and there is none of the pro-staff bias that

6   permeates the CDCR investigations.  Nevertheless, as a check and balance on CDCR, the

7   OIG is not effective.  Some of that may be a question of scale.  If CDCR's investigation

8   and staff discipline process were generally good, with occasional serious problems, then

9   the OIG might have the resources to highlight those occasional problems and CDCR might

10   be able to respond by bringing poor performers up to their generally accepted standard.

11   That is not the situation now and it has not been for some years.  It is as if the OIG's office

12   is set up to rescue individual hikers but instead, busloads of people keep falling off the

13   cliff.  The "falling off the cliff" analogy is not complete hyperbole because almost every

14   aspect of the CDCR investigation and staff discipline problem is deeply flawed or worse.

15   In addition to the problems of scale, and resources, the Sentinel Case illustrates how

16   CDCR exerts pressure over the OIG to suppress from the public portions of its

17   investigative files, thereby undermining the watchdog function of the OIG.  Third,

18   publishing analyses of CDCR problems does not seem to result in corrective efforts, either

19   within the department or politically.  The history of CDCR, unfortunately going back

20   decades, is that only court intervention has been effective.  Fourth, it is my understanding

21   that the OIG does not have the power to conduct independent investigations.  The OIG sits

22   on the Central Intake Panel and monitors some investigations conducted by OIA, but has

23   no independent investigative power.  When the OIG reviews CDCR's compliance with its

24   use of force policy, for example, the OIG's evaluations rely solely on paperwork produced

25   by the officers involved in the force incident, as well as the institution's review of the

26   incident; the OIG cannot interview the officers involved or the incarcerated people who

27   were the subject of the use of force, or gather any other evidence on its own.  Finally, the

28   most important question in evaluating the OIG's effectiveness in correcting or improving

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  CDCR's staff misconduct investigation and staff discipline process, is whether it has

2  produced substantial change.  It has not.

3      256.    This Sentinel Case is presented as a summary.  The longer and more detailed

4  OIG's report is well written and publicly available.

5      257.    This case involves the off-duty conduct of a correctional officer.  In

6  December 2018, the officer in question was alleged to have punched his girlfriend in the

7  face outside their apartment and then slammed his truck door on her hand, severing her

8  thumb at the first joint.  His girlfriend alleges that he came out of their apartment and they

9  were yelling at each other and then he punched her in the face and got in his truck.  She

10 said that she followed him to the truck, pleading with him to talk with her and that she had

11 her hand on the door jam.  She said that he slammed the truck door on her hand and she

12 passed out.  When she came to, he was driving away at a high rate of speed and a neighbor

13 had come out because of the yelling and found her bleeding from a cut lip and from her

14 severed thumb.  She called 911 and told them what happened and they dispatched police

15 and fire.  She also told the neighbor what had happened and the neighbor tried to locate her

16 missing thumb.  He did not but when the police arrived, they did find it although the

17 hospital was unable to reattach it.  They did give her approximately six sutures to close her

18 cut lip.

19     258.    CDCR opened an investigation which was conducted by OIA.  The OIA

20 investigator noted that the officer could not be contacted by police that evening and did not

21 return a call from police that night.  The officer told police and OIA that he had not

22 punched his girlfriend and that he had not slammed the truck door on her hand.  The police

23 department charged the officer and referred the case to the District Attorney.  The officer

24 was arrested and taken to a preliminary hearing where he was bound over.  The Warden at

25 the officer's prison reviewed the case and the OIA investigation and decided on

26 termination for the officer, based on specific charges of battery and lying to the OIA

27 investigator.  A CDCR attorney supported that conclusion.

28     259.    All was well until that point.  Then, at the *Skelly* hearing, the Hearing Officer

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

found inconsistencies in the girlfriend's statements and that the officer "presented himself humbly, confident in demeanor and body language, and was agreeing with his attorney." The Hearing Officer recommended withdrawing the discipline and at the prison, a new Warden was in place and the charges were dropped.  An attorney from OIG asked the new Warden how the girlfriend had sustained her injuries and he responded, "I don't know, I wasn't there."  The new Warden blamed the girlfriend and said that she could have tripped. Then the CDCR attorney changed her mind and supported the new Warden and the *Skelly* officer.  The OIG's office elevated this case to an associate director, to a deputy director and then to a director.  Those individuals took the position that the Department could not prove that it was more likely than not that the officer had punched his girlfriend and lied about it.  Then the girlfriend recanted, saying she was not sure if the officer had punched her.  The District Attorney's office dropped the criminal charges.

260.    While criminal court charges require proof "beyond a reasonable doubt," Departmental discipline is governed by a much lower standard of proof, "a preponderance of the evidence."  The fact that the girlfriend recanted some of her testimony does explain why the District Attorney's office would consider dropping criminal charges.  However, it is well established that victims of domestic violence do frequently drop charges, change their story and refuse to participate in prosecution.  That does not mean that the original story is wrong, particularly when supported by other evidence.  In this case the girlfriend had told the neighbor that the officer had punched her and slammed the car door on her hand.  She told that to 911 and then told that to the police when they arrived.  That was completely consistent with her injuries.  The Department's position was that one of the two parties was credible and the other was not.  The investigation had found that both individuals were drinking before this incident occurred and that the officer had had three drinks and that his girlfriend had had six.  However, the OIA investigation appears to have said that because that is what the officer told OIA and it appears that they had no other source for that conclusion.  CDCR also attempts to trivialize the girlfriend's injuries by describing the laceration to her lip that was extensive enough to require six sutures as "a

cut" and then referring to her loss of "the tip of her thumb." The reality is that she was permanently disfigured and lost her thumb entirely down to the first joint. That CDCR downplayed the victim's serious injuries for the sake of exonerating the responsible officer is a pattern that appears in many of the LAC and RJD investigations I reviewed. The Department also relied on her "inconsistencies" such as whether the officer was carrying one bag or two bags when he came out of the apartment and went to his truck initially. Again, this reliance on immaterial details to discredit a credible witness during a stressful event is the same pattern found with the cases involving inmate witnesses I have reviewed. As the OIG report points out, it is hardly surprising that she would get some minor details of the incident wrong, particularly when she was interviewed months afterward.

261.   The officer claimed that after he pulled the truck door shut, he opened it again because his girlfriend was sitting on the ground and he said that he asked her if she was alright and she ran into their apartment. He said that he saw no blood. When the police arrived, she was covered in blood. Additionally, the officer said that he had no idea how her thumb had been severed. He had not waited for the police at the scene and he had not responded to a police telephone call to him that night.

262.   The facts in this case speak for themselves. The officer received no discipline and is still working at the prison. When I reviewed this case, I did not know which prison was involved. However, Plaintiffs' counsel has informed me that they received information that the prison in question is ███ and the Warden who decided not to sustain the allegations is ███████████ ███████████ █████████████ ██████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████

H.   Mr. ████████, Incident on December 20, 2019, Local Inquiry into Incid████ No. LAC-D03-19-12-1095

263.   Defendants submit the Declaration of ██████████ to rebut Mr. ██████████'s declaration. In my review, I found Defendants' evidence does not establish that the

1  misconduct did not occur.  Instead, after reviewing the totality of the case record, I found

2  that the events outlined in Officer ███████'s declaration were not credible.  On the

3  contrary, there was sufficient evidence available in the case record to conclude that the

4  misconduct occurred as alleged by Mr. ██████.

5      264.    ██████████ is a thirty-six-year-old inmate at LAC.  He is a Coleman

6  class member with a history of schizophrenia and an ongoing need for psychiatric

7  medications.  His level of care is EOP.  The incident at the center of this case involving

8  Mr. ██████ took place on the afternoon of December 20, 2019.

9      265.    The staff version of events is presented in the report of Officer ██████.

10  According to Officer ██████, he was searching Mr. ██████'s cell along with Officer

11  ██████  As he left the cell, Mr. ██████ approached the two officers angrily and

12  yelled, "You need to keep your ass out of my fucking house."  Officer ██████ ordered

13  Mr. ██████ to return to his cell but he refused and then ordered him to turn around for

14  handcuffs.  Instead, Mr. ██████ took a step forward and punched Officer ██████ in the

15  face with his right fist and swung again with a left-handed second punch that missed.

16  Then the two officers grabbed Mr. ██████ by the upper arms or shoulders and pushed

17  him to the floor.  Mr. ██████ was able to roll onto his back and punch Officer ██████

18  twice in the face after which Officer ██████ punched Mr ██████ in the face.

19  Mr. ██████ was able to push Officer ██████ in the chest, unhooking his shirt

20  microphone, which struck him in the chin.  Officer ██████ then punched Mr. ██████

21  a second time in the face after which the two officers were able to get Mr. ██████n's arms

22  behind him and handcuff him at which point, he became cooperative.

23      266.    As has been true in almost all of these cases, the inmate version of events is

24  very different.  On December 18, two days before the use of force event, Mr. ██████

25  went to get his canteen order and was told it was not there.  On December 20, he returned

26  to the canteen but was again told that he was not on the list and there was nothing there for

27  him.  He was upset as he worried that someone might be stealing his canteen order.

28      267.    Later that afternoon he was on the phone in the day room when Officer

1  █████ told another inmate on the unit to tell him, Mr. █████, to get off the phone.

2  Mr. █████ looked over and Officer █████ was telling the other inmate or the control

3  booth officer to hang up the phone on Mr. █████. Instead, Mr. █████ continued to

4  talk on the phone as he said he had time left and wanted to finish his conversation.

5       268.   While Mr. █████ remained on the phone he saw Officer █████ signal

6  for the tower officer to open his cell door and saw Officer █████ go into his cell and start

7  to throw his personal belongings in to a bag on the tier. An inmate worker took the bag of

8  his personal belongings. Mr. █████ got off the phone and went over and took the bag

9  from the inmate porter. Officer █████ told him to drop the bag and when Mr. █████n

10 asked why, the officer told him to "cuff up." As Mr. █████ turned around to be cuffed,

11 Officer █████ punched him in the face without warning. Mr. █████ dropped the

12 bag and then fell and landed hard on the floor, fracturing his elbow he thinks. Then

13 Officers █████ and █████ punched him in the face and shoulders repeatedly as he

14 was on the ground and he tried to defend by punching them from a sideways position on

15 the ground. Then a group of officers, including Sergeant █████, responded to the alarm

16 and began to punch and stomp on Mr. █████ repeatedly. He rolled onto his stomach

17 and tried to protect his face. He felt like the officers broke one of his fingers.

18      269.   Mr. █████ was taken to the gym where he showed a nurse one of his

19 fingers that appeared deformed and he told her and a sergeant that he wanted to go to the

20 hospital, where he stayed until late that night.

21      270.   Mr. █████ found out that he did have a broken finger, a broken bone in

22 his left arm, a broken bone in his elbow and that one of his ribs was broken.

23      271.   In his interview, Mr. █████ was detailed and explicit about the use of

24 force, stating that Officer █████ "blind-sided" him by hitting him in the side of the

25 head and that he had been holding his bag of property and dropped it when he was hit and

26 then fell over the bag on to the floor, fracturing his elbow. He also said that he has

27 wondered why Officer █████ had it in for him and did not know if it had something to do

28 with his canteen orders or whether it was something else. He mentioned that he had not

1   been disrespectful to Officer ███ but that Officer ███ had seemed to have it in for

2   him and, for example, would not provide him with supplies that he provided for other

3   inmates.  He ended up telling the investigator that he simply did not know what the

4   incident was all about.

5        272.   The inquiry was conducted by Sergeant ███ of ISU at LAC and it is a

6   disaster.  It is ironic that for all of the many ways that the institution-level investigations

7   and the OIA investigations attempt to paint inmate victims and inmate witnesses as

8   unreliable, it is the investigators and the investigations themselves that are by far the most

9   unreliable.

10       273.   One simple example from the beginning of this incident is a good place to

11  start this analysis.  In the first paragraph of the conclusion of the inquiry, Sergeant

12  ███ writes, "On December 20, 2019, Inmate ███ was utilizing the housing unit

13  D-3 inmate telephones located in the day room.  ███ alleges to the PLO that he was

14  on the telephone list and that he was ordered to get off the phone when he still had more

15  time available for his sign-up time.  It was discovered that ███ was not on the phone

16  list for December 20, 2019, and that he was in violation of policy for utilizing the inmate

17  telephone without signing up."  Sergeant ███ lends weight to that indictment of

18  Mr ███ by referencing the phone sign-up list for that unit that day, which is attached

19  to the investigation as an exhibit.  The only part of that that is accurate is that

20  Mr. ███ was in fact on an inmate telephone in the day room.  He was not ordered off

21  the phone.  He was told to get off the phone by another inmate.  When he did not, Officer

22  ███ yelled at the other inmate or an officer to hang the phone up on him, he did not

23  give any order to Mr. ███.  Much more importantly, Mr. ███ did not allege to

24  Plaintiffs that he was on the telephone list.  That is not in the March 27 letter sent to the

25  CDCR Office of Legal Affairs about this incident, it is certainly not in Mr. ███'s

26  sworn declaration and it is not in his interview with Sergeant ███.  In fact, during that

27  interview, Mr. ███ tells Sergeant ███s clearly that he, Mr. ███, was not

28  signed up to use the phone that afternoon but that he followed common practice and waited

[3618106.1]

89                                    Case No. C94 2307 CW



1   until a phone was free and then used it. The reference to "still having time left on his call"

2   was because any call that is initiated has a time limit, and it was not a reference to his sign-

3   up time. It is clear in the interview that Sergeant ▮▮▮▮ understood that. It is also clear

4   in the interview that Sergeant ▮▮▮▮ understood that inmates are allowed to use the

5   phone even when they have not signed up, if the phone is free, and that inmates also trade

6   phone time and generally work out the phones with each other. It is clear that Sergeant

7   ▮▮▮▮ knew that because Mr ▮▮▮▮, in his recorded interview with Sergeant ▮▮▮▮

8   about the same incident, explained that same issue in the same way and Sergeant ▮▮▮▮

9   acknowledged that and did not react or object. What Sergeant ▮▮▮▮ has done is to

10  intentionally distort and fabricate the facts on this issue in order to make it a major source

11  of evidence indicating that Mr. ▮▮▮▮ is not being truthful. It is not just Sergeant

12  ▮▮▮▮' failure to acknowledge that Mr. ▮▮▮▮ said in his interview that he had not

13  signed up for the phone. It is also Sergeant ▮▮▮▮' emphasis in the conclusion to his

14  inquiry that Mr. ▮▮▮▮ was in violation of department policy. Sergeant ▮▮▮▮ knew

15  that that policy was roundly ignored by inmates and staff alike when the phones were not

16  fully used by those who had signed up, but he does not say that. This is reminiscent of the

17  interview in the ▮▮▮▮ case of Mr. ▮▮▮▮ by an ISU sergeant and an ISU lieutenant, who

18  then fabricated the results of that interview to make it appear that Mr. ▮▮▮▮ was a

19  reliable witness contradicting Mr. ▮▮▮▮ and corroborating the staff version of events. It is

20  difficult enough to contemplate physically disabled and mentally ill inmates being preyed

21  upon, humiliated and beaten without reason. It is more difficult to recognize that the very

22  staff supposedly chosen and trained to hold the rest of the staff accountable for serious

23  misconduct, will themselves go to almost any lengths to exonerate staff, no matter what

24  they have done, and to find inmates culpable, even when blameless.

25          274.    The events around the telephone use in the dayroom are seminal in this case.

26  According to Mr. ▮▮▮▮, the reason that Officer ▮▮▮▮ went into his room and began

27  throwing his personal effects out of his cell was in retaliation for Mr. ▮▮▮▮ not getting

28  off the phone when Officer ▮▮▮▮ wanted him to. That is a plausible explanation. What

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  is not plausible is that both Officer ███ and Officer ███ begin their reports by

2  saying that they were searching Mr. ███ s cell.  Neither says why.  Was it a "for

3  cause" search?  Was it one of the random "cell shakes" that are required intermittently?  It

4  does not appear to be either of those.  Both officers acknowledge that Mr. ███'s

5  property was in the plastic bag.  Why was that?  If it was contraband found during the cell

6  search, perhaps more clothes or more books than are allowed in a cell, then the officers

7  would have recorded that, documented the cell search, and told Mr. ███ that there

8  was contraband in his cell.  They might have written him up for contraband.  (I use

9  contraband in the prison meaning of the term, which is anything not permitted, rather than

10 the narrow meaning of illegal drugs).  If, in fact, the officers had found more shirts or more

11 sweatpants than are allowed, they would not have thrown them out.  They would have put

12 them aside to be laundered and reissued.

13      275.   None of this makes any sense.  Why did Sergeant ███ not ask each

14 officer about the interchange concerning phone usage?  Why did Sergeant ███ not ask

15 each officer why they happened to be searching Mr. ███'s cell, and why they were

16 throwing his personal property out?  Here, the investigator went to great lengths to build a

17 case against Mr. ███ based on his phone usage, in an attempt to undermine his

18 credibility, but he ignores procedural discrepancies that someone would recognize after

19 having worked a week in a prison.  I fear this is not bias; it appears to be something quite

20 different, a lack of integrity.

21      276.   The crux of this case is who punched who first.  I don't know.  I know which

22 individuals have more credibility.  If CDCR had cameras in its prisons as it should have

23 years ago, we would know definitively.  Or perhaps the cameras would have prevented this

24 incident from occurring.  Instead, we are left with testimony from a variety of individuals

25 and inference.  Officers ███ and ███ allege that Mr. ███ punched Officer

26 ███ in the face first.

27      277.   Officer ███, the control booth officer, corroborates the reports of the two

28 officers and states that Mr. ███ initiated the fight with a punch to Officer ███'s

[3618106.1]

91

Case No. C94 2307 CW

1   face. Mr. ███ disputes that and alleges that Officer ███ punched him in the

2   head without warning or provocation.  Three inmates provide eyewitness testimony that

3   Mr. ███ was on the phone in the day room and that Officer ███ wanted him off

4   the phone.  All four inmate witnesses support Mr. ███ that once he was taken to the

5   floor or had fallen on the floor, he was given a serious beating.  There are variations

6   among the four inmate witnesses about which officers were hitting Mr. ███, how

7   many times, and where.  One of the inmate witnesses could not see who hit whom in front

8   of the cell at the beginning of the altercation but the other three inmates were in agreement

9   that one of the officers began the fight by punching Mr. ███ in the face, although all

10  three inmate witnesses had Officer ███ throwing that first punch while Mr. ███

11  said it was Officer ███.

12         278.   Another aspect of this situation that is not easily understood is that there is

13  no dispute that the physical altercation began in front of Mr. ███'s opened cell door

14  and began with Officer ███ ordering Mr. ███ to "cuff up."  Why not continue

15  with direction for Mr. ███ to go into his cell.  Once he is in his cell and his cell door

16  is closed, there is no imminent danger to anyone and the officers could have returned with

17  a disciplinary report for Mr. ███ if they felt that was warranted.  Instead, Officer

18  ███ switched from telling Mr ███ to get in his cell, once, to telling him submit

19  to handcuffs.  That does not answer most of the questions in this case but it is unusual.

20         279.   I have reviewed other CDCR investigations in which there was clear

21  evidence of officer collusion in writing reports.  That specter is raised in this case in the

22  reports of Officers ███████████████.  All three officers report that

23  Mr. ███ yelled, "You need to keep your ass out of my fucking house."  It is

24  exceptional that all three officers would have remembered that, after a violent incident that

25  went on for some time, and remembered it to the exact word.  Also, Mr. ███ yelled

26  that, and most people in reporting that, would have used an exclamation point at the end

27  rather than a period.  None of these three officers did.  Officer ███ writes that due to his

28  distance from the incident scene he was unable to identify the exact specific hand

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES



1   placement the two officers used in subduing the attack.  However, with several officers

2   around Mr. ███████ on the floor, Officer ██████ was able to observe "█████ and

3   ████████ securing ████████ in handcuffs. ████████ was moving his upper torso back in

4   (sic) forth while Officers ███████████ and ████ntes were applying downward pressure

5   with their hands on ████████'s upper torso area."  That is extraordinary from that distance

6   with several officers around Mr. ████████ and moving.  It raises the question of whether

7   Officer ████████ used Officer ████████'s or Officer ████████'s report as a model in

8   preparing his report.

9        280.   The other major issue in this case is the discrepancy between the force

10  reported by the officers and the injuries received by Mr. ████████. Mr. ████████ received

11  four broken bones: a fractured finger, a fractured elbow, another fractured bone in his arm,

12  and a broken rib.  The force reported by staff is two punches to Mr. ████████'s face.

13  Obviously, the four broken bones are not in his face or head and did not result from two

14  punches to the face.  Mr. ████████ and four inmate eyewitnesses describe a beating by

15  officers that is consistent with Mr. ████████'s injuries.  It should be noted that one of

16  those injuries, the fractured elbow bone, occurred according to Mr. ████████ when he was

17  initially punched in the face, causing him to fall over the plastic trash bag that he had just

18  dropped on to the floor.  The investigator suggests that none of Mr. ████████'s broken

19  bones were caused by use of force from any officers.  The notion that Mr. ████████

20  suffered a broken rib because of the weight of the two officers when they took him to the

21  ground, seems most unlikely.  Mr. ████████ is not some seventy-five or eighty-year-old

22  inmate with fragile bones.  The investigator also suggests that Mr. ████████ broke a finger

23  on his left-hand punching Officer ████ or Officer ████████.  It could not have been

24  Officer ████████ because according to the staff reports, Mr. ████████ threw a left handed

25  punch at Officer ████████ but missed and all of his other left handed punches were when he

26  was on his back on the ground, punching at Officer ████████. Mr. ████████ described it

27  as, "punching sideways."  All things are conceivable but it seems most unlikely, again, that

28  while Mr. ████████ was on his back, he could have gotten enough leverage to punch

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  Officer ███████ hard enough to break his own finger.  Even with these improbable

2  explanations of Mr. ██████'s injuries, the investigator simply ignores the fact that

3  Mr. ██████ also sustained a broken bone in his arm.  All of Mr. ████████s injuries are

4  completely consistent with his having been punched and kicked by several officers after he

5  was on the floor.  Also left unexplained are the medical records stating that there was loss

6  of consciousness, possible concussion, extensive suturing and serious disfigurement.  None

7  of that is consistent with the staff version of events but all of it is consistent with what

8  Mr. ██████ and the inmate witnesses stated.

9       281.   There are a number of aspects of this investigation package that speak to

10  broader issues than this case.  The "Incident Commander Review/Critique: Use of Force

11  Incidents" states, "██████'s injury to his left hand was clearly and unquestionably a

12  result of his willful and unlawful attack on custody."  That was written in this case by

13  Lieutenant ██████ but it demonstrates the degree to which various forms, reviews, and

14  checks and balances that CDCR represents as leading to meaningful accountability, are in

15  fact hopeless exercises in bias, and worse.  No reasonable person could review this case

16  and determine that Mr. ██████'s injury to his left hand, a fractured finger, was "clearly

17  and unquestionably" a result of his punching staff rather than a result of staff punching,

18  kicking or stomping on him.  It is also even possible that it was the result of some other

19  aspect of this situation.  In the next check and balance, the Manager's Review, first level,

20  Captain ██████ writes, "The Incident Commander determined SBI was a result of his

21  striking officers in the face, not the physical force by either correctional officer."  That's

22  ridiculous.  There were four broken bones.  Each constitutes SBI.  Perhaps Captain

23  ██████ would simply agree that Mr. ██████ did not break his rib by using it to strike

24  an officer in the face.  Then, the next check and balance in the CDCR system is the second

25  level Manager's Review.  Associate Warden Jordan simply concurs with the conclusions

26  of the Incident Commander and Captain ██████.  It could not be more clear that the

27  review process is a sham.

28       282.   Before leaving Mr. ██████, it is worth mentioning that he did not

1  immediately file a 602 complaint about this use of force and said that he did not do so
2  because he was afraid of retaliation.  He similarly refused a video interview after the
3  incident.  With enough retaliation occurring, there can be no reliance on inmates reporting
4  officer misconduct.  Retaliation and harassment can both have a chilling effect on victim's
5  willingness to report serious matters.  That should not be a surprise to anyone.

6        283.    This is also one of a number of cases that I have reviewed in which an
7  inmate is found guilty of an RVR based on the incident in question but before any
8  meaningful investigation has been undertaken.  Then, during the investigation, the finding
9  of guilty on the RVR is used as strong evidence that the inmate's version of events should
10  not be believed.  That kind of circular reasoning and illogic may strike me as almost
11  humorous when I am reviewing a case, but for an inmate it must feel like they are being
12  held in a system designed by Kafka.

13        284.    This case is an excellent exemplar that the standards and procedures that are
14  used so studiously to try to discredit inmate statements and testimony are just as studiously
15  avoided when dealing with officer statements or testimony.

16        285.    Unless the situation is one staff member reporting misconduct by another
17  staff member, or there is video showing indisputable misconduct, CDCR investigators will
18  find a way to exonerate staff and in the rare cases where they cannot, the Wardens or
19  Skelly hearing officers will ignore the investigation results and minimize sanctions or clear
20  officers.  When that fails to dispense with a misconduct investigation, the CDCR attorneys
21  or Central Office administrators step in to whitewash the case, as happened in the OIG
22  Sentinel Case, 20-04.

23        286.    Finally, CDCR has said that this staff misconduct investigation procedure
24  will be largely fixed by the transition to a new procedure, AIMS.  I do not believe that is
25  true.  Most importantly, in the cases I have reviewed at LAC and earlier at RJD, the OIA
26  investigations were so deeply biased and incompetent and/or incomplete that there will be
27  no quick or easy fix.  Second, even if OIA were much better than it is, many cases that
28  should go to OIA under the new system, will not.  Under AIMS, use of force cases

involving SBI should be sent to OIA.  However, when the staff conclude, as they have in
this case, that inmate injuries, although multiple and serious, were somehow self-inflicted
or at any rate not the obvious result of staff use the force, then no matter how twisted or
unjustified that conclusion, the case will not go to OIA and there will be no external
review beyond the facility itself.  AIMS is not the answer to the many and deep-seated
problems with CDCR investigations of staff misconduct, nor is it close to the answer.

**I.    Mr. ███, Incident on October 9, 2019, OIA Case No. S-LAC-015-19-A**

287.    This case is in many ways the most simple of all of the cases that I have
reviewed, and the easiest in one way in that no one was injured, even minimally.  At the
same time, this case offers an unusually vivid picture of both the CDCR culture and the
actual goals of the CDC staff misconduct investigative process, as opposed to the stated
goals, which are quite different.  The investigation in this case was handled exclusively at
the OIA level.

288.    Mr. ███ is a *Coleman* class member with a long psychiatric history.  His
level of care is EOP.  He is sometimes irritable, loud and disruptive.  On October 9, 2018,
Mr. ███ was in a group treatment session lead by Psychologist ███  He became
upset with Dr. DeLight and began yelling and swearing at her.  She walked out of the
classroom where the session was taking place and requested that custody staff remove
Mr. ███ from the group session.  Officer ███ had heard the yelling in the classroom
and responded by walking toward the classroom.  She was the closest officer when the
clinician made her request to remove Mr. ███.  Officer ███ went into the classroom
and talked with Mr. ███, calming him down.  She had known Mr. ███ for four or five
months and escorted him frequently.  She undid Mr. ███'s ankle restraints and then took
him to a nearby holding cell where she removed his waist chains and handcuffed him
behind his back for the escort back to his housing unit.  Officer ███ describes escorting
Mr. ███, walking next to him with her left arm on his right bicep and talking to him.
After a short distance in the corridor, Mr. ███ noticed an officer several feet behind
them and told him something to the effect of "we don't need you.  You don't need to be

1  following us." Officer ███, according to Officer ███, responded, "If you stop the
2  escort again, I am going to take you to the floor." Very shortly after that, still according to
3  Officer ███ Officer ███ rushed up between Officer ███e and Mr. ███, put his
4  hands on Mr. ███'s chest and took Mr. ███ to the floor. Officer ███ fell on top of
5  Mr. ███, holding him down and Officer ███e held his legs by the ankles to stop him
6  from kicking. Other officers arrived quickly because Officer ███ had initiated her alarm
7  and called for a Code 1 response over the radio as soon as Officer ███ had started to
8  use force. Mr. ███ was led away in restraints and medically evaluated. Neither he nor
9  either of the two officers involved sustained any significant injuries, although in his video
10 interview several days later, he complained of back and elbow pain.

11      289.   Officer ███ and Officer ███ wrote contradictory reports. Officer
12 ███ said that Mr. ███ had stopped the escort for the second time, turned away from
13 Officer ███ breaking her hold on his bicep and that at that point Officer ███ had
14 gotten between them, essentially to protect Officer ███ and that Mr. ███ who had
15 taken a bladed stance, advanced towards Officer ███ who then took him to the floor by
16 putting his hands on his chest and putting his left leg behind Mr. ███'s left leg and
17 pushing him to the floor. His report did not mention threatening Mr. ███ with being
18 taken to the floor if he stopped the escort.

19      290.   Officer ███'s report recounted the threat from Officer ███ and then
20 described Officer ███'s use of force as occurring without provocation as she was
21 escorting Mr. ███s. Sergeant ███ noticed the discrepant reports and notified her
22 supervisor (Lieutenant ███, no relation I hope). He spoke with Officer ███ and
23 she then submitted a memo about the incident. That memo made clear that Officer ███
24 was reporting that Officer ███ had threatened Mr. ███ with taking him to the floor,
25 that Mr. ███ was not resisting and that Officer ███'s use of force was unnecessary.

26      291.   Some three months after the incident, LAC Warden Johnson requested an
27 OIA investigation and Special Agent ███ was assigned at OIA. The two
28 allegations were that Officer ███ had been unprofessional in that he threatened force

1   against Mr. ███ and that he then used immediate force when none was necessary.  In

2   addition to the video interview that had been conducted at LAC with Mr. ███ several

3   days after the incident, the OIA investigation consisted of six interviews, each audio

4   recorded.

5        292.    There are two aspects of this case that stand out.  The first is that the singular

6   goal of the investigation was to exonerate Officer ███.  The second is that Officer

7   ███ was doing an exceptionally good job working with Inmate ███ but that was

8   contrary to the culture of CDCR.

9        293.    To begin with the second of those issues, Sergeant ███, in her interview

10  with OIA, was asked about Officer ███ and said that Officer ███, "knows how to talk

11  to people but won't take initiative independently."  Although this case presents only a

12  small sample of Officer ███'s professional conduct, it could not be further from

13  Sergeant ███'s assessment.  When this incident began, there were other officers in the

14  area but it was Officer ███ who walked down toward the classroom when she heard

15  yelling, putting her in a position to respond to the clinician's request to remove Mr. ███

16  from the classroom.  Officer ███ went into the classroom and immediately began

17  calming Mr. ███ down, relying on her positive relationship with him and telling him

18  they would have a chance to talk about it as she escorted him and that she would listen.  In

19  her report, her memo and her interview, she provides chapter and verse of her truly

20  excellent work with an admittedly difficult inmate.  If only more CDCR correctional staff

21  had her skills at de-escalation and her understanding of the importance of using them.

22  Officer ███ also has an even more important attribute: integrity.  After all of the cases I

23  have reviewed and the seeming mountain of code of silence and cover-up examples, it is

24  refreshing to find an officer, a very experienced officer at that, who simply tells it as it is,

25  without regard to whether it puts an inmate or a staff member in a bad light.

26       294.    Rather than recognizing Officer ███ for her good work in this case or for

27  her willingness to report it honestly, everything that is a part of this case record after her

28  memo to Lieutenant ███ underscores the degree to which she is out of step with what

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1  is expected, the CDCR culture.  Is it just that Officer ███ is good at "talking with

2  inmates"?  No.  In this incident, she took the initiative to respond to yelling in a classroom

3  before other custody staff had, she correctly removed Mr. ███'s classroom restraints and

4  substituted behind the back handcuffs for escort, she began the escort without hesitation

5  noting that she had already calmed Mr. ███ down, she encouraged Mr. ███ to ignore

6  the provocative and threatening comment from Officer ███, she immediately initiated

7  her alarm and radioed a "Code One" as soon as the use of force began and, in spite of her

8  belief that the use of force was unnecessary and unjustified, she immediately grabbed and

9  held Mr. ███'s ankles once he was on the floor to prevent him from kicking.  What

10  more could she have done?  Yet her sergeant, both OIA investigators, the CCPOA

11  representative and the *Skelly* hearing officer all paint her as the scapegoat in all of this.

12      295.    The heart of the OIA investigation is the interview of Officer ███.  That is

13  unusual because the expectation would be that the focus of this investigation would be on

14  Officer ███, or perhaps Mr. ███, or both.  It was not.  The OIA interview with

15  Officer ███ is just over one hour.  By contrast, in the ███ case, the interviews of two

16  key eyewitnesses were two minutes and three minutes each in duration, respectively.

17      296.    As the OIA interview with Officer ███ goes on, it takes on the

18  characteristics of a police interrogation of a felony suspect.  The two OIA investigators

19  both ask questions of Officer ███, after a while in the interview they began to alternate

20  questions and ask them more rapidly, and a third person participating in the interview

21  occasionally chimes in with something new or to clarify one of the two investigator's

22  questions, but always putting more pressure on Officer ███.  The investigators would

23  return to the same question at different points in the interview, repeating it two or three

24  times as if checking for the officer's veracity, or giving her a chance to recant, which she

25  did not.

26      297.    The investigators also raised issues that had not been brought up previously

27  by either Officer ███ or Officer ███ and which were intended to exonerate Officer

28  ███.  For instance, they asked Officer ███ if the events had happened so quickly that

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES



1   it was possible that Mr. ███ did something to resist which she did not see.  Officer

2   ███ answered "no."  They asked if she was certain that Mr. ███ didn't resist and she

3   said that she was certain.  They asked if perhaps Mr. ███ was following orders from

4   Officer ███ and Officer ███ said something to the effect that Officer ███ had not

5   given orders, he had just threatened.  During the hour plus interview, the investigators

6   would come back to the question of whether Mr. ███ resisted and ask that multiple

7   times.  They asked multiple times whether Mr. ███ had stopped the escort.  Each time,

8   Officer ███ would say that Mr. ███ was walking very slowly but not stopping.  The

9   investigators attempted to portray Mr. ███ as an extremely disruptive, profane and

10  extremely difficult and threatening inmate.  Officer ███ acknowledged that he was

11  occasionally disruptive and that he occasionally swore but would not agree with the rest of

12  that.  They pushed on her about whether a two officer escort had been required to take

13  Mr. ███ back to his living unit and she said two officers were not required and that

14  Mr. ███ had not been trouble when she took off the waist chains and put on the

15  handcuffs and that she was letting him vent and talking to him and listening.  She said she

16  was continuing to calm him down.  She said clearly that she did not see any "bladed

17  stance."

18          298.    Officer ███ was consistent and resilient throughout.  She was asked a third

19  time whether Mr. ███ had stopped the escort.  She said he had not.  She was asked

20  whether when she held his legs on the ground, he was resisting, as if that would shed light

21  on whether he had been resisting before the use of force.  She acknowledged that he was

22  loud during the escort but not resistive.  At approximately thirty nine minutes and thirty

23  seconds into the interview, the female investigator begins by saying that in her experience

24  as an officer and then as a sergeant and then as a lieutenant, and then goes on to make the

25  point that it was natural for Officer ███ to want to provide back up for the escort by a

26  female officer.  The investigators try to make the point that Officer ███ is relatively

27  small and that Mr. ███ is substantially larger.  Officer ███ responds that it was not a

28  consideration and that she believes she is taller than Mr. ███.  Then the female

[3618106.1]

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   investigator returns to the question of whether Officer ███ should have waited for a

2   second officer before starting the escort.  Officer ███ disagrees once again and at that

3   point the investigator devolves into simply arguing with her.  It could not be more clear

4   that Officer ███ is being treated as a suspect by OIA because she has had the temerity to

5   report that another officer used force unnecessarily.

6        299.   None of the interrogation style interviewing methods are used with Officer

7   ███, although he is the subject of the investigation and the person against whom the

8   allegations have been made.  This case fits squarely within a pattern that I identified in my

9   review of cases at RJD and that pattern has continued to hold with the cases at LAC.  More

10  specifically, inmate allegations are assumed to be false and the testimony of inmate victims

11  and inmate witnesses is ignored, or discounted and then ignored, but with two exceptions.

12  If the allegations include direct video evidence that misconduct has occurred or if there are

13  staff allegations about other staff misconduct, then those cases are not typically dismissed

14  out of hand.  In the OIG Sentinel Case 20-04, there is direct video evidence that officers

15  engaged in the beating of an inmate for no other reason than retaliation, and then lied about

16  it in their reports.  The video evidence was questioned, attacked and ultimately ignored,

17  demonstrating that even video surveillance evidence is not sufficient for holding staff to

18  account for their misconduct against inmates.  Similarly, in this case, with an officer

19  reporting unnecessary force by another officer, the officer witness is attacked, her

20  truthfulness is questioned but ultimately the case cannot be dismissed out of hand.  Instead,

21  in the few cases where there is video evidence or where there is a staff member reporting

22  misconduct by another staff member, minimal allegations are sustained and then the

23  sanction against the officer is negotiated down to something trivial and transient.

24       300.   In this case, the whole premise of the use of force is ridiculous.  An inmate is

25  being successfully escorted to his housing unit after causing a disruption in a psychology

26  group treatment session.  The inmate is already in handcuffs.  If the inmate is not

27  assaulting someone, what is the point of taking the inmate to the ground?  That is usually

28  done so that the inmate can be put in handcuffs and then escorted to his housing unit.

REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

1   Here, the inmate is already in handcuffs and being escorted to his housing unit.  If the
2   inmate is becoming uncooperative or beginning to resist, the obvious answer is to get one
3   or two more staff to help with the escort.  The point is that taking someone to the ground is
4   usually done to get handcuffs on and then escort the inmate to a holding cell, medical or
5   their living unit.  That has already been accomplished with Mr. █████ so what is the point
6   of taking him to the floor except as retaliation by Officer █████, for not being deferential
7   enough when Officer █████ threatened him.  Further, why did Officer █████ threaten
8   him, which is not only a policy violation but also counterproductive.  Why not join Officer
9   █████ in encouraging Mr. █████ to calm down, talk it out, etc.?

10        301.   It is easy to overlook in this situation but Officer █████ acted in a manner
11   that is directly contrary to officer safety.  By physically engaging with Mr.█████, he,
12   Mr. █████, and Officer █████ could have been hurt during the use of force.  Fortunately,
13   they were not.  It is of particular concern that Officer █████ describes putting his hands
14   on Mr. █████'s chest and then putting one of his legs behind one of Mr. █████'s legs and
15   pushing him to the ground.  That is essentially a "leg sweep."  The problem is that when an
16   inmate is pushed to the ground while he or she is handcuffed behind the back, then the
17   inmate may sustain serious injuries to the head or face.  That is not uncommon.  Here,
18   Officer █████ makes no mention of anything to protect Mr. █████ from that kind of
19   injury.  No one alleges that Mr. █████ was assaultive and even if he did stop the escort
20   momentarily, so what?  Officer █████'s contention that Mr. █████ took a "bladed
21   stance" fails on two grounds.  First, Officer █████ states clearly that that did not happen.
22   She was right there and she did not know Officer █████ and has no plausible motive for
23   accusing him of something he didn't do or getting him in trouble.  Second, just how does
24   an individual who is handcuffed behind his back take a "bladed stance"?

25        302.   There are other, more minor, questions in this case.  The medical evaluation
26   of Mr █████ after the use of force is done by a psychiatric technician.  That has happened
27   in other cases and it is not clear why medical evaluations would not be done by medical
28   nurses rather than psychiatric technicians.  Second, Officer █████ describes approaching

[3618106.1]
102                          Case No. C94 2307 CW

1  Mr. ████ and in his interview he says he is within one foot of Mr. ████. There are two

2  problems. First, Officer ████ says that Mr. ████ then took a step toward him. That

3  could not happen if Mr. ████ was less than twelve inches from the officer unless

4  Mr. ████ stepped into him, which Officer ████ would have described as an assault.

5  He does not describe that. Second, Officer ████ says that with his hands on

6  Mr. ████'s chest, he put his left leg behind Mr. ████'s left leg to push Mr. ████ off

7  balance onto the floor. That would have had to be Mr. ████'s right leg. It seems

8  probable that that was simply a mistake in Officer ████'s report writing but it is

9  extraordinary that with all of the minute scrutiny of Officer ████ and the situation, no one

10  noticed this discrepancy. This case was supposedly reviewed in detail by the Incident

11  Commander, a Captain, an Associate Warden, the Warden, two OIA investigators, and a

12  Skelly Hearing Officer. None of them noticed that? There is also Officer ████'s

13  testimony that he thought Mr. ████ was going to head strike, spit or kick and that is why

14  he took Mr. ████ to the ground. That is not adequate justification for a use of force. It is

15  not enough for an officer to say "I thought I was in jeopardy." There must be some

16  objective reality but in this situation all that Officer ████ offers is that he approached

17  Mr. ████ in order to create a barrier for Officer ████. There is no indication that

18  Officer ████ needed or wanted a barrier and she has stated clearly that she did not need

19  assistance. Beyond that, Officer ████ did not provide assistance with the escort, he

20  terminated the escort.

21        303.    There is one more chapter in this case and that is the *Skelly* hearing. It is a

22  farce. The CCPOA representative and Officer ████ do a demonstration for the Skelly

23  officer, roleplaying part of the incident but without either Mr. ████ or Officer ████

24  present to ensure that what they are demonstrating is accurate. The *Skelly* Hearing Officer

25  says that Officer ████ failed to acknowledge the situation and to control it because of her

26  incompetence which led her to make false accusations to justify her failure to act and

27  control. That is astonishing. I do not know Officer ████'s history but in this incident,

28  she acted decisively and appropriately from the beginning of the incident. Evidently, the

1  Hearing Officer and the CCPOA representative both fault Officer ███ for effectively

2  using de-escalation techniques and for failing to use force on Mr. ███ before Officer

3  ███ did.  There is no indication anywhere in this case record that Officer ███ lost

4  control or that Mr. ███ was out of control from the time she first made contact with him.

5  Mr. ███, the CCPOA representative, said at the *Skelly* hearing that if force had been

6  used unnecessarily, Mr. ███ would have said so during his 7219-medical assessment.

7  That is simply not so, as I have seen in a number of other cases.  Mr. ███ did say

8  clearly that the force was unnecessary, and he said it in both his complaint and in his

9  interview within days of the incident itself.  Mr. ███ then, at the *Skelly* hearing,

10 unwittingly corroborates Officer ███ and Mr. ███'s version of events by suggesting

11 that Officer ███ had advised Mr. ███ that the situation could lead to force.  Officer

12 ███ has insisted that he did not say that but here his representative acknowledges it in

13 trying to minimize what Officer ███ did.

14      304.   Finally, the Hearing ███ decides that the proper disposition is to

15 withdraw the action against Officer ███ entirely.  In coming to that determination, the

16 Hearing Officer noted that Mr. ███' disciplinary history should be considered as a

17 mitigating factor in determining what discipline to impose on Officer ███.  Of course,

18 the Hearing Officer did not also investigate Officer ███'s disciplinary history to

19 determine whether that should count as an aggravating factor.  That is consistent with how

20 investigators treat the disciplinary histories of victims of misconduct, where inmates'

21 disciplinary histories are used to discredit and undermine their credibility, while the

22 disciplinary histories of the implicated officers are omitted entirely.  Ultimately, the

23 Department negotiated the sanction down to a letter of reprimand that would be removed

24 from Officer ███'s file within six months.

25      305.   In considering the amount of pressure put on Officer ███ to change her

26 story or recant, and the degree to which she was subject to scrutiny, insulted professionally

27 and accused of bad motives, when what she actually did was demonstrate first-rate

28 correctional work with a difficult inmate and comply with CDCR policies requiring

1  reporting of fellow officers' unnecessary force, is it any surprise that a deep-seated code of

2  silence continues to be maintained within CDCR?

3

4         I declare under penalty of perjury under the laws of the United States of America

5  that the foregoing is true and correct to the best of my knowledge, and that this declaration

6  is executed at Campbell, California this 2\forall day of September, 2020.

7

8                                                Jeffrey A. Schwartz, Ph.D.

9  (

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
REPLY DECL. OF JEFFREY A. SCHWARTZ, PH.D. ISO PLS.' MOTION TO STOP DEFS FROM
ASSAULTING, ABUSING AND RETALIATING AGAINST PEOPLE W/ DISABILITIES

**APPENDIX A**

| **DESCRIPTION OF DOCUMENTS UPLOADED TO SHAREFILE FOR JEFFREY SCHWARTZ BY ROSEN BIEN GALVAN & GRUNFELD LLP, as of September 24, 2020** |
| --- |
| Defendants' March 13, 2020 Verified Response to Plaintiffs' Special Interrogatories |
| Excerpts from CDCR Department Operations Manual (DOM), updated through 2020 |
| Plaintiffs' February 28, 2020 RJD Motion and Supporting Documents and Exhibits, Proposed Order |
| Index of Appeals and Institution-Level Inquiries into Staff Misconduct at RJD, as of 03/31/20 |
| Index of Appeals and Institution-Level Inquiries into Staff Misconduct at RJD, as of 04/17/20 |
| Index of Appeals and Institution-Level Inquiries into Staff Misconduct at RJD, as of 04/20/20 |
| Index of OIA-Level Investigations into Staff Misconduct at RJD, as of 03/31/20 |
| Index of OIA-Level Investigations into Staff Misconduct at RJD, as of 04/01/20 |
| Index of OIA-Level Investigations into Staff Misconduct at RJD, as of 06/01/20 |
| December 10, 2018 Memorandum from Associate Warden Bishop to Associate Director Seibel |
| December 2015 Office of Inspector General Report re High Desert State Prison (HDSP) |
| January 2019 Office of Inspector General Report re Staff Complaints at Salinas Valley State Prison (SVSP) |
| March 25, 2020 CDCR Emergency Rules, Office of Administrative Law Mater No. 2020-0309-01 |
| 2019 CCPOA-CDCR Bargaining Agreement |
| April 4, 2018 Letter from Don Specter to CDCR Secretary Scott Kernan |
| May 5, 2020 Letter from Penny Godbold to Tamiya Davis and Joanna Hood, Defendants' Counsel |
| AIMS Flowchart (produced at Bates No. DOJ00093720) and AIMS UOF Flowchart (produced at Bates No. DOJ00093721) |
| Exhibits 89 and 90 to Freedman RJD Declaration (video media) |
| Exhibit 11 to February 4, 2020 Deposition of Tricia Ramos |
| Documents produced in *Armstrong v. Newsom* relating to OIA investigations and local inquiries into allegations of staff misconduct at RJD involving *Armstrong* class members, at beginning Bates Nos.: <br> • ▮▮▮▮▮▮ – DOJ00017312, DOJ00059503 <br> • ▮▮▮▮▮▮ – DOJ00018042, DOJ00059511 <br> • ▮▮▮▮▮▮ – DOJ00018506, DOJ00059477 <br> • ▮▮▮▮▮ – DOJ00003238, DOJ00079077, DOJ00065484 <br> • ▮▮▮▮▮ – DOJ00056575 <br> • ▮▮▮▮▮▮ – DOJ00017408, DOJ00012683, DOJ00017612, DOJ00012753, DOJ00020158, DOJ00017000, DOJ00016518, DOJ00016522, DOJ00016526, |

**APPENDIX A**

---

**DESCRIPTION OF DOCUMENTS UPLOADED TO SHAREFILE FOR JEFFREY SCHWARTZ BY ROSEN BIEN GALVAN & GRUNFELD LLP,**
**as of September 24, 2020**

DOJ00016528, DOJ00016524, DOJ00016540, DOJ00016531, DOJ00016538, DOJ00016534, DOJ00016546, DOJ00016530, DOJ00020158, DOJ00076199, DOJ00065146, DOJ00076203, DOJ00047738

- ██████████ DOJ00018479, DOJ00048246, DOJ00065664, DOJ00091038, DOJ00091070

- ██████████ – DOJ00052714, DOJ00018158, DOJ00052918, DOJ00020109, DOJ00047983, DOJ00047986, DOJ00047989, DOJ00047991, DOJ00047994, DOJ00047985, DOJ47988, DOJ00047993, DOJ00059440, DOJ00090954, DOJ00090956, DOJ00071742, DOJ00065571

- ██████████ – DOJ00017244, DOJ00056124, DOJ00019999, DOJ00056065, DOJ00076250, DOJ00076251, DOJ00076252, DOJ00076253, DOJ00078554

- ██████████ – DOJ00017220, DOJ00052424, DOJ00052470, DOJ00055435, DOJ00055999, DOJ00055516, DOJ00091030, DOJ00091046

- ██████████ DOJ00052393, DOJ00016446, DOJ00052306, DOJ00071589, DOJ00078473, DOJ00078471, DOJ00078475

- ████████████████ – DOJ00059495, DOJ67845

- ██████████ – DOJ00078287, DOJ00059484

- ██████████ – DOJ00068553

- ██████████ – DOJ00073287, DOJ00073416, DOJ00057650, DOJ00017731, DOJ00065372, DOJ00073281, DOJ00073283, DOJ00017498, DOJ00017496, DOJ00073279, DOJ00093343, DOJ00093344

- ██████████ – DOJ00077170, DOJ77596, DOJ00077698, DOJ00051777, DOJ00077786, DOJ00077575, DOJ00057659, DOJ0077788, DOJ00076238, DOJ00076240, DOJ00076883, DOJ00076885, DOJ00076879, DOJ00076887, DOJ00077164, DOJ00077169, DOJ00076241, DOJ00076243, DOJ00077558, DOJ00077281, DOJ00077276, DOJ00077283, DOJ00077560, DOJ00077277, DOJ00077166, DOJ00076244, DOJ00077801, DOJ00077802, DOJ00077804, DOJ00077795, DOJ00077806, DOJ00077796, DOJ00077798

- ██████████ – DOJ00048330, DOJ00074940, DOJ00072818, DOJ00072876, DOJ00018850, DOJ00018851, DOJ00090793, DOJ00072817, DOJ00091014, DOJ00091032, DOJ00091080, DOJ00093503

- ██████████ – DOJ00091615, DOJ00092687, DOJ00096290, DOJ00079165, DOJ00091997, DOJ00091797, DOJ00092036, DOJ00091879, DOJ00092837, DOJ00091830, DOJ00091838, DOJ00092808, DOJ00091727, DOJ00092261, DOJ00091676, DOJ00092382, DOJ00092154, DOJ00020076, DOJ00092447, DOJ00092647, DOJ00092056, DOJ00090750, DOJ00090783, DOJ00092148, DOJ00090756, DOJ00079056, DOJ00079162, DOJ00079576, DOJ00079137, DOJ00079053, DOJ00092835, DOJ00093554, DOJ00093676, DOJ00093673, DOJ00093637, DOJ00093697

**APPENDIX A**

---

**DESCRIPTION OF DOCUMENTS UPLOADED TO SHAREFILE FOR
JEFFREY SCHWARTZ BY ROSEN BIEN GALVAN & GRUNFELD LLP,
as of September 24, 2020**

- ███ – DOJ00093145, DOJ00049693, DOJ00090650
- ███ – DOJ00090053, DOJ00050070, DOJ00090224, DOJ00090136, DOJ00090051, DOJ00049805, DOJ00093709, DOJ00093706, DOJ00093704, DOJ00093712
- ███ – DOJ00076342, DOJ00076621, DOJ00076860, DOJ00076256, DOJ00090788, DOJ00091180, DOJ00091391, DOJ00076254, DOJ00076616, DOJ00076428, DOJ00090786, DOJ00091593, DOJ00091606, DOJ00093536, DOJ0009333
- ███ – DOJ00002945, DOJ00078561, DOJ00078555, DOJ00059461, DOJ00068260
- ███ – DOJ00093627, DOJ00093543, DOJ00018431, DOJ00078167, DOJ00078202, DOJ00078086, DOJ00078093
- ███ File – DOJ00016330, DOJ00062548, DOJ00061399
- ███ File – DOJ00006717, DOJ00006735
- ███ File – DOJ0001281
- ███ File – DOJ00064188, DOJ00063554
- ███ File – DOJ00015111, DOJ00015125, DOJ00015174, DOJ00015203
- Audit Inquiry File – DOJ00004803
- ███ File – DOJ00010628, DOJ00010640
- ███ File – DOJ00006831, DOJ00006838
- ███ File 2 – DOJ00006821, DOJ00006828
- ███ File – DOJ00006926, DOJ00006923
- ███ File 2 – DOJ00006758, DOJ00006785, DOJ00006769
- ███ File – DOJ000006786, DOJ00006794
- ███ File – DOJ00002404, DOJ00006942, DOJ00047562, DOJ00002513, DOJ00013863
- ███ File – DOJ00002236
- ███ File – DOJ00061874, DOJ00060462
- ███ File – DOJ00062057, DOJ00060811
- ███ File – DOJ00062002, DOJ00060685
- ███ File – DOJ00012821
- ███ File – DOJ00015227
- ███ File – DOJ00010120, DOJ00010124, DOJ000101249

Declarations of *Armstrong* and *Coleman* class members in support of Plaintiffs' RJD
Motion related to investigations and inquiries into staff misconduct at RJD:

- ███

**APPENDIX A**

| DESCRIPTION OF DOCUMENTS UPLOADED TO SHAREFILE FOR JEFFREY SCHWARTZ BY ROSEN BIEN GALVAN & GRUNFELD LLP, as of September 24, 2020 |
|---|

**APPENDIX A**

| |
|---|
| **DESCRIPTION OF DOCUMENTS UPLOADED TO SHAREFILE FOR JEFFREY SCHWARTZ BY ROSEN BIEN GALVAN & GRUNFELD LLP, from June 3, 2020 through September 23, 2020** |
| Plaintiffs' Motion to Stop Defs from Assaulting, Abusing, Retaliating Against PWD, filed 6-3-2020 at Docket 2948, including Decl. of Gay Grunfeld and unredacted versions of Decls of Freedman, Nolan and Schwartz, filed under seal |
| Reply ISO Motion to Stop Defendants from Assaulting Abusing and Retaliating Against People with Disabilities at RJD, and Unredacted Version of Declaration of Gay Grunfeld in Support, filed 07-29-2020 |
| Defs' Opposition to Pltfs' Motion for a Permanent Injunction Statewide and Objections to Pltfs' Evidence, filed 9-11-20, Docket 3082, and supporting documents including unredacted versions of Declarations of ███████████ , and ███████ , filed under seal, excerpts of Declaration of Matt Cate, filed under seal, excerpts of Declaration of Sino, filed under seal |
| Transcript of Deposition of Amy Miller, taken 05-15-2020 |
| OIG_Semi-Annual_Report_Volume_I_January-June_2016 OIG-Sentinel-Case-No.-20-03, June 15, 2020 |
| OIG-Sentinel-Report-No.-20-04, 08-19-2020<br><br>Documents, audio and video files produced by Defs:<br>DOJ ███ 0001317<br>DOJ ███ 0001318<br>DOJ ███ 0001319<br>DOJ ███ 0001320<br>DOJ ███ 0001321<br>DOJ ███ 0001322<br>DOJ ███ 0001323<br>DOJ ███ 0001326<br>DOJ ███ 0001328<br>DOJ ███ 0001327<br>DOJ ███ 0001329<br>DOJ ███ 0001325<br>DOJ ███ 0001324 |

**APPENDIX A**

| |
|---|
| Documents produced by Defs re OIA Case No. S-LAC-015-19-A:<br>DOJ-LAC0015705 -15707<br>DOJ-LAC0015702 -15704<br>DOJ-LAC0015682 -15701<br>DOJ-LAC0015798 -15833<br>DOJ-LAC0015708 -15797<br>DOJ-LAC0015657 -15670<br>DOJ-LAC0015834 -15909<br>DOJ-LAC0015910 -15954<br>Video file "███ s UOF Interview"<br>Six audio files "████ witness interview", "████ witness interview", "██<br>interview", "███ interview", "Lt ████ interview re ██" and "████ Subject<br>Interview" |
| Documents produced by Defs re Internal Affairs Case S-LAC-1515-19-A:<br>DOJ-LAC00016285 – 16389<br>DOJ-LAC00016104 – 16133<br>DOJ-LAC00016134 – 16146<br>DOJ-LAC00016200 – 16284<br>DOJ-LAC00016147 – 16199<br>DOJ-LAC00016090 – 16103<br>Video file ███ UOF"<br>Audio files DOJ-LAC00020429, DOJ-LAC00020430, DOJ-LAC00020431, DOJ-LAC00020432, DOJ-LAC00020433, DOJ-LAC00020434<br><br>Pltf Letter to OLA re █████ LAC UOF Incident, 03-27-20<br>OLA Non-Class Action Closure Ltr re ████, 06-24-20<br>. |
| Documents produced by Defs re Case 121-20-P:<br>DOJ-LAC00017135 – 17199<br>DOJ-LAC00020327 - 20334 |
| Documents re █████:<br><br>Declaration of █████, 04-27-2020<br><br>Documents produced by Defs re Case No. S-LAC-379-19-A:<br>DOJ-LAC00017112 – 17134<br>DOJ-LAC00016981 – 17109<br>DOJ-LAC00017110 – 17111<br>DOJ-LAC00019521 – 19592 |

**APPENDIX A**

DOJ-LAC00017282 – 17356
DOJ-LAC00017215 – 17281
Audio files " ███ 379-19", "███ 379-19", "███ les 379-19" "CO ███ 379-19", "███", "███", "███", "IM ███ 379-19", "███ 379-19", "███, 379-19", "ISU Interview of ███", "ISU Interview of ███", "ISU Interview of ███", "ISU Interview of ███l", "ISU Interview of S███", "ISU Interview of ███", "ISU Interview of ███", "███, ███", "███", "███, 379-19", "███", "███ 379-19"
Two video files, "███ UOF" and "███ UOF 2"

Pltf Letter to OLA re ███) LAC UOF Incident, 11-04-19

Documents re ███:

Declaration of ███, 05-29-20

Advocacy Letter re ███, DPM, LAC, 08-13-19
Defs Resp to Adv Ltr re ███ 10-25-19
Nolan Letter to OLA re follow up response to ███ Advocacy, 10-30-2019
Nolan Ltr re ███ LAC UOF Incident, 03-27-20
Pltfs May 2019 LAC Monitoring Report, 07-16-2019

Docs produced by Defs:
D0J-LAC00017563 – 17713
D0J-LAC00017624 – 17632
Audio file, 6-11-2020 "███

CDCR EHRS system records including: 6-21-2018 new arrival to STRH, 6-22-2018 7362, 8-10-2019 7362 Nursing, 8-11-2019 7362, 8-7-2019 ASU pre-placement note, 6-18-2018 Med Expiration, 8-14-2019 MHPC note, 7-3-2018 MHPC note, 8-8-2019 note re supplies, 7-1-2018 request for assistance filing 602, 6-1-2019 Telemedicine Officer Visit Note

Documents re ███:

Declaration of ███ (LAC), 05-20-2020

Documents produced by Defs:
DOJ-LAC00018438 – 18447

**APPENDIX A**



DOJ-LAC00018448 – 18504
DOJ-LAC00018527 – 18584
DOJ-LAC00018585 – 18638
DOJ-LAC00018507 – 18518
Audio files "███████, "█████████mb", "███████████", "█████, ████████████████████", "█████████"

Pltfs Ltr to OLA re █████████████ UOF Incident, 11-15-19
Email from Tom Nolan to OLA re Witnesses to UOF Incident Against ███████
█████████ 01-28-20
OLA Non-Class Action Closure Letter re █████████ 06-17-2020

---

Documents re █████████████:

Declaration of █████ (LAC), 05-14-20

Documents produced by Defs:
DOJ-LAC00018965 – 18978
DOJ-LAC00018956 – 18964
DOJ-LAC00018947 – 18955
DOJ-LAC00019003 – 19029
DOJ-LAC00018979 – 19002
Audio files ████████████████ "██████████████████████
████████████████

Pltfs Letter to OLA re ████████████████ LAC UOF Incident, 11-05-19

---

Documents re ████████████████

Declaration of ███████████ re LAC Staff Misconduct, 04-30-2020

Documents produced by Defs:
DOJ-LAC00019730 – 19787
DOJ-LAC00019789 – 19799
Audio files ████████████████████████████
████████████████████████████

Records from CDCR EHRS system: 9-5-2019 note re arrival, 8-26-2019 Initial Health Screening, 8-30-2019 MHMD Intake Assessent, 9-12-2019 MHPC Progress Note, 8-26-2019 Nursing Note, 8-27-2019 Nursing Note, 8-28-2019 Outpatient Progress Note, 8-27-2019 Progress Note, 8-19-2019 SOAPE, 8-30-2019 X-ray notes

**APPENDIX A**

---

Exhibits re ▒ attached Sino Declaration in Opposition filed under seal, numbered DEFS707-777, 9-11-2020

Excerpts from Declaration of Matt Cate in Opposition, 9-11-2010

---

Pltfs Letter to OLA re ▒ ) LAC UOF Incident, 03-27-20

Documents produced by Defs:
DOJ-LAC00017538 – 17548
DOJ-LAC00017360 – 17439
Audio files ▒ Interview, April 2020", "▒ LVN interview"
Video file "▒ UOF"

---

Documents re ▒ :

Declaration of ▒ (LAC), 04-21-20
Declaration of ▒ (LAC), 04-22-20
Declaration of ▒ (LAC), 04-23-20
Declaration of ▒ (LAC), 05-07-2020

Pltfs Letter to OLA re ▒ LAC UOF Incident, 03-27-20
OLA Non Class Action Closure Letter re ▒ 07-02-2020

Documents produced by Defs:
DOJ-LAC00019046 - 19121
DOJ-LAC00019122 – 19132
Video files "▒ " and "▒ "

---

Documents re ▒ :

Declaration of ▒ (LAC), 04-23-20

OLA Acknowledgement of May 2019 LAC AMT Report re staff misconduct, 07-23-19
May 2019 LAC AMT Report - Staff Misconduct Section, 07-16-2019
Pltfs Advocacy Ltr re ▒ , ▒ DPO, LAC, 07-08-2020

Excerpts from Declaration of Matt Cate, filed under seal 9-11-2020

Documents produced by Defs:
DOJ-LAC00019142 – 19175
DOJ-LAC00019176 – 19205
DOJ-LAC00019206 – 19215

---

**APPENDIX A**



Records from CDCR EHRS sytem: 1-17-2019 1845/7410, 12-10-2018 7362, 12-12-2018 DME Progress Note, 12-11-2018 First Medical Responder, 8-23-2018 Return from OTH, 12-11-2018 Man Down Note, 2-25-2019 Neurosurgery Consult, 12-12-2018 Nursing Face-to-Face, 12-13-2018 OutPatient Progress Note, 8-31-2018 Post op note, 12-11-2018 SOAPE, 12-11-2018 X-ray report

Videos "SAC 1" and "SAC 2" produced by Defendants