UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | No. 2:19-cr-00107-KJM |
| Plaintiff, | ORDER |
| v. | |
| Brant Daniel, | |
| Defendant. | |

Defendant Brant Daniel moves to compel the production of information from the government. Some of the information he requests is within the scope of Federal Rule of Criminal Procedure 16(a)(1)(E)(i) and may help him respond if the government later contends he poses a danger to others in the prison, which is a relevant consideration in capital cases. **The motion is therefore granted in part**, as explained in this order.

I. **BACKGROUND**

The government alleges Daniel is a member of the Aryan Brotherhood, a criminal organization of white men in California's prison system. *See* Indictment ¶¶ 3, 20, ECF No. 25. According to an affidavit in the criminal complaint, Daniel and another man used improvised weapons to stab another inmate to death in the fall of 2016. *See* Compl. at 124–27, ECF No. 1. The government alleges Daniel did this to increase his standing in the Aryan Brotherhood.
/////

*Id* at 124. Daniel admitted to the homicide and pled guilty to murder and manslaughter in state court. *See id.* at 127. He is currently detained in California State Prison Sacramento.

In this federal prosecution, the government charges Daniel and several others with a conspiracy to participate in a racketeering enterprise in violation of 18 U.S.C. § 1962(d). Indictment at 23 & ¶¶ 30–32.[1] The current indictment does not include charges that would permit the government to seek the death penalty, *see id.* at 23, and the government has not given notice that it intends to seek the death penalty under the Federal Death Penalty Act, *see* 18 U.S.C. § 3593(a). It has not, however, ruled the death penalty out. The indictment also includes a "Notice of Special Sentencing Factors," which alleges Daniel "did unlawfully, willfully, and intentionally, and with deliberation and premeditation, kill Zachary Scott, with malice aforethought" in violation of California law. Indictment ¶ 42. Given the seriousness of these charges, this case has been treated as a capital case for some time. *See* Order (July 22, 2019), ECF No. 111 (appointing counsel to represent Daniel under 18 U.S.C. § 3005, which requires a court to "promptly" appoint two attorneys, one "learned in the law applicable to capital cases," to represent any person indicted for a capital crime, if that person requests).

After the government brought this case, correctional officers found an improvised weapon in Daniel's cell. Mot. at 6, ECF No. 702. They claimed to have been acting on a tip that Daniel was planning to kill a correctional officer. *Id.* After the weapon was found, prison officials moved Daniel to the psychiatric services unit to keep him away from the officer they alleged he had targeted. *Id.* Daniel denies he planned to kill any officer. He claims the weapon was either (1) planted in his cell as part of an ongoing plot among the prison's officers and other inmates or (2) was indeed his weapon but was only ever intended for self-defense. *See id.* 11–12. Daniel also argues his placement in the psychiatric services unit was part of the officers' conspiracy against him; every other inmate in that unit had been diagnosed with a major disorder, and the noise and stress from confinement in that unit strained Daniel's health, which was already poor. *See id.* at 3, 6–7.

---

[1] Page numbers cited in the indictment refer to the numbers printed at the top right of each page by the CM/ECF system.

In explaining his theories, Daniel claims several correctional officers have been involved in "serious misconduct and criminal offenses, including aiding and abetting inmates in assaulting and killing other inmates," and related coverups. *Id.* at 3; *see also id.* at 4–6. One of the officers allegedly involved in these plots is an officer Daniel refers to as "A.A." *See id.* at 3. This is the same person Daniel allegedly planned to murder. *See id.* at 6. Daniel says this officer has harassed him and has attempted to provoke him by giving confidential information to other inmates, including information about this case and personal letters from Daniel's wife. *See id.* at 3. Daniel also claims the officer has twice come to the psychiatric services unit even though Daniel was transferred to that unit specifically to avoid contact with the officer. *Id.* at 8. This, Daniel says, shows no one in the prison actually believed Daniel was targeting the officer. *See id.* His counsel have also submitted a declaration about their knowledge of claims from a confidential source who may corroborate some of Daniel's claims. *See generally* Balazs & Warriner Decl., ECF No. 764 (under seal).

Daniel sent the government a request for discovery to substantiate these theories. Mot. at 8. The government did not respond, and Daniel has filed this motion. *Id.* He seeks nine categories of information:

1. Any information, documents, memoranda, or evidence indicating that officer A.A. or any other correctional officer may have threatened Daniel, passed on confidential information or documents (including his wife's letters) about Mr. Daniel or his case, or otherwise may have sought or conspired to have Daniel threatened, assaulted, or killed;

2. Any information, documents, memoranda, or evidence that officer A.A. has worked or been in the Psychiatric Services Unit (PSU) *after* Daniel was transferred to that unit for allegedly conspiring to kill officer A.A. The defense believes that officer A.A. has worked or been present on at least two occasions in the PSU after Daniel was transferred there for conspiring to kill A.A.;

3. Any information, documents, memoranda, or evidence that officers may have been complicit in the December 12, 2019 killing of inmate Luis Giovanny Aguilar at CSP-Sacramento by inmates Anthony Rodriguez and Cody Taylor. Rodriguez, Taylor, and Dion Green have been charged with this murder in Sacramento County case no. 20FE00875. This includes a request for the discovery provided to counsel for the defendants in this case, as well as any information tending to show that correctional officers were complicit in the killing, including any videotape evidence and all statements of the defendants or witnesses to investigating agents;

4. Any information, documents, memoranda, or evidence, including discovery and witness statements, related to the killing and acts of misconduct by CSP-Sacramento correctional officers alleged in [two other federal prosecutions];

5. Any information, documents, memoranda, or evidence that correctional officers solicited any CSP-Sacramento inmate to threaten, assault, or kill either Daniel, inmate Green, or any other person and any information, documents, memoranda, or evidence indicating that any officer attempted to cover up any such offenses;

6. Any information, documents, memoranda or evidence that any correctional officer provided or allowed CSP-Sacramento inmates to possess weapons on their person or in their cell and any information, documents, memoranda, or evidence indicating that any officer attempted to cover up such conduct;

7. Any information, documents, memoranda, emails, or evidence about the Warden and CDCR staff's decision to place Daniel in the PSU and to continue to house him there; . . .

8. Any information, documents, memoranda, or evidence of a correctional officer "Green Wall" prison guard gang at CSP-Sacramento, Salinas Valley State Prison where Daniel was previously imprisoned, or any other California correctional institutions; [and]

9. Any information or evidence in the government and CDCR's possession that officers have planted drugs or weapons on inmates at CSP-Sacramento.

Mot. at 9–11 (emphasis in original); Reply at 7–12, ECF No. 769.

The government opposes the request, ECF No. 708, and Daniel has replied, ECF No. 724. The court heard oral arguments by videoconference on March 15, 2021 and permitted Daniel to file a surreply in response to arguments the government offered for the first time at the hearing. *See* Minutes, ECF No. 726; Surreply, ECF No. 729 (discussing *United States v. Fernandez*, 231 F.3d 1240 (9th Cir. 2000), and *United States v. Wilson*, ___ F. Supp. 3d ___, No. 19-00155, 2021 WL 480853 (W.D.N.Y. Feb. 10, 2021)). The court heard further arguments by videoconference on March 29, 2021 and permitted both parties to then file supplemental briefs addressing whether Daniel's requests were "material," and thus discoverable, under Federal Rule of Criminal Procedure 16(a)(1)(E)(i). *See* Minutes, ECF No. 726; Gov't Suppl. Br., ECF No. 765; Def. Suppl. Br., ECF No. 769. The court heard arguments on that question by videoconference on May 3, 2021, then took the matter under submission. *See* Minutes, ECF No. 771.

Daniel argues he is entitled to the discovery he seeks "under the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution, Federal Rule of Criminal Procedure 16, *Brady v.*

4

/////

*Maryland*, 373 U.S. 83 (1963), and its progeny," Mot. at 1–2, but discusses only *Brady* and Rule 16 in his legal memos, so the court addresses those authorities only, beginning with *Brady*.

## II. *BRADY* DISCLOSURES

In *Brady*, the Supreme Court held that in order to ensure "criminal trials are fair," prosecutors must disclose to the defense any "evidence favorable to an accused" that is "material either to guilt or to punishment." 373 U.S. at 87. Evidence is "favorable" if it "would tend to call the government's case into doubt" because it is exculpatory or impeaching. *United States v. Bruce*, 984 F.3d 884, 895 (9th Cir. 2021) (quoting *Milke v. Ryan*, 711 F.3d 998, 1012 (9th Cir. 2013)). Evidence is "material" if there is a "reasonable probability" the result would have been different if that evidence were produced. *Strickler v. Greene*, 527 U.S. 263, 281 (1999). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Because the *Brady* rule is intended to ensure defendants receive a "fair trial" under the Constitution, *id.* at 678, and because "there is never a real '*Brady* violation'" unless nondisclosures undermine confidence in the ultimate outcome, *Strickler*, 527 U.S. at 281, disclosures need only "be made at a time when disclosure would be of value to the accused," *United States v. Gordon*, 844 F.2d 1397, 1403 (9th Cir. 1988) (quoting *United States v. Davenport*, 753 F.2d 1460, 1462 (9th Cir. 1985)). In most cases, this means the prosecution must disclose evidence "in time for it to be of use at trial," which is not necessarily a very long time before the trial. *Fernandez*, 231 F.3d at 1248 n.5 (emphasis omitted). But there are exceptions for "certain pretrial proceedings, such as suppression hearings," when information must be produced sooner. *Id.*

Here, Daniel argues he is entitled to disclosures under *Brady* now because the information he requests would be "of value" to him in persuading the government not to pursue additional charges that carry the possibility of a death penalty and not to seek the death penalty if those charges are filed. Some background about the Justice Department's regulations for capital cases is necessary to explain Daniel's argument.

/////

The Department of Justice has published guidelines "for all Federal cases in which a defendant is charged, or could be charged, with an offense subject to the death penalty." U.S. Dep't of Justice, Justice Manual § 9-10.010.[2] Under these guidelines, the Attorney General is ordinarily the one to decide whether the prosecution will seek the death penalty. *See id.* § 9-10.050. If the prosecution "is contemplating requesting authorization to seek the death penalty," or if the prosecution "otherwise believes it would be useful to the decision-making process to receive a submission from defense counsel," it must "give counsel for the defendant a reasonable opportunity to present information." *Id.* § 9-10.080. And if the prosecution seeks the Attorney General's authorization to pursue the death penalty, Justice Department attorneys will arrange "to meet with defense counsel and representatives of the United States Attorney's Office or Department component to consider the case." *Id.* § 9-10.130. A "Capital Review Committee" then reviews the materials submitted by both the prosecution and defense and makes a recommendation to the Attorney General, who makes a final decision. *Id.*

When prosecutors, the Capital Review Committee, and the Attorney General are deciding whether to seek the death penalty, they must decide "whether the applicable statutory aggravating factors and any non-statutory aggravating factors sufficiently outweigh the applicable mitigating factors to justify a sentence of death." *Id.* § 9-10.140(C). "[T]here must be substantial, admissible, and reliable evidence of the aggravating factors." *Id.* In addition, the Justice Manual permits prosecutors, the Capital Review Committee, and the Attorney General to consider "any legitimate law enforcement or prosecutorial reason that weighs for or against seeking the death penalty" and lists several examples, including "[t]he strength and nature of the evidence" and "[w]hether the defendant has a history of infractions or offenses while incarcerated." *Id.* ¶ 9-10.140(D). Defendants facing potential capital charges have often sought discovery from the

---

[2] https://www.justice.gov/jm/jm-9-10000-capital-crimes, last visited July 1, 2021. The Justice Manual was previously known as the United States Attorneys' Manual, and that name is often used in cases discussing its provisions. *See, e.g.*, *Fernandez*, 231 F.3d at 1243. The portions of the Justice Manual that govern capital cases are often referred to as the "death penalty protocol" or "capital case protocol." *See, e.g.*, *United States v. Shakir*, 113 F. Supp. 2d 1182, 1184 (M.D. Tenn. 2000).

government in advance of the meetings described in these regulations, sometimes citing *Brady*, as Daniel does here. *See, e.g.*, *Fernandez*, 231 F.3d at 1242; *United States v. Pray*, 764 F. Supp. 2d 184, 186 (D.D.C. 2011); *Shakir*, 113 F. Supp. 2d at 1184. That discovery is often referred to as "pre-authorization" discovery. *See, e.g.*, *Wilson*, 2021 WL 480853 at *3.

The Ninth Circuit and Supreme Court have not decided whether the government has any obligation to produce pre-authorization discovery under *Brady*. *See Fernandez*, 231 F.3d at 1248 n.5. District courts have issued conflicting decisions. *Compare, e.g.*, *Wilson*, 2021 WL 480853, at *4–5 (holding *Brady* does not apply), *with, e.g.*, *United States v. Delatorre*, 438 F. Supp. 2d 892, 900 (N.D. Ill. 2006) (holding *Brady* applies), *aff'd sub nom. United States v. Benabe*, 436 F. App'x 639 (7th Cir. 2011) (unpublished). The more persuasive of these decisions hold that *Brady* does not require the government to make pre-authorization disclosures. A defendant's constitutional rights are protected by other procedures that click into place after prosecutors make their charging decisions—including most importantly the trial itself, which was the Supreme Court's focus in *Brady*. *See Wilson*, 2021 WL 480853, at *4 (citing *United States v. McVeigh*, 944 F. Supp. 1478 (D. Colo. 1996)). That conclusion fits squarely within the Ninth Circuit's unambiguous holding in *Fernandez* that the Justice Manual does not establish a defendant's rights, but rather describes how federal prosecutors and the Attorney General go about exercising their discretion. *See* 231 F.3d at 1243, 1246.

The court concludes that *Brady* does not require the government to disclose evidence in time for a pre-authorization presentation by the defense. This conclusion does not foreclose the possibility that it may sometimes be prudent to order "accelerated discovery" of information required by *Brady* so that the defense can review that information before a pre-authorization presentation. *United States v. Ortiz*, No. 12-0119, 2012 WL 5379512, at *4 (N.D. Cal. Oct. 31, 2012). A district court has inherent authority to manage discovery in criminal cases and to ensure the parties can conduct appropriate discovery. *See United States v. W.R. Grace*, 526 F.3d 499, 508–09 (9th Cir.2008). But Daniel has not asked the court to exercise that inherent power here, and the court declines to consider that possibility on its own motion. The court does not order discovery under *Brady*.

## III. RULE 16 REQUESTS

Daniel next argues he is entitled to discovery under Federal Rule of Criminal Procedure 16. Unlike the rights guaranteed by the Supreme Court in *Brady*, the provisions of Rule 16 on which Daniel relies do not expressly rest on his due process rights at trial. Instead they permit a defendant to request any information from the government that is "material to preparing the defense" and "within the government's possession, custody, or control," subject to several exceptions not relevant here. Fed. R. Crim. P. 16(a)(1)(E)(i). If a party does not comply with Rule 16, "the court may: (A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions; (B) grant a continuance; (C) prohibit that party from introducing the undisclosed evidence; or (D) enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2).

### A. Government's Threshold Arguments

The government advances two threshold arguments. It argues first that Rule 16 does not cover information that is material only to sentencing, citing two decisions by the Sixth Circuit. *See* Opp'n at 5 (citing *United States v. Pirosko*, 787 F.3d 358 (6th Cir. 2015), and *United States v. Robinson*, 503 F.3d 522 (6th Cir. 2007)). In both *Pirosko* and *Robinson*, the Sixth Circuit relied on *United States v. Armstrong*, 517 U.S. 456 (1996). In *Armstrong*, the Supreme Court held that the word "defense" in Rule 16(a)(1)(E)(i) means "the defendant's response to the Government's case in chief"—that is, information to be used as a shield. *Id.* at 462. The term does not extend to information to support affirmative arguments "challenging the prosecution's conduct of the case"—that is, information to be used as a sword. *Id.* The Supreme Court held as a result that Rule 16 does not encompass information intended to support defendants' argument that they were wrongfully targeted by the prosecution based on their race. *See id.* Such evidence would be offensive, sword-like evidence rather than defensive, shield-like evidence. *See id.*

*Armstrong, Pirosko* and *Robinson* do not support the government's position here. The information Daniel seeks is not for use in an offensive attack. Rather, it will be used defensively, at least in part, in reaction to sentencing arguments the government might make. *See, e.g.*, Mot. at 12; Reply at 3–4. Moreover, as a Massachusetts District court explained in *United States*

8

*v. Tsarnaev*, a "defense" under Rule 16(a)(1)(E)(i)—that is, the "response to the Government's case in chief," *Armstrong*, 517 U.S. at 462—means something very different in death penalty cases. *See* No. 13-10200, 2013 WL 6196279, at *4 (D. Mass. Nov. 27, 2013). "[S]entencing in a federal death penalty case is unique in that it involves a hearing 'before the jury that determined the defendant's guilt.'" *Id.* (quoting 18 U.S.C. § 3593(b)(1)). "The penalty phase is a part of the bifurcated trial." *Id.* For that reason, in a capital case, evidence about sentencing is, in fact, evidence in response to the government's "case in chief" under *Armstrong*. *Id.* Several federal district courts have accordingly held that Rule 16 covers evidence relevant to the mitigating factors listed in the Federal Death Penalty Act. *See, e.g.*, *Wilson*, 2021 WL 480853, at *6; *Tsarnaev*, 2013 WL 6196279, at *4. This court agrees. Rule 16(a)(1)(E)(i) covers information "material" to preparing a defense against capital punishment.

Timing is the other threshold question the government raises. Can a defendant rely on Rule 16(a)(1)(E)(i) to obtain information from the government for a pre-authorization meeting with the U.S. Attorney or Capital Review Committee? The government argues the answer is "no." Some federal district courts agree. *See Delatorre*, 438 F. Supp. 2d at 899 n.7 (collecting authority). Others do not. *See, e.g., id.* at 899;*Wilson*, 2021 WL 480853, at *6.

*Wilson* is a persuasive example from this second group. In *Wilson*, the defendants had been charged with drug trafficking and murder while engaged in a narcotics conspiracy, among other crimes. *See* 2021 WL 480853, at *1. For some of the defendants, the government had obtained a superseding indictment giving notice of special findings under the Federal Death Penalty Act. *See id.*; *see also* Second Superseding Indictment, *United States v. Cobb*, No. 19-155 (W.D.N.Y. Aug. 26, 2020), ECF No. 106. As a result, the defense scheduled a meeting with the Capital Review Committee. *See* 2021 WL 480853, at *1. Before that meeting, it asked the government to disclose any information it had about the victims' criminal histories and whether any people for whom the government was not seeking the death penalty were equally culpable. *See id.* at *1–2. The district court required the government to disclose information in response to two categories of information the defense requested: (1) the victims' "rap sheets," if any, and (2) information identifying "any individual" who was "equally as culpable" as the defendant in

the murders. *Id.* at *7. This information, the court held, was "material" to preparing a defense under Rule 16(a)(1)(E)(i) because it related to two statutory factors mitigating against the death penalty and a non-statutory factor in the Justice Manual. *See id.* at *6 (citing 18 U.S.C. §§ 3592(a)(4) and (7) and Justice Manual § 9–10.140 D(5)). The court was unpersuaded by the government's arguments about the timing for disclosures under Rule 16. *See id.* "Rule 16 is not expressly tied to a defendant's due process trial rights," the court explained, but rather "materiality." *Id.* And in the context of a potential capital case, "materiality" extended "to a defendant's efforts to convince the [government] not to pursue the death penalty." *Id.*

A decision from the Northern District of Illinois is also persuasive on this point. *See Delatorre*, 438 F. Supp. 2d at 899–900. The defendants in *Delatorre* asked for discovery that would assist them in convincing the United States Attorney and the Attorney General not to authorize the government to seek the death penalty. *See id.* at 899. The court granted this request: "[T]he exigencies of capital litigation compel . . . prompt disclosure of all information which will affect the choice of penalty." *Id.* at 900 (quoting *United States v. Diaz*, No. 05-0167, 2005 WL 1575191, at *10–11 (N.D. Cal. June 30, 2005)). Potential death sentences warrant "especially careful treatment" because "capital punishment is qualitatively different than any other form of punishment." *Id.*

This court agrees with the logic expressed in *Wilson* and *Delatorre*. If a factor is likely to play a role in the government's decision to pursue the death penalty, information about that factor may be "material to preparing the defense" under Rule 16. And the most natural reading of "defense," in the context of a potential capital crime, includes an effort to persuade the government not to seek the defendant's death.

The government disputes this conclusion for three reasons, but none is persuasive. First, it argues a defendant has no right to pre-authorization discovery of any kind because in *Fernandez*, the Ninth Circuit held that the Justice Manual "does not create any substantive or procedural rights, including discovery rights." 231 F.3d at 1240; *see also United States v. Thompson*, No. 10-00325, 2011 WL 782258, at *1 (D. Nev. Feb. 23, 2011) (relying on the same reasoning). In *Fernandez*, however, the Ninth Circuit was not interpreting Rule 16, was not deciding whether

requested information was "material," and was not considering whether a defendant could request "material" information in advance of a presentation to the prosecution. It was deciding whether the defendant could demand specific work product described in the Justice Manual. *See id.* at 1242 (agreeing "Defendants have no right to discover *these documents* . . . ." (emphasis added)). Here, Daniel is not asking for work product. Nor does he request information that would be immaterial but for some Justice Manual provision. He is asking for information that might help him prove he is not dangerous. Danger to others is a justification the government has used in pursuing previous capital cases. *See* Reply at 3–4 (citing *United States v. Mikhel*, 889 F.3d 1003, 1056 (9th Cir. 2018) and *United States v. Stone*, No. 12-0072, 2013 WL 6799119, at *1 (E.D. Cal. Dec. 20, 2013)). Daniel's attorneys are, at least arguably, required to seek this type of information and to do so as soon as possible. "The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover . . . evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting Am. Bar Ass'n, Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) at 93 (1989)). Modern ABA guidelines in fact require counsel to "determine at the earliest possible time what aggravating factors the prosecution will rely on in seeking the death penalty *and what evidence will be offered in support thereof*." *United States v. Karake*, 370 F. Supp. 2d 275, 278 (D.D.C. 2005) (emphasis in original) (quoting ABA Guideline 10.11(A) and 10.11(H)).

Second, the government argues Daniel is not entitled to pre-authorization discovery because the Federal Death Penalty Act is "implicated only if the government has made an authoritative decision to seek the death penalty," which the government has not done here. Gov't Suppl. Br. at 3–4 (quoting *Fernandez*, 231 F.3d at 1243). That argument expands too far on what the court in *Fernandez* actually says. In the passage the government cites, the Ninth Circuit was not explaining when a defendant may seek discovery, but rather when a criminal trial must be bifurcated and when the government must give notice of its intention to seek the death penalty and why. *See* 231 F.3d at 1243 (citing 18 U.S.C. §§ 3593(a)(1), (a)(2), and (b)). Specifically, the court was explaining that a trial will not be bifurcated and the government need not make

11

disclosures before it makes an "authoritative decision to seek the death penalty." *Id.* The materiality of evidence, by contrast, does not depend on the government's final decision. If evidence would disprove an aggravating factor after the government relies on that factor, it would also prove the same point beforehand.

Third, the government argues this case is unlike others in which federal courts have permitted defendants to obtain pre-authorization discovery under Rule 16(a)(1)(E)(i) because here, the indictment includes no charges that carry a possible death sentence. *See, e.g.*, Gov't Suppl. Br. at 2–5, 6. That is a reasonable distinction to draw, but it blinkers the practical realities of this case. The indictment includes a notice of special sentencing factors, which alleges Daniel committed first-degree murder in furtherance of the RICO conspiracy, Indictment ¶ 42, and this case has been treated as a capital case for some time, *see* Order (July 18, 2019) (citing 18 U.S.C. § 3005). The government's position would force Daniel into a Catch-22. He cannot obtain discovery because the government has not filed death-eligible charges, but he cannot attempt to persuade the government not to file death-eligible charges because he does not have discovery. Nor is the intrusion on a prosecutor's discretion a decisive difference between this case and those in which death-eligible charges have been formally charged. The decision to seek a particular sentence is no less an exercise of discretion than the decision to charge.

### B. Materiality

With these threshold disputes resolved, the court turns to the materiality of Daniel's requests. A defendant who requests discovery under Rule 16(a)(1)(E)(i) "must make a prima facie showing of materiality." *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990). This showing has two aspects. First, the defendant must present facts "which would tend to show" the government is in possession of the requested information. *United States v. Muniz-Jaquez*, 718 F.3d 1180, 1183 (9th Cir. 2013) (quoting *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010)). "Neither a general description of the information sought nor conclusory allegations of materiality suffice . . . ." *Mandel*, 924 F.2d at 1219. Second, the requested information must be "helpful to the defense" or "relevant to the development of a possible defense." *Id.* This is a broad standard. "Information that is not exculpatory or impeaching may

still be relevant to developing a possible defense." *Muniz-Jaquez*, 718 F.3d at 1183. Even inculpatory evidence might be "material" under this standard. *Id.* "A defendant who knows that the government has evidence that renders his planned defense useless can alter his trial strategy. Or he can seek a plea agreement instead of going to trial." *Id.*

Here, as in *Wilson*, some of Daniel's requests target "material" information, and others do not. *See* 2021 WL 480853, at *6–7. As Daniel points out, in previous cases, the government has justified its intent to seek the death penalty by arguing that a defendant is likely to be a danger to others in the future. *See* Reply at 3–4 (citing *Mikhel*, 889 F.3d at 1056, and *Stone*, 2013 WL 6799119, at *1). The Justice Manual also counsels attorneys within the Department of Justice to consider whether the defendant "has a history of infractions or offenses while incarcerated" when deciding whether to seek the death penalty. *See* Justice Manual 9-10.140(D)(8). And under the Federal Death Penalty Act, Daniel may present evidence about any factors in his "background, record, or character" that "mitigate against imposition of the death sentence." 18 U.S.C. § 3592(a)(8). Information is therefore "material" under Rule 16(a)(1)(E)(i) if Daniel can make a prima facie showing that it will help him show he poses no danger to others and respond to arguments that he has a history of infractions or offenses.

### 1. First, Fifth, Second, Sixth and Seventh Requests

Daniel has made the necessary prima facie showing of materiality for some of his requests. Daniel's first request seeks information about whether officer "A.A." threatened him, passed confidential information about him and his case to others, or sought to have Daniel threatened, assaulted or killed. Daniel's fifth request is related, at least in part. It seeks similar information about whether officers solicited inmates to threaten, assault, or kill Daniel. These requests target evidence corroborating Daniel's theories that the weapon was either planted in his cell or that he kept it out of fear that he might need to protect himself against an assault. The remainder of Daniel's fifth request does not satisfy the materiality standard of Rule 16(a)(1)(E)(i). It requests information about threats to other inmates "or any other person." Mot. at 10. Information about threats to other inmates would do very little, if anything, to show whether
/////

Daniel is a threat or whether he has a history of infractions, and information about threats to anyone anywhere would be even less useful.

Daniel's second request has a similar anchor. As summarized above, Daniel has been accused of keeping a weapon and planning to kill a correctional officer. He asks for information about whether the officer he allegedly intended to murder later worked in Daniel's new unit even after learning Daniel allegedly intended to kill him. This request targets Daniel's theory that the officer did not take threats from Daniel seriously, which might support Daniel's claim that the charges against him were fabricated.

Daniel has also satisfied his burden to show that portions of his sixth request satisfy the materiality standard. This request asks for information about whether officers permitted other inmates in the prison to possess weapons or attempted to cover up another inmate's weapon possession. *See* Mot. at 11. If they did, this evidence would support Daniel's implicit claim that he was singled out. The request as he has written it, however, is overbroad in both timeframe and location. It sweeps in evidence about any weapons possessed by any inmates anywhere in the prison at any time. *See id.* (referring generally to all "CSP-Sacramento inmates"). The court limits the sixth request to the time of the officers' discovery of a weapon in Daniel's cell and the same cell block.

Portions of the seventh request are also within the scope of Rule 16(a)(1)(E)(i). That request seeks information "about the Warden and CDCR staff's decision to place Daniel in the PSU [psychiatric services unit] and to continue to house him there." Mot. at 11. This request is similar to the second, and the information it requests is material for the same reasons, if limited to the timeframe of Daniel's confinement in that unit.

Daniel has also satisfied his obligation to make a prima facie showing that the requested material is in the government's possession, custody or control. The government is likely to possess information about any dangers Daniel poses to others in the prison system due to the nature of the charges against him and the government's role in his detention. The government does not contend otherwise. His motion is granted with respect to the requests reviewed above, as narrowed.

### 2. Other Requests

The other requests listed in Daniel's motion fall much further afield. They concern different inmates, different officers, and different crimes by people without connections to the conspiracy alleged here. *See, e.g.*, Mot. at 10 (requesting information about whether any officers were complicit in the 2019 death of another inmate at the hands of two other inmates unconnected to the conspiracy). These requests often rely on speculation. *See, e.g.*, Def. Suppl. Br. at 10 (asking for information about whether officers planted drugs and weapons in inmates' cells in CSP-Sacramento). Others relate to events far in the past. *See, e.g.*, Mot. at 4, 11 & n.1 (requesting information about "gang" of correctional officers described in a 2009 book). Daniel has not made the necessary showing for these requests.

## IV. CONCLUSION

**The motion for discovery is granted in part** under Federal Rule of Criminal Procedure 16(a)(1)(E)(i). The government must respond to the following requests for discovery:

**Request No. 1**: Any information, documents, memoranda, or evidence indicating that officer A.A. or any other correctional officer may have threatened Daniel, passed on confidential information or documents (including his wife's letters) about Mr. Daniel or his case, or otherwise may have sought or conspired to have Daniel threatened, assaulted, or killed.

**Request No. 2**: Any information, documents, memoranda, or evidence that officer A.A. has worked or been in the Psychiatric Services Unit (PSU) after Daniel was transferred to that unit for allegedly conspiring to kill officer A.A.

**Request No. 5 as Modified**: Any information, documents, memoranda, or evidence that correctional officers solicited any CSP-Sacramento inmate to threaten, assault, or kill Daniel and any information, documents, memoranda, or evidence indicating that any officer attempted to cover up any such offenses.

**Request No. 6 as Modified**: Any information, documents, memoranda or evidence that any correctional officer provided or allowed CSP-Sacramento inmates in the same cell block to possess weapons on their person or in their cell during the time Daniel was confined in that cell

/////

block and any information, documents, memoranda, or evidence indicating that any officer attempted to cover up such conduct.

**Request No. 7 as Modified**: Any information, documents, memoranda, emails, or evidence about the Warden and CDCR staff's decision to place Daniel in the PSU and to continue to house him there during the time of his confinement in the PSU.

The motion is otherwise **denied.**

This order resolves ECF No. 702.

IT IS SO ORDERED.

DATED: July 2, 2021.

_____
CHIEF UNITED STATES DISTRICT JUDGE